1  GEORGE A. KIMBRELL (*Pro Hac Vice application pending*)
   PAIGE M. TOMASELLI State Bar No. 237737
2  KATERYNA L. RAKOWSKY State Bar No. 246248
   Center for Food Safety
3  2601 Mission St., Suite 803
   San Francisco, CA 94110
4  T: (415) 826-2770 / F: (415) 826-0507
   Emails: gkimbrell@icta.org
5          ptomaselli@icta.org
           kateryna@icta.org
6
7  PAUL H. ACHITOFF (*Pro Hac Vice application pending*)
   Earthjustice
8  223 South King Street, Suite 400
   Honolulu, Hawai'i 96813
9  T: (808) 599-2436 / F: (808) 521-6841
   Email: achitoff@earthjustice.org
10 *Counsel for Plaintiffs*

FILED

SEP 1 0 2010

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

11                    **UNITED STATES DISTRICT COURT**
12            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
                       **SAN FRANCISCO DIVISION**
13

| | |
|---|---|
| 14  CENTER FOR FOOD SAFETY, *et al.*, | ) Case No.: CV 10-4038-SBA |
| 15  Plaintiffs, | ) **NOTICE OF MOTION, MOTION, AND** |
| 16 | ) **MEMORANDUM IN SUPPORT OF** |
|   vs. | ) **MOTION FOR TEMPORARY** |
| 17 | ) **RESTRAINING ORDER AND** |
|   THOMAS J. VILSACK, *et al.*, | ) **PRELIMINARY INJUNCTION** |
| 18 | ) |
|   Defendants. | ) Date: |
| 19 | ) Time: |
| 20 | ) Judge:  Hon. Saundra B. Armstrong |
|   | ) Place:  Courtroom 1, 4th Floor |
| 21 | ) |

22
23
24
25
26
27
28

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... ii

NOTICE OF MOTION AND MOTION FOR A TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION ............................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ......................2

I.    INTRODUCTION ...............................................................................................2

II.   STATEMENT OF FACTS ..................................................................................3

      A.    HISTORY OF THE GE SUGAR BEET LITIGATION...........................3

      B.    APHIS'S PROPOSED PERMITTING AND DEREGULATION OF
            ROUNDUP READY SUGAR BEETS..................................................4

III.  ARGUMENT.....................................................................................................5

      A.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS ...........5

            1.    Defendants' Attempt to Segment the Pre-Flowering Phase of the Seed
                  Crop From the Rest of the Sugar Beet Production Cycle to Circumvent
                  NEPA is Unlawful. ...........................................................................5

                  a.    NEPA prohibits APHIS's segmented approach. ..............6

                  b.    Plaintiffs' claims are consistent with
                        Monsanto Co. v. Geertson Seed Farms. .......................11

            2.    APHIS Unlawfully Seeks to Categorically Exclude The Permits From
                  NEPA Compliance. .........................................................................12

      B.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE
            ABSENCE OF A PRELIMINARY INJUNCTION .............................14

            1.    Evidence Presented to the Sugar Beets I Court, As Well As Its Own
                  Findings, Demonstrates That Irreparable Harm is Likely Absent an
                  Injunction. .....................................................................................14

      C.    THE BALANCE OF HARDSHIPS TIPS SHARPLY IN FAVOR
            OF PLAINTIFFS .............................................................................16

      D.    THE PUBLIC INTEREST FAVORS ISSUANCE OF A
            PRELIMINARY INJUNCTION ........................................................17

IV.   TEMPORARY RESTRAINING ORDER...........................................................17

VI.   CONCLUSION................................................................................................18

## TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009)....................5

*Bob Marshall Alliance v. Hodel,* 852 F.2d 1223 (9th Cir. 1988) ..................................10

*Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988)..........................................10, 11, 16

*Ctr. for Food Safety v. Johanns*, 451 F. Supp. 2d 1165 (D. Haw. 2006).......................13

*International Center For Technology Assessment*, 473 F. Supp. 2d 9 (D.D.C. 2007)...........13, 14

*Jones v. Gordon*, 792 F.2d 821 (9th Cir. 1986) ...........................................................13

*Monsanto Co. v. Geertson Seed Farms, __U.S.__,* 130 S.Ct. 2743 (2010)............................11, 12

*Morgan v. Walter*, 728 F. Supp. 1483 (D. Idaho 1989)..................................................7

*Oregon Natural Resources Council v. U.S. Forest Serv.*, 834 F.2d 842 (9th Cir. 1987) ...............6

*Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768 (9th Cir. 2006) ..................................10

*Save the Yaak Comm. v. Block*, 840 F.2d 714 (9th Cir. 1988).........................................7

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001) ..........................5

*The Steamboaters v. FERC*, 759 F.2d 1382 (9th Cir. 1985).........................................13

*Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985)......................................................7

*Warner Bros., Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120 (2d Cir. 1989)................................17

*West v. Sec'y of Dept. of Transp.*, 206 F.3d 920 (9th Cir. 2000) ....................................13

*Western Land Exchange Project v. U.S. Bureau of Land Management*, 315 F. Supp. 2d
    1068 (D. Nev. 2004) ..........................................................................................7, 8

*Winter v. Natural Res. Def. Council,* 129 S.Ct. 365 (2008)..............................................5

**UNPUBLISHED FEDERAL CASES**

*Alliance for Wild Rockies v. Cottrell*, ___ F.3d ___, 2010 WL 2926463,
    Case No. 09-35756 (9th Cir. 2010)...........................................................................5

*Baykeeper v. U.S. Army Corps of Engineers*, 2006 WL 2711547, Case No. S-06-1908
    (E.D. Cal. Sept. 20, 2006)..................................................................................8, 9

*Center for Food Safety v. Vilsack*, 2010 WL 3222482, Case No. 08-00484 JW (N.D. Cal.
    Aug. 13, 2010) .........................................................................................1, 2, 4

*Center for Food Safety v. Vilsack*, 2009 WL 3047227, Case No. 08-00484 JW
    (N.D. Cal. Sept. 21, 2009) ........................................................................3, 4, 9, 14, 15

1

2
*Greater Yellowstone Coal. v. Timchak*, 2009 WL 971474, Case No. 08-36018
    (9th Cir. 2009)..................................................................................................................5

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Page

**UNPUBLISHED FEDERAL CASES (Cont.)**

*Center for Food Safety v. Schafer*, 2010 WL 964017, Case No. 08-00484 JW (N.D. Cal.
    Mar. 16, 2010)...............................................................................................14, 15, 16

**UNITED STATES CODE**

5 U.S.C. § 706................................................................................................................2
42 U.S.C. § 4321............................................................................................................2
42 U.S.C. § 4332..........................................................................................................13
42 U.S.C. § 4332(2)(C)..................................................................................................6
42 U.S.C. § 4332(2)(C)(iii)..........................................................................................10

**CODE OF FEDERAL REGULATIONS**

7 C.F.R. § 340.0(a).........................................................................................................3
7 C.F.R. § 340.1.............................................................................................................3
7 C.F.R. § 340.2(a).........................................................................................................3
7 C.F.R. § 372.5(b)(5)(i)..............................................................................................12
7 C.F.R. § 372.5(c)(3)(ii).............................................................................................12
7 C.F.R. § 372.5(d)......................................................................................................12
7 C.F.R. § 372.5(d)(1)..................................................................................................12
7 C.F.R. § 372.5(d)(4).............................................................................................12, 14
40 C.F.R. § 1502.4(a).....................................................................................................6
40 C.F.R. § 1502.14.....................................................................................................10
40 C.F.R. § 1508.4..................................................................................................12, 13
40 C.F.R. § 1508.25(a)(1)..............................................................................................6

**FEDERAL REGISTER**

70 Fed. Reg. 13007 (Mar. 17, 2005)..............................................................................3

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 65(b)..................................................................................................1, 17

**LEGISLATIVE HISTORY**

Pub. L. No. 110-246, Tit. X § 10204, 122 Stat. 1651 (2008)......................................16

## NOTICE OF MOTION AND MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs Center for Food Safety, Organic Seed Alliance, Sierra Club, and High Mowing Organic Seeds ("Plaintiffs") hereby move for a temporary restraining order ("TRO") and preliminary injunction. This motion is being filed in the above-captioned case, and a hearing date has not yet been set. Pursuant to Fed. R. Civ. P. 65(b), notice to Defendants was provided through service of a copy of this motion and all supporting papers on this day by electronic mail and/or fax. Plaintiffs request that this Court immediately issue a temporary restraining order enjoining the United States Department of Agriculture ("USDA") from issuing permits to producers of Roundup Ready ("RR") sugar beet seed, authorizing seedling production this fall ("the Permits") and all actions based on the permits, until this Court has decided Plaintiffs' pending request for a preliminary injunction. Plaintiffs also request that this Court issue an injunction prohibiting USDA from issuing the permits and prohibiting further planting, processing or selling of RR sugar beets (aside from such activity as authorized by the August 13, 2010 Order in *Center for Food Safety v. Vilsack*, 2010 WL 3222482, Case No. 08-00484 JW (N.D. Cal. Aug. 13, 2010)) until this Court has issued a decision on the merits of Plaintiffs' claims.

These motions are based upon the Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, the Declarations and Exhibits accompanying the Motion, the pleadings, the record, and any other evidence or argument as may be presented at any hearing on these motions.

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## I.    INTRODUCTION

Plaintiffs request that this Court issue a temporary restraining order and subsequently a preliminary injunction prohibiting USDA from further issuing permits to sugar beet seed producers, authorizing seedling production this fall. Last month, United States District Court Judge Jeffery S. White vacated APHIS's deregulation of RR sugar beets ("RRSB"). *Ctr. for Food Safety v. Vilsack*, 2010 WL 3222482, Case No. 08-00484 (N.D. Cal. Aug. 13, 2010) (*"Sugar Beets I"*). Judge White's vacatur prohibited all future RRSB production, pending APHIS's preparation of an Environmental Impact Statement ("EIS"), because the impact of such production risks immediate and irreparable harm to important environmental and socio-economic interests. Mere weeks later, USDA has begun issuing permits allowing the continued planting of RRSB without any analysis of environmental impacts whatsoever. This action, currently on-going, will cause the identical irreparable harms considered in *Sugar Beets I*, harms that necessitated the preparation of an EIS before RRSB could be lawfully deregulated. Further attempting to circumvent judicial review, USDA announced—in the same press release in which it disclosed its intent to authorize planting—that the permitting process would be completed within two weeks, by September 15, 2010.

Plaintiffs now must return to federal court to ensure APHIS's compliance with the law and Judge White's Order. Plaintiffs are likely to prevail on their claim that USDA is once again violating the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, for two reasons: 1) USDA's issuance of the permits without prior assessment of the impacts of the entire sugar beet production cycle constitutes unlawful "segmentation" of the production cycle and expressly violates NEPA; and 2) USDA's attempt to avoid NEPA compliance by invoking a categorical exclusion violates its own regulations, which require preparation of at least an Environmental Assessment, and potentially an EIS, in these circumstances. Established law requires that before APHIS may allow any planting of RRSB, it must assess the environmental and associated socioeconomic

1  impacts of not only the pre-flowering phase of the seed crop—the first stage of sugar beet
2  production—but also the impacts of the inevitable and intended subsequent stages, including
3  flowering, seed production and harvesting, transport, and processing, and sugar beet planting,
4  production, transport and processing. USDA's issuance of permits to RRSB seed producers to
5  authorize seedling production this fall is not in accordance with law and therefore, this Court
6  should issue a TRO and preliminary injunction to prevent immediate and irreparable harm to
7  Plaintiffs' agricultural, environmental, and socio-economic interests.

8  **II.    STATEMENT OF FACTS**

9       USDA, through the Animal and Plant Health Inspection Service ("APHIS"), proposes a
10  drastic and unprecedented departure from its standard operating procedures for deregulating and
11  permitting genetically engineered ("GE") crops. In so doing, the agency disregards not only a
12  district court ruling made less than four weeks ago, but also established law, in the form of
13  NEPA and the APA.

14      **A. HISTORY OF THE GE SUGAR BEET LITIGATION**

15      The RRSB at issue in this case, known as "Event H7-1," was engineered by Monsanto
16  Company and the German corporation KWS SAAT AG ("KWS") to include a gene from
17  *Agrobacterium* that confers tolerance to glyphosate, the active ingredient in Monsanto's
18  Roundup herbicide, making them "Roundup Ready." Tomaselli Decl. Ex. X. Because
19  regulations adopted by APHIS pursuant to the PPA list *Agrobacterium* as a "plant pest," 7 C.F.R.
20  § 340.2(a), RRSB qualifies as a "regulated article" and cannot be introduced into the
21  environment without approval from APHIS. 7 C.F.R. §§ 340.0(a), 340.1. Monsanto and KWS
22  therefore petitioned APHIS to deregulate RRSB.

23      APHIS and USDA prepared an Environmental Assessment ("EA") and a Finding of No
24  Significant Impact ("FONSI") and unconditionally deregulated RRSB. 70 Fed. Reg. 13007,
25  13008 (Mar. 17, 2005). Plaintiffs brought suit under NEPA and the APA, alleging that APHIS's
26  EA was inadequate and that its FONSI was arbitrary and capricious. *Ctr. for Food Safety v.*
27  *Connor*, No. C 08-00484 (N.D. Cal. Jan. 17, 2008) ("*Sugar Beets I* Complaint").

28

On September 21, 2009, Judge White granted Plaintiffs' motion for summary judgment. *Ctr. for Food Safety v. Vilsack*, 2009 WL 3047227 at *9 (N.D. Cal. Sept. 21, 2009) ("*Sugar Beets I* Summary Judgement Order"). The court concluded that growing RRSB has the potential to injure Plaintiffs and the public in a number of ways, including by contaminating non-GE crops and eliminating farmers, vendors, and consumers' choice to grow, sell, and consume non-GE food, and by promoting the proliferation of Roundup-resistant "superweeds," which requires farmers to use greater amounts of more toxic pesticides. *Id.* The court determined that APHIS had violated NEPA by failing to prepare an EIS before deregulating RRSB and allowing their commercial use. *Id.* On August 13, 2010, Judge White vacated APHIS's deregulation of RRSB, making the planting of these beets after the date of the order illegal. *Ctr. for Food Safety v. Vilsack*, 2010 WL 3222482, at *5 (N.D. Cal. Aug. 13, 2010) ("*Sugar Beets I* Remedies Order").

## B. APHIS'S PROPOSED PERMITTING AND DEREGULATION OF ROUNDUP READY SUGAR BEETS

On September 1, 2010, APHIS, in a flagrant attempt to allow the sugar beet industry to circumvent the court's ruling and continue planting RRSB without any environmental review, announced it was issuing permits to authorize the planting of RRSB seedlings (or "stecklings") this fall, under permit conditions that "would not allow the flowering of the stecklings" until 2011. Press Release, USDA, Release No. 0437.10: USDA Announces Next Steps on Sugar Beets (Sept. 1, 2010), *available at* http://usda.gov/wps/portal/usda/usdahome?contentidonly=true&contentid=2010/09/0437.xml ("USDA Release"). This unprecedented permitting of a commercially-grown GE crop was initiated without conducting a deregulation process, without public notice and comment, and without analysis of environmental impacts. APHIS also announced that it had received and was evaluating, separately from the permits, a request for partial deregulation of RRSB. *Id.* No evaluation of the impacts of that request has yet been made.

APHIS, by arbitrarily defining the scope of the action it is authorizing as the "pre-flowering phase" of the RRSB seed crop, is attempting to permit precisely what Judge White prohibited by vacating APHIS's deregulation of the crop and mandating preparation of an EIS. APHIS's

1 | issuance of the permits is unlawful and must be enjoined.

2 | **III.   ARGUMENT**

3 | Plaintiffs satisfy the four factors that a district court must consider when deciding

4 | whether to grant a preliminary injunction. "A plaintiff seeking a preliminary injunction must

5 | establish that he is [1] likely to succeed on the merits, [2] that he is likely to suffer irreparable

6 | harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4]

7 | that an injunction is in the public interest." *Am. Trucking Ass'ns v. City of Los Angeles,* 559 F.3d

8 | 1046, 1052 (9th Cir. 2009) (citing *Winter v. Natural Res. Def. Council,* 555 U.S. ___, 129 S. Ct.

9 | 365, 374 (2008)). *Winter* did not disturb the Ninth Circuit's alternative formulation of the

10 | preliminary injunction standard, the "sliding scale" approach, which allows relief where "serious

11 | questions [going to the merits] are raised and the balance of hardships tips sharply in [the

12 | plaintiff's] favor." *See Greater Yellowstone Coal. v. Timchak,* 2009 WL 971474, at *1 & n. 1

13 | (9th Cir. 2009) (noting continued viability of alternative formulation); *see also Alliance for Wild*

14 | *Rockies v. Cottrell,* ___ F.3d ___, 2010 WL 2926463, at *6-*7 (9th Cir. 2010) (holding that the

15 | "serious questions" version of the sliding scale test for preliminary injunctions remains viable

16 | after the Supreme Court's decision in *Winter*); *id.* at *4 ("This circuit has adopted and applied a

17 | version of the sliding scale approach under which a preliminary injunction could issue where the

18 | likelihood of success is such that 'serious questions going to the merits were raised and the

19 | balance of hardships tips sharply in [plaintiff's] favor.'"); *id.* ("Under this approach, the elements

20 | of the preliminary injunction test are balanced, so that a stronger showing of one element may

21 | offset a weaker showing of another.")  The same standard governs temporary restraining orders.

22 | *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,* 240 F.3d 832, 839 n.7 (9th Cir. 2001).

23 | **A. PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS.**

24 |
25 | **1. Defendants' Attempt to Segment the Pre-Flowering Phase of the Seed Crop From the Rest of the Sugar Beet Production Cycle to Circumvent NEPA is Unlawful.**

26 | As noted, this Court previously determined that an EIS must be prepared before RRSB is

27 | deregulated and further RRSB production occurs, and vacated Defendants' deregulation of the

28 |

1   genetically engineered variety. Defendants seek to circumvent both rulings by pretending that
2   the pre-flowering phase of seed production is a stand-alone action, severable from the remaining
3   phases of RRSB production, and has no environmental impacts.[1] This ploy ignores settled
4   NEPA jurisprudence. Defendants must first assess the environmental impacts of not merely the
5   pre-flowering phase of seed production, but all the other aspects of the sugar beet production
6   cycle that are not only *foreseeable* from, but *intended* by, the seed crop plantings: flowering,
7   pollination, and harvest of the seed crop, and use of the seed crop for planting the RR sugar beet
8   crop. The impacts of this sugar beet production cycle are precisely those that the court
9   determined will likely injure Plaintiffs and the public interest and the reason prior preparation of
10  an EIS was mandated.

### a. *NEPA prohibits APHIS's segmented approach*

12          NEPA requires an EIS for "major Federal actions significantly affecting the quality of the
13  human environment." 42 U.S.C. § 4332(2)(C). An agency may not circumvent NEPA's
14  effective application by slicing up a project into multiple "actions," each of which individually
15  has an insignificant environmental impact, but which collectively have a substantial impact.
16  Such "segmenting"—precisely what APHIS is currently attempting—is prohibited.

17          The Council on Environmental Quality's regulations require "connected actions" to be
18  considered together in a single EIS.[2] "Connected actions" are defined as actions that:

19          (i) Automatically trigger other actions which may require environmental impact
            statements.
20          (ii) Cannot or will not proceed unless other actions are taken previously or
            simultaneously.
21          (iii) Are interdependent parts of a larger action and depend on the larger action for
            their justification.
22

23  40 C.F.R. § 1508.25(a)(1). *See also* 40 C.F.R. § 1502.4(a) ("Proposals or parts of proposals

24  _____
    [1]  Although Defendants may intend to pursue a partial deregulation in the future, preceded by
25       an EA or EIS, no such partial deregulation has occurred, and no such NEPA analysis has
         been prepared.
26  [2]  The CEQ regulations are binding on all federal agencies and provide guidance to the courts
         for interpreting NEPA requirements. *See, e.g., Oregon Natural Resources Council v. U.S.
27       Forest Serv.*, 834 F.2d 842, 847 n.5 (9th Cir. 1987).
28

which are related to each other closely enough to be, in effect, a single course of action *shall be evaluated in a single impact statement.*") (emphasis added).

In *Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985), the Forest Service proposed to construct a gravel road to provide access to an area slated for development for timber extraction. The Agency prepared an EA assessing the impacts of the road itself, but not the impacts of the timber sales that the road was designed to facilitate. Finding the impacts of the road itself trivial, the agency issued a Finding of No Significant Impact ("FONSI"). Granting summary judgment for the agency, the district court was "unable to find that the decision to build the road in question is anything more than a decision to build a forest road," and that an EIS covering both the road and the timber sales "would require needless speculation." *Id.* at 757.

Reversing, the Ninth Circuit found the road construction and the contemplated timber sales inextricably intertwined and "connected actions." *Id.* at 759. "It is clear that the timber sales cannot proceed without the road, and the road would not be built but for the contemplated timber sales." *Id.* at 758. The court concluded, "[I]t would be irrational to build the road and then not sell the timber to which the road was built to provide access." *Id.* at 759 (citation omitted); *see also Save the Yaak Comm. v. Block*, 840 F.2d 714, 720 (9th Cir. 1988) ("The road reconstruction, timber harvest, and feeder roads are all 'connected actions' that must be analyzed by the Forest Service in deciding whether to prepare an EIS or only an EA."); *id.* (where it would be "irrational, or at least unwise" to undertake one action without subsequent actions, the actions are connected) (citation omitted); *Morgan v. Walter*, 728 F. Supp. 1483, 1493 (D. Idaho 1989) (enjoining construction of stream diversion without prior analysis of proposed fish propagation facility that the stream diversion was designed to facilitate; the two were "links in the same bit of chain.").

Similarly, in *Western Land Exchange Project v. U.S. Bureau of Land Management*, 315

F. Supp. 2d 1068 (D. Nev. 2004), the BLM proposed to privatize certain federal lands to allow expansion of nearby municipalities, and issued an EA and FONSI in connection with its auction of the lands. BLM argued that the mere transfer of title "works no change in the environmental status quo and therefore cannot have a significant impact," that any further analysis of environmental impacts could be deferred until specific developments were proposed, and that the land disposal was not "connected" to any future development. *Id.* at 1088. The privatization of the lands had "independent utility" because it would immediately place the property on the county's "private property tax rolls, whether developed or not." *Id.* at 1089.

The court rejected each argument and enjoined sale of the lands pending preparation of an EIS addressing the impacts of not merely the sale of the lands but their foreseeable development. It noted, "[i]t is highly likely, if not reasonably certain, that BLM fully expected land use on the ... lands to change as a result of privatization." *Id.* at 1089. Dismissing the argument that privatization had "independent utility," the court observed: "[T]here is no way that the two projects 'would have taken place with or without the other.'" *Id.* at 1090 (citation omitted).

*Baykeeper v. U.S. Army Corps of Engineers*, 2006 WL 2711547 (E.D. Cal. Sept. 20, 2006), in which the court enjoined the U.S. Army Corps' attempt to permit certain dredging without considering the impacts of the port development the dredging would facilitate, is instructive. Rejecting the argument that the dredging had "independent utility," the court found "NEPA simply prohibits this justification for segmentation" *id.* at *10, and issued a preliminary injunction. Notably, the *Baykeeper* court also was "troubled by the obvious haste with which the Corps permitted the Dredging Activities," and how the project had "abruptly changed course," been truncated, and became a "water quality demonstration project." *Id.* It noted:

> This sudden turn of events should have served as a red-flag to the Corps or any federal agency. Instead, the Corps, according to its counsel 'jumped on the application,'[and]

without comment or review from the other previously involved federal agencies, the Corps issued the EA/FONSI and Permit within three weeks of the application.

*Id.* The court observed: "'[M]anipulation of a project design to conform to a concept of independent utility, particularly with the intention that a permit be expedited, undermines the underlying purposes of NEPA.'" *Id.* at *11 (citation omitted).

This is exactly what is occurring in this case. After the *Sugar Beets I* court vacated APHIS's deregulation and ordered preparation of an EIS, APHIS is allowing the industry to continue without interruption; rushed to issue permits without environmental review, purportedly for only the pre-flowering phase of RRSB seed crop seedlings. Although the industry could plant conventional sugar beet seed, it prefers not to. And although planting could await an attempted partial deregulation accompanied by a proper NEPA analysis, the industry prefers not to. APHIS therefore seeks to bypass the entire deregulation process, and concomitant NEPA review, by segmenting the pre-flowering phase of the process and declaring it will have no impacts. [3]

APHIS suggests no analysis is required because the seedlings will not flower until after APHIS prepares an EA or EIS. But as APHIS well knows, a seed crop that does not flower not only has no independent utility, *it has no utility whatsoever*. The *only* purpose of this crop is to produce seed, which requires that the plants flower and cross-pollinate, creating risks of contamination the *Sugar Beets I* court has already declared requires prior preparation of an EIS. *Sugar Beets I* Summary Judgement Order, at *9. The pre-flowering stecklings and the flowering, seed-producing plants they will inevitably become are not merely "links in the same bit of chain"—they are the *same link*. And the only purpose of producing RRSB seed is to allow

---

[3] APHIS further seeks to circumvent the *Sugar Beets I* court's ruling by misusing the PPA field trial permitting process which is intended for experimental field trials, not to create seed stock to be used commercially.

1   planting of an RRSB root crop—the other links in the chain.

2       Authorizing this planting falls squarely within the prohibition on segmentation. It would

3   be irrational to plant the stecklings and then not allow them to flower and produce seed, or for

4   that matter, to produce the seed and not grow sugar beets. APHIS cannot segment the seed crop

5   into pre-flowering and flowering segments, or segment it from the rest of the sugar beet growing

6   cycle. APHIS must analyze the impacts of the entire cycle in the EIS the *Sugar Beets I* court

7   required, before the first step in the cycle of seed, beet, and sugar production is taken.

8

9       APHIS suggests it intends to issue at least an EA before the plants flower. Yet, such a

10  belated analysis cannot cure APHIS's failure to perform the required analysis now. As the Ninth

11  Circuit emphasized in *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768 (9th Cir. 2006), NEPA

12  requires an EIS to assess "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii). The

13  "alternatives" section is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14.

14  "The consideration of alternatives requirement ... guarantee[s] that agency decisionmakers have

15  before them and take into proper account all possible approaches to a particular project

16  (*including total abandonment of the project*) which would alter the environmental impact and the

17  cost-benefit balance." *Pit River Tribe*, 469 F.3d at 785 (quoting *Bob Marshall Alliance v. Hodel*,

18  852 F.2d 1223, 1228 (9th Cir.1988) (internal quotation marks, punctuation, and citation omitted)

19  (emphasis in original)). Given that "'[t]he purpose of an EIS is to apprise decisionmakers of the

20  disruptive environmental effects that may flow from their decisions at a time when they retain a

21  maximum range of options,'" "we have repeatedly held that dilatory or ex post facto

22  environmental review cannot cure an initial failure to undertake environmental review." *Id.*

23  (quoting *Conner v. Burford,* 848 F.2d 1441, 1446 (9th Cir.1988) (internal quotation marks,

24  punctuation, and citation omitted)).

25

26       Once RRSB seed is planted, APHIS can no longer meaningfully assess the impacts of the

27

28

"no action" alternative of not allowing RR sugar beet production at all. This is exactly the point

of APHIS's action now: *By hastily planting RRSB seed-producing stecklings, rather than*

*conventional stecklings, APHIS and the industry hope to eliminate any practical possibility of*

*growing conventional sugar beets again, before APHIS has prepared so much as an EA, let*

*alone the EIS the Sugar Beets I court ordered.* "By relinquishing the 'no action' alternative

without the preparation of an EIS, the government subverts NEPA's goal of insuring that federal

agencies infuse in project planning a thorough consideration of environmental values." *Conner*,

848 F.2d at 1451. It begs credulity to suppose APHIS will in a few months demand that the

industry destroy the seed crop APHIS is now authorizing with its permits. APHIS's approach

makes a mockery of the NEPA process.

> **b.** ***Plaintiffs' claims are consistent with Monsanto Co. v. Geertson Seed Farms.***

Enjoining APHIS's attempt to circumvent NEPA is entirely consistent with the Supreme

Court's recent decision in *Monsanto Co. v. Geertson Seed Farms*, __U.S.__, 130 S.Ct. 2743

(2010). The *Monsanto* Court reversed a district court injunction precluding APHIS from

attempting to partially deregulate GE alfalfa. Plaintiffs do not ask this Court to preclude APHIS

from proposing a partial deregulation, but seek only to prevent APHIS from implementing such

action prior to compliance with NEPA and other applicable laws. The *Monsanto* decision fully

supports Plaintiffs, as the Court predicated its analysis on the conclusion that APHIS would

comply with all procedures, including NEPA, and that the public would have an opportunity to

challenge any such proposal. *E.g.*, *Monsanto*, 130 S.Ct. at 2758 ("If the agency found, on the

basis of a new EA, that a limited and temporary deregulation satisfied applicable statutory and

regulatory requirements, it could proceed .... If and when the agency were to issue a partial

deregulation order, any party aggrieved by that order could bring a separate suit under the

Administrative Procedure Act to challenge the particular deregulation attempted."); ("[W]e also

know that any party aggrieved by a hypothetical future deregulation decision will have ample
opportunity to challenge it, and to seek appropriate preliminary relief, if and when such a
decision is made."). Further, the Court did not address the question of whether any such interim
measures would themselves require an EIS. *Id.* at 2761 ("If APHIS may partially deregulate
[Roundup Ready alfalfa] before preparing a full-blown EIS—a question that we need not and do
not decide here ...."). Finally, the Court did not sanction a scenario such as the one proposed
here, where APHIS has authorized commercial planting to continue, using measures short of a
partial deregulation.

### 2. APHIS Unlawfully Seeks to Categorically Exclude The Permits From NEPA Compliance.

Although NEPA allows agencies to adopt regulations excluding specific types of actions
from the need to prepare an EA, such exclusions are designed for routine activities that the
agency may confidently assume will not have significant environmental impacts, 40 C.F.R. §
1508.4. While APHIS's regulations generally require EA preparation for field trials of new GE
crop varieties, 7 C.F.R. § 372.5(b)(5)(i), APHIS's categorical exclusions include "[p]ermitting
... confined field releases of genetically engineered organisms and products." *Id.* §
372.5(c)(3)(ii). APHIS presumably supposes that because the stecklings will not flower until
next spring, they are, for the time being, "confined," and therefore categorically excluded from
further NEPA analysis under this provision. Of course, there is nothing "routine" about what
APHIS is doing. It is unprecedented. The whole purpose of planting the seed crop is to allow
the plants to flower and create seed on thousands of acres that are anything but "confined."
APHIS has never attempted a partial deregulation for *any* GE crop, let alone attempted to use its
field trial permitting scheme unlawfully to allow commercial planting.

Notwithstanding an agency's categorical exclusion, an EIS is still required for any action
that may have a significant effect on the environment. A categorical exclusion, by definition,

can only apply to an action that cannot have such effect. 40 C.F.R. § 1508.4; 42 U.S.C. § 4332.

Thus, any regulation adopting a categorical exclusion must provide exceptions for excluded

actions that may have significant environmental effects. 40 C.F.R. § 1508.4; *Jones v. Gordon*,

792 F.2d 821, 827 (9th Cir. 1986). APHIS's regulations include a list of nonexhaustive

"exceptions for categorically excluded actions" that require preparation of an EA or EIS for any

otherwise categorically excluded activities that may potentially significantly affect the

environment. 7 C.F.R. § 372.5(d). One relevant exception provides:

> When any routine measure, the incremental impact of which, when
> added to other past, present, *and reasonably foreseeable future
> actions* (regardless of what agency or person undertakes such
> actions), has the potential for significant environmental impact.

*Id.*, § 372.5(d)(1).

When an agency decides to proceed with an action in the absence of an EA or EIS under

a categorical exclusion, the agency must adequately explain its decision, *Jones*, 792 F.2d at 828,

and "supply a convincing statement of reasons why potential effects are insignificant." *The

Steamboaters v. FERC*, 759 F.2d 1382, 1393 (9th Cir. 1985)). Failure to carry this burden

violates NEPA. *West v. Sec'y of Dept. of Transp.*, 206 F.3d 920, 928-29 (9th Cir. 2000); *Jones*,

792 F.2d at 828. Courts have repeatedly rejected APHIS's creative attempts to use categorical

exclusions to avoid NEPA compliance when authorizing GE crops have been rejected

repeatedly. *See Int'l Ctr. for Tech. Assessment v. Johanns*, 473 F. Supp. 2d 9, 29-30 (D.D.C.

2007); *Ctr. for Food Safety v. Johanns*, 451 F. Supp. 2d 1165, 1184-85 (D. Haw. 2006).

APHIS cannot explain away 7 C.F.R. § 372.5(d)(1), the exception to the categorical

exclusion for actions that may have a significant impact. The Agency must look beyond the pre-

flowering phase of seed planting and examine the impacts of what it actually seeks to do:

authorize RRSB production. The stecklings' inevitable—and intended—flowering, will not be

"confined" under any reasonable interpretation of that word. Nor will the subsequent seed

harvest, transport, and processing, nor the planting of sugar beets; nor will the sowing, harvest,

transport, and processing of the sugar beets be confined. The categorical exclusion cannot be

1  used to insulate one small segment of a series of connected actions from environmental review.

2  APHIS's regulations' non-exhaustive list of otherwise categorically excluded actions

3  warranting EA/EIS preparation also includes "[w]hen a confined field release of genetically

4  engineered organisms or products involves new species or organisms or novel modifications that

5  raise new issues." 7 C.F.R. § 372.5(d)(4). Here, the *Sugar Beets I* court has already ruled that

6  APHIS's approval of RRSB was arbitrary and capricious and that the agency must prepare an

7  EIS that will analyze potential significant impacts to farmers and the environment, such as crop

8  contamination and the creation of superweeds. *Sugar Beets I* Summary Judgement Order, at \*9.

9  These are new issues for APHIS: APHIS has never completed an EIS for *any* crop analyzing

10  these issues, let alone analyzed them specifically for RRSB.

11  Further, in holding that APHIS's attempted categorical exclusion for field trials of GE

12  bentgrass was arbitrary and capricious, the court in *International Center For Technology*

13  *Assessment v. Johanns* held that both the size of a proposed field trial and its potential to raise

14  new issues must be analyzed and can require at least an EA. 473 F. Supp. 2d 9, 30 n.22 ("On

15  remand, any consideration of the application of § 372.5(d)(4) to an otherwise-exempt field test

16  should consider the impact of the test's size on (1) the test's capacity to affect the environment

17  and/or on (2) the test's presentation of "new issues" warranting consideration of EA

18  preparation."). That court noted that APHIS has "repeatedly described" the categorical exclusion

19  "as applying only to 'small-scale' field tests," and that "scale" of an action "should be relevant

20  [to the exception] lest APHIS own statements regarding scale be rendered meaningless." *Id.* at

21  30.

22  **B. PLAINTIFFS WILL SUFFER IMMEDIATE AND IRREPARABLE HARM IN**
   **THE ABSENCE OF A PRELIMINARY INJUNCTION**
23

24  **1. Evidence Presented to the *Sugar Beets I* Court, As Well As This Court's**
   **Own Findings, Demonstrates That Irreparable Harm is Likely Absent an**
25  **Injunction.**

26  *Sugar Beets I* established that irreparable harm is sufficiently likely should planting

27  continue has already been established in *Sugar Beets I. Sugar Beets I* Remedies Order at \*2

28  ("[T]he Court also finds that Plaintiffs have demonstrated a likelihood of irreparable harm.").

1    APHIS has done *nothing* since that determination to alter the facts upon which this Court made

2    its finding, beyond arbitrarily segmenting the pre-flowering phase of seed production from the

3    rest of the production cycle. APHIS's fast-tracked permits have no new NEPA compliance or

4    record documentation to establish that Plaintiffs will not be irreparably harmed.

5         In its Order granting Plaintiffs' motion for summary judgment, the *Sugar Beets I* court

6    focused on RRSBs' potential for the "elimination of [a] farmer's choice to grow non-genetically

7    engineered crops, or a consumer's choice to eat non-genetically engineered food." *Sugar Beets I*

8    Summary Judgment Order at *9. This Court also found that, with regard to RRSB

9    contamination, "the fact that *it already did happen* demonstrates that, based on human error,

10   genetically engineered sugar beets may not be contained and may contaminate conventional

11   sugar beets, Swiss chard, or table beets." *Ctr. for Food Safety v. Schafer*, 2010 WL 964017, at

12   *2 (N.D. Cal. Mar. 16, 2010) (emphasis added). Despite APHIS's and industry's assurances of

13   containment, the question is not *if* further and more widespread contamination will occur, but

14   *when* such contamination will occur.

15        Ample additional evidence of past contamination by RRSB, uncovered since Judge

16   White's March 2010 ruling, abounds in *Sugar Beet I* declarations and exhibits.[4] While heavily

17   redacted, text taken from Plaintiffs' briefing in *Sugar Beets I* provides a basic overview:

18        Discovery has uncovered further conclusive evidence that contamination is not only likely,
          but a common and continuing occurrence, and that Intervenors' containment efforts are
19        ineffective. *See infra* pp. 13-14 and Appendix A. Due to competitive constraints and the
          inability to stop gene flow, contamination has become an *accepted* part of seed growing.
20        Seed companies have not been able to isolate the sources of the contaminants entering their
          own fields, and it is impossible to know how many other farmers crops they have
21        contaminated. Stewardship techniques and pinning guidelines—which Intervenors tout and
          APHIS espouses as proposed "protective measures"—have repeatedly proven ineffective:
22        • [REDACTED text concerning contamination of conventional sugar beet seed by RR
            sugar beets]
23        • [REDACTED text concerning industry concessions regarding limitations on
            contamination]
24        • **Pollen routinely flows between table beet, chard, and sugar beet seed fields.**
            Contamination of sugar beet seed fields by *beta* species seems to be an even greater
25          problem for seed companies, and "roguing" off-types (hand-weeding), isolation
            distances, and other measures have not stopped contamination from occurring year
26

27   [4]   *See* Achitoff Decl. Exs. A through M; Tomaselli Decl. Exs. A through AA.

28

after year, dating back at least as far as 2006. See, e.g., [REDACTED] Thus, *if sugar beet seed fields are being contaminated by red beets and chard pollen, red beet and chard seed fields are being contaminated by sugar beet pollen.* [REDACTED]

- **Demonstrated flaws in the pinning process ensure that contamination continues.** [REDACTED]

Plaintiffs' Opposition and Reply in Support of Permanent Relief at 13-14, *Sugar Beets I* (Dkt. No. 575).

Further, allowing continued planting now will only hasten industry's transition to a self-created reliance on RRSB, a fact well-documented by the industry's own arguments in *Sugar Beets I.* Tomaselli Decl. Ex. BB. As past briefing has shown, this reliance will then be used by industry and APHIS to "relinquish[] the 'no action' alternative without the preparation of an EIS," subverting NEPA's goal in direct contravention of established NEPA jurisprudence. *See, e.g., Conner,* 848 F.2d at 1451 (discussed *infra,* at 10). Tomaselli Decl. Exs. Y, Z, and AA..

Finally, that irreparable harm is likely is supported by the repeated past incidences of contamination in other GE crops. *See Ctr. for Food Safety v. Schafer,* 2010 WL 964017, at *2 ("Moreover, the Court finds it significant that there have been instances in which genetically engineered corn, cotton, soybean and rice have mixed with and contaminated the conventional crops."). Past is prologue. APHIS has a long and dismal history of oversight failures, at all stages of crop growth and use. *See* Tomaselli Decl. Ex. A-1 at 3, ("the ease with which genetic material from crops can be spread makes future releases *likely*"). APHIS's record is so poor that Congress enacted new oversight mandates in the 2008 Farm Bill that it required APHIS to implement within eighteen months of its codification. Pub. L. No. 110-246, Tit. X. APHIS has thus far willfully flouted and unlawfully ignored these mandates.

## C. THE BALANCE OF HARDSHIPS TIPS SHARPLY IN FAVOR OF PLAINTIFFS

Here, Defendant APHIS cannot claim hardship from a delay resulting from a preliminary injunction. The agency has time and again requested stays from the *Sugar Beets I* court, admitting that it is not in a position to adequately oversee limited production of RRSB. *Sugar Beets I,* Fourth Smith Decl at ¶ 8 (Dkt. No. 554) (requesting that the Court stay its vacatur until

1   March 1, 2011 to allow the agency adequate time to establish appropriate interim regulatory

2   measures to deal with regulated RR sugar beet until completion of the RR sugar beet EIS); *see also*

3   *Sugar Beet I*, Third Smith Decl. at ¶ 6 (Dkt. No. 485). Indeed, the agency stands only to benefit

4   from the additional time it will gain, through a TRO and/or preliminary injunction, for the

5   completion of its required NEPA documentation, whether an EA or an EIS.

6           However, Plaintiffs seed companies, consumers, and environmentalists risk economic

7   harm, loss of reputation, loss of goodwill, and loss of choice through genetic contamination of

8   non-GE crops, as well as narrowing consumer options, exposure to increased use of herbicides,

9   and the spread of glyphosate-resistant "superweeds," should APHIS's interim proposal go

10  forward. *See* Achitoff Decl. Exs. A through M. The balance of hardships favors Plaintiffs.

11          **D. THE PUBLIC INTEREST FAVORS ISSUANCE OF A PRELIMINARY
                INJUNCTION**

12          APHIS's decision to issue permits for the continued planting of RRSB without first

13  complying with NEPA harms the public interest in enforcing NEPA, a law promulgated to

14  protect to the environment; in a free market allowing farmers to grow organic and conventional

15  crops in addition to Monsanto's patented crops; in avoiding crop disease, genetic contamination,

16  and Roundup-resistant weeds, and in preserving farmer and consumer choice. *See* Achitoff Decl.

17  Exs. A through M; *see also* Tomaselli Decl. Exs. B through S.

18  **IV.    TEMPORARY RESTRAINING ORDER**

19          Plaintiffs respectfully request immediate issuance of a temporary restraining order to

20  remain in effect pending this Court's consideration of their request for a preliminary injunction.

21  A temporary restraining order is appropriate as Plaintiffs will otherwise suffer "immediate and

22  irreparable injury." Fed. R. Civ. P. 65(b). A court should issue a temporary restraining order to

23  preserve the status quo—here, the halt on planting pending NEPA compliance as ordered by the

24  court—and to prevent irreparable harm until there can be a hearing on the merits of the demand

25  for a preliminary injunction. *Warner Bros., Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1124

26  (2d Cir. 1989). As discussed above, and as demonstrated in the attached declarations, *see* Decls.

27  of Achitoff and Tomaselli, absent a temporary restraining order pending resolution of Plaintiffs'

28

request for a preliminary injunction, Plaintiffs and the public will suffer immediate and

2  irreparable injury.

3  **V.    CONCLUSION**

4       For the foregoing reasons, Plaintiffs respectfully request this Court issue a temporary

5  restraining order.  Plaintiffs further request this Court issue a preliminary injunction against the

6  issuance of permits to sugar beet seed producers authorizing seedling production this fall and any

7  action based thereon, to preserve the status quo pending a resolution of the merits of this case.

8       Respectfully submitted this 10th day of September, 2010.

9

10                          /s/
                    GEORGE A. KIMBRELL (*Pro Hac Vice application pending*)
11                  PAIGE M. TOMASELLI, State Bar No. 237737
                    KATERYNA L. RAKOWSKY, State Bar. No. 246248
12                  Center for Food Safety
                    2601 Mission St., Suite 803
13                  San Francisco, CA 94110
                    T: (415) 826-2770 / F: (415) 826-0507
14                  Emails: gkimbrell@icta.org
                            ptomaselli@icta.org
15                          kateryna@icta.org

16                  PAUL H. ACHITOFF (*Pro Hac Vice application pending*)
                    Earthjustice
17                  223 South King Street, Suite 400
                    Honolulu, Hawai'i 96813
18                  T: (808) 599-2436 / F: (808) 521-6841
                    Email: achitoff@earthjustice.org

19                  *Counsel for Plaintiffs*

20

21

22

23

24

25

26

27

28