United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR FOOD SAFETY, et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>THOMAS J. VILSACK, et al.,<br><br>  Defendants.<br>_____ / | No. C 10-04038 JSW<br><br>**ORDER REGARDING PENDING MOTIONS** |

Now before the Court are the following: (1) motions to intervene filed by proposed intervenors Betaseed, Inc., Monsanto Company, Syngenta Seeds, Inc. (collectively, "Proposed Defendant-Intervenors"); (2) joint motion to file a brief as amici curaie filed by Proposed Defendant-Intervenors and American Crystal Sugar Company (collectively, "Amici"); (3) motions to hear the motions to intervene and motion to file a brief as amici curaie on shortened time; and (4) an application for a temporary restraining order ("TRO") filed by plaintiffs Center for Food Safety, Organic Seed Alliance, Sierra Club, and High Mowing Organic Seeds (collectively, "Plaintiffs").

The Court hereby GRANTS the motions to hear the motions to intervene and motion to file a brief as amici curaie on shortened time. The Court will address the other pending motions below.

///

///

**BACKGROUND**

Plaintiffs filed this action challenging the decision by the United States Department of Agriculture ("USDA") and its Animal and Plant Health Inspection Service ("APHIS") (collectively, "Defendants") to issue permits to four seed companies to plant stecklings of genetically engineered sugar beets. Plaintiffs contend that APHIS's decision to issue these permits without conducting any environmental review violates the National Environmental Policy Act, 42 U.S.C. §§ 4321-4335 ("NEPA"), the Plant Protection Act ("PPA"), the 2008 Farm Bill, and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ("APA").

Monsanto Company ("Monsanto") owns intellectual property rights in the technology used to produce Roundup Ready sugarbeets. Betaseed, Inc. ("Betaseed") is a supplier of sugar beet seed. Betaseed's parent company, KWS SAAT AG ("KSW"), pursuant to a licensing agreement with Monsanto, inserted the gene for glyphosate tolerance into sugar beets to produce a type of Roundup Readysugar beets known as Event H7-1.

KSW and Monsanto submitted a petition to the USDA seeking to deregulate Event H7-1, which the USDA granted on March 4, 2005. However, on August 13, 2010, in another case, this Court vacated Defendants' deregulation decision based on APHIS's failure to prepare an Environmental Impact Statement ("EIS").

Plaintiffs have filed an application for a TRO against Defendants. Monsanto, Betaseed, and Syngenta Seeds, Inc. ("Syngenta") move to intervene in this action pursuant to Federal Rule of Civil Procedure 24(a) and (b). Monsanto, Betaseed, Syngenta, and American Crystal Sugar Company ("American Crystal") also move for leave to file an amicus curiae brief opposing Plaintiffs' application for a TRO.

The Court shall address additional facts as necessary to its analysis in the remainder of this Order.

///
///
///
///

2

**ANALYSIS**

**A.      Motions to Intervene.**

      **1.      Intervention as of Right.**

Pursuant to Federal Rule of Civil Procedure 24(a), an applicant seeking to intervene in a pending lawsuit "as of right" must demonstrate that: "(1) it has a significant protectable interest relating to the property or transaction that is the subject matter of the action; (2) the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; (3) the application is timely; and (4) the existing parties may not adequately represent the applicant's interest." *United States v. City of Los Angeles*, 288 F.3d 391, 397 (9th Cir. 2002) (internal citations omitted). An applicant must satisfy all four of these requirements. *Arakaki v. Cayetano*, 324 F.3d 1078, 1083 (9th Cir. 2003). With respect to the merits portion of this action, the only issues before the Court are whether Defendants' actions in issuing permits without conducting any environmental review violates NEPA, the PPA, and the 2008 Farm Bill and whether Defendants' actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

A private party may not intervene in the merits of an action to compel compliance with NEPA. *Wetlands Action Network v. United States Army Corps of Engineers*, 222 F.3d 1105, 1114-15 (9th Cir. 2000). The Ninth Circuit has repeatedly held that, because only the federal government can comply with NEPA, private parties cannot intervene as defendants in the merits phase of this type of action. *Id.*; *see also Churchill County v. Babbitt*, 150 F.3d 1072, 1082, *as amended by* 158 F.3d 491 (9th Cir. 1998); *Forest Conservation Council v. United States Forest Service*, 66 F.3d 1489, 1499 (1995); *Portland Audubon Society v. Hodel*, 866 F.2d 302, 309 (9th Cir. 1989).

Courts have applied this rule to claims under other environmental statutes where the plaintiff is seeking the federal government's compliance with its legal obligations under such statutes. *See e.g., Forest Conservation*, 66 F.3d at 1499 (denying intervention with respect to a federal agency's liability under the National Forest Management Act ("NFMA") as well as NEPA); *Southwest Center for Biological Diversity v. U.S. Forest Service*, 82 F. Supp. 2d 1070,

3

1074 (D. Ariz. 2000) (denying intervention as of right by private parties with respect to Endangered Species Act ("ESA") claim challenging federal agencies' compliance); *Sequoia Forestkeeper v. United States Forest Service*, 2008 WL 324013, *3-4 (E.D. Cal. Feb. 5, 2008) (same re NFMA); *Protect Lake Pleasant, LLC v. Johnson*, 2007 WL 1108916, *2 (D. Ariz. April 13, 2007) (same holding re the Federal Property and Administrative Services Act and the Clean Water Act); *Center for Tribal Water Advocacy v. Gutierrez*, 2007 WL 527932, *2-3 (D. Or. Feb. 12, 2007) (same re ESA); *Oregon Natural Desert Ass'n v. Lohn*, 2006 WL 3762119, *2 (D. Or. Dec. 20, 2006) (same re ESA); *Sierra Nevada Forest Protection Campaign v. Tippin*, 2006 WL1319397, *5 (E.D. Cal. May 15, 2006) (same re NFMA); *Oregon Natural Desert Ass'n v. Shuford*, 2006 WL 2601073, *3 (D. Or. Sept. 8, 2006) (same re Federal Land Policy and Management Act, the Public Rangelands Improvement Act, and the Taylor Grazing Act of 1934).

Proposed Defendant-Intervenors do not dispute that they are not entitled to intervene on the merits issues. Instead, they argue that because Plaintiffs' application for TRO and motion for preliminary injunction raise issues on both the remedies and the merits, they should be allowed to intervene without restriction. The Court agrees that they should be allowed to intervene on the remedies issues, but finds that Proposed Defendant-Intervenors have not demonstrated that they would be entitled to intervene as of right on the merits issues.

**2.    Permissive Intervention.**

Pursuant to Federal Rule of Civil Procedure 24(b), "[a]n applicant who seeks permissive intervention must prove that it meets three threshold requirements: (1) it shares a common question of law or fact with the main action; (2) its motion is timely; and (3) the court has an independent basis for jurisdiction over the applicant's claims." *Donnelly v. Glickman*, 159 F.3d 405, 412 (9th Cir. 1998); *see also Canatella v. California*, 404 F.3d 1106, 1117 (9th Cir. 2005) ("Permissive intervention to litigate a claim on the merits under Rule 24(b) requires ... an independent ground for jurisdiction.") (citation omitted). In *Center for Tribal Water Advocacy v. Gutierrez*, 2007 WL 527932, *4 (D. Or. Feb. 12, 2007), the court denied permissive intervention in the environmental action raising claims under NEPA and the ESA. The court

4

1  reasoned that there was no common issue of law or fact because the only issue during the
2  liability phase was whether the federal defendants complied with the environmental statutes. *Id*.
3  This Court finds the reasoning of *Center for Tribal Water Advocacy* persuasive. The Court
4  finds that no common issues of law or fact exist regarding the merits portion of this action
5  because the only issue on the merits is whether the federal government complied with NEPA,
6  the PPA, and the 2008 Farm Bill. Only the federal defendants can be held liable under these
7  claims. Therefore, the Court DENIES the Proposed Intervenors' motions to intervene
8  permissively in the merits portion of this case.

However, the Court will allow Proposed Defendant-Intervenors and American Crystal to appear as Amici, but only with respect to the merits issues. The Court GRANTS Proposed Defendant-Intervenors' motions to intervene as of right with respect to the remedies issues. Therefore, the Court will consider Amici's joint brief on the merits issues in Plaintiffs' TRO application and will consider Proposed Defendant-Intervenors' joint opposition brief on the remedies issues raised in Plaintiffs' TRO application. For future proceedings in this matter, on merits issues, Proposed Defendant-Intervenors may only appear as amici and shall submit a joint brief with American Crystal. For future proceedings on remedy issues, Proposed Defendant-Intervenors may submit a joint brief as Defendant-Intervenors. To the extent future proceedings raise issues relating to both the merits and the remedies, such as a motion for preliminary injunction, Amici may file a joint brief to address the merits and Proposed Defendant-Intervenors may file a joint brief as Defendant-Intervenors to address the remedies. These joint briefs, considered together, should not exceed the allowable page limits.[1]

**B.    Plaintiffs' TRO Application.**

In order to obtain a temporary restraining order, as with a preliminary injunction, Plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in

---

[1] The Court notes that the current submissions exceed the allowable page limits, but due to the time constraints on the Court due to the filing of the TRO, the Court will consider all of the briefing. However, in the future, Amici and the parties are directed to comply with this Court's standing orders setting page limits.

5

1  [their] favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council*, 129 S. Ct. 365, 374 (2008) (citations omitted). The *Winter* court also noted that because injunctive relief is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 375-76 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*)). Thus "[i]n each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Id.* at 376 (citing *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987)). "'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *Id.* at 376-77 (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

**C.   Discussion.**

    **1.   Standing.**

As a threshold issue, Defendants and Amici challenge Plaintiffs' standing to obtain a TRO with respect to the permits at issue. In order to demonstrate Article III standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

To demonstrate standing in cases raising procedural issues, environmental plaintiffs need not show that substantive environmental harm is imminent. *Cantrell v. City of Long Beach*, 241 F.3d 674, 679 n.4 (9th Cir. 2001) (citing *Defenders of Wildlife*, 504 U.S. at 572 n.7). Moreover, such plaintiffs need not present proof that the challenged federal project will have particular environmental effects. To do so "would in essence be requiring the plaintiff to conduct the same environmental investigation that he seeks in his suit to compel the agency to undertake." *Citizens for Better Forestry v. United States.S. Dept. of Agriculture*, 341 F.3d 961, 972 (9th Cir. 2003). Instead, the "'asserted injury is that environmental consequences might be

6

1  overlooked' as a result of deficiencies in the government's analysis under environmental
2  statutes." *Id*. at 971-72 (quoting *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346,
3  1355 (9th Cir. 1994)).  Thus, Plaintiffs only need to demonstrate that "it is reasonably probable
4  that the challenged action will threaten their concrete interests." *See Citizens for Better
5  Forestry*, 341 F.3d at 969-70; *see also City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th
6  Cir. 2004).  A plaintiff must also demonstrate that a government agency violated certain
7  procedural rules and that these rules protect a plaintiff's concrete interests.  *See Citizens for
8  Better Forestry*, 341 F.3d at 969-70.

In actions challenging a procedural violation, some uncertainty about redressability and causality is allowed. *Defenders of Wildlife*, 504 U.S. at 573 n.7.  A plaintiff challenging a procedural violation need only show "(1) that he or she is a 'person who has been accorded a procedural right to protect [his or her] concrete interests' ... and (2) that the plaintiff has 'some threatened concrete interest ... that is the ultimate basis of [his or her] standing.'" *Douglas County v. Babbitt*, 48 F.3d 1495, 1500 (9th Cir. 1995) (quoting *Defenders of Wildlife*, 504 U.S. at 573 n.7).  The threat must derive at least in part from the actions at issue in the case and not from some cause or party not before the court. *Ecological Rights Foundation v. Pacific Lumber Co.*, 230 F.3d 1141, 1152 (9th Cir. 2000).

Defendants' and Amici's challenges to Plaintiffs' standing derive from their arguments that Defendants did not improperly segment their consideration of the permits and that Plaintiffs have not demonstrated any harm specifically attributable to the permits.  However, as will be discussed below, the Court disagrees with Defendants and Amici on the segmentation issue. When considered in the proper, full context, Plaintiffs have sufficiently demonstrated standing at this procedural stage.

### 2. Likelihood of Success on the Merits.

#### a. Defendants Unlawfully Segmented the Decision to Issue Permits.

NEPA requires an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  The Council on Environmental Quality's

7

("CEQ") regulations require that "connected actions" be considered together in a single EIS.[2] *See* 40 C.F.R. § 1508.25(a)(1) (1984). "Connected actions" are defined as actions that:

> (i) Automatically trigger other actions which may require environmental impact statements.
> (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.
> (iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

*Id.* The purpose of this requirement is "to prevent an agency from dividing a project into multiple 'actions,' each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Wetlands Action Network*, 222 F.3d at 1118 (internal quotations and citation omitted).

The Ninth Circuit applies "an 'independent utility' test to determine whether multiple actions are so connected as to mandate consideration in a single EIS. The crux of the test is whether 'each of two projects would have taken place with or without the other and thus had 'independent utility.'" *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 969 (9th Cir. 2006) (quoting *Wetlands Action Network*, 222 F.3d at 1118.) Stated another way, "[w]hen one of the projects might reasonably have been completed without the existence of the other, the two projects have independent utility and are not 'connected' for NEPA's purposes." *Id*.

In *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1215 (9th Cir. 1998), the court held that five potential logging projects in the same watershed had to be evaluated in a single EIS where the individual projects were "reasonably foreseeable" and "developed as part of a comprehensive forest recovery stategy." Similarly, in *Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir. 1985), the court held that a logging project and construction of a road designed to facilitate the logging had to be considered in a single EIS where "[i]t [was] clear that the timber sales [could not] proceed without the road, and the road would not be built but for the contemplated timber sales." The federal agency stated that the

---

[2] "The CEQ regulations are binding on all federal agencies and provide guidance to the courts for interpreting NEPA requirements." *Oregon Natural Resources Council v. United States Forest Service*, 834 F.2d 842, 847 n.5 (9th Cir. 1987) (citing 43 Fed. Reg. 55,978 (1978)).

8

1  road would yield benefits in addition to providing timber access.  However, the court found
2  such statement insufficient to demonstrate independent utility because the agency did "not
3  claim that such other benefits would justify the road in the absence of the timber sales."  *Id*. at
4  758-59; *see also Baykeeper v. United States Army Corps of Engineers*, 2006 WL 2711547, *9-
5  10 (E.D. Cal. Sept. 20, 2006) (rejecting agency's proffered statement of independent utility
6  based on the facts in the record).

7      In *Baykeeper*, the court noted that for nearly three years, the United States Army Corp of
8  Engineers ("Corp") and the Port of Stockton and the Stockton Port District (collectively, the
9  "Port") had consistently treated the dredging of Docks 14-20 as an essential component of, and
10 prerequisite for another project – the economic development of a port.  *Id*., 2006 WL 2711547
11 at *3.  However, just three weeks after another federal agency issued a biological opinion on the
12 proposed dredging and the project, the Port submitted a revised permit application for dredging
13 only Docks 14 and 15, asserting for the first time that the dredging of these two docks was
14 completely independent of the Project.  *Id*. at *4.  The Corp issued the permit a few weeks later
15 without providing any public notice of the permit application.  *Id*.  The Corp stated in its
16 environmental assessment ("EA") that the dredging of these two docks neither required nor
17 relied on the other docks and, thus, the Corp determined that the proposed project had separate
18 and independent utility from the original permit application for all of the docks.  *Id*.  The Corp
19 further stated that it was not in any way committed to approve work on Docks 16 through 20.
20 *Id*.  The court rejected the Corp's finding that dredging Docks 14 and 15 had independent utility
21 because dredging these two docks would allow an adequate number of vessel calls and would
22 enhance terminal efficiency regardless of whether the remaing docks were ever dredged.  *Id*. at
23 *9.  Although the Corp established limited benefits of dredging the two docks, the court held
24 that the Corp failed demonstrated a rational basis to support its finding of independent utility
25 based on the contradictory facts in the record.  *Id*. at *9-10.

26     Here, Defendants do not dispute the independent utility standard, but only argue in the
27 most conclusory fashion that planting the seed stecklings pursuant to the permits issued has
28 independent utility.  Defendants fail even to articulate what the independent utility might be.

9

Instead, Defendants rely entirely on the fact that they have not yet authorized further permits and retain the ability to deny further permits. However, the fact that the agency retains authority to review additional steps or portions of a project is not the standard. The standard is whether the project at issue has any "independent utility." *Great Basin Mine Watch*, 456 F.3d at 969. A review of the permits at issue and the record in this action confirms that it does not. The stated purpose of the requested permits were to "[p]roduce stecklings (seed vernalization) for transplant into basic seed (commercial) production trials in the winter of 2010-2011." (Declaration of Luther L. Hajek ("Hajek Decl."), Ex. 3 at 12, Ex. 4 at 6.)

Amici argue that they and the other seed company sought the permits at issue "for research and development, basic seed production and the transplant nurseries needed to preserve the seed companies' ability to create [genetically engineered] commercial seed varieties to meet potential future market demand in a timely manner if subsequent APHIS decision authorize such production." (Amici's Br. at 6.) However, the documents to which they cite do not support of the proposition that the permits had any utility other than enabling the seed companies to take the first step in a multi-step process related to the commercial production of genetically engineered sugar beets. (*Id*.)[3]

As in *Baykeeper*, the Court finds that the factual context belies any argument by Defendants and Amici that the permits issued have any independent utility. On August 13, 2010, in another case, this Court vacated APHIS's deregulation decision and denied APHIS's request to delay the vacature for nine months to provide APHIS time to consider interim measures regarding the genetically engineered sugar beets pending the full environmental review. Less than three weeks later, on September 1, 2010, APHIS announced that it had

---

[3] The only evidence that comes close to supporting this argument is paragraph 8 of the Declaration of Bryan Meier, Syngenta's representative, in which he states: "The challenged permit authorizes Syngenta to plant RR sugar beets for R&D, basic seed production, and transplant nurseries intended for further transplanting for the commercial production of hybrid seed." However the permit application submitted by Syngenta and approved by APHIS states that the purpose of the plantings pursuant to Syngenta's permit merely was to "[p]roduce stecklings (seed vernalization) for transplant into basic seed (commercial) production trials in the winter of 2010-2011." (Declaration of Luther L. Hajek, Ex. 4 at 6.) Amici do not submit any evidence that they informed APHIS of any other purpose for the requested permits.

10

1   "received applications from and is issuing permits to sugar beet seed producers to authorize
2   'steckling' (i.e. seedlings) production this fall." (Declaration of Andrew Deeringer filed on
3   September 24, 2010, ¶ 5, Ex. B.) APHIS further announced that it anticipated that the issuance
4   of these permits could be completed in the next two weeks. (*Id.*) On September 14 and 15,
5   2010, Proposed Defendant-Intervenors filed briefs and supporting declarations stating that the
6   permits had been issued and that most, if not all, of the plantings pursuant to the permits had
7   already been completed. Significantly, as stated above, the permits explicitly state that their
8   purpose was to produce stecklings to transplant into basic seed for commercial production in the
9   winter of 2010-2011, a production stage which goes beyond the supposedly limited plantings at
10  issue. Moreover, the permits are replete with references to future transplantation and use of the
11  stecklings. (*See*, *e.g.*, Hajek Decl., Ex. 1 at 3, 4, Ex. 2. at 6.)

12  Based on the current record, the Court finds that there is no reasonable basis to support
13  APHIS's conclusion that the permits have some independent utility. Accordingly, the Court
14  holds that Plaintiffs have sufficiently demonstrated a likelihood of success on the merits, *i.e.*,
15  that APHIS violated NEPA by considering the permits in isolation and segmenting them from
16  the later cycles of genetically engineered sugar beet plantings and production.

17               **b.     APHIS Unlawfully Relied on a Categorical Exclusion.**

18  APHIS and Amici also argue that APHIS's decision to issue the permits without
19  conducting any environmental review was warranted under the "categorical exclusions" created
20  by the CEQ regulations. An action which falls within a categorical exclusion does not require
21  the preparation of either an EIS or an EA. 40 C.F.R. § 1507.3(b)(2). Actions subject to
22  categorical exclusions may not "individually or cumulatively have a significant effect on the
23  human environment." 40 C.F.R. § 1508.4. APHIS's categorical exclusions include
24  "[p]ermitting ... confined releases of genetically engineered organisms and products." 7 C.F.R.
25  § 372.5(c)(3)(ii). However, as required, APHIS's regulations provide an exception to otherwise
26  categorically excluded activities that may potentially significantly affect the environment, such
27  as when an ordinarily excluded activity, "the incremental impact of which, when added to other
28  past, present, and reasonably foreseeable future actions (regardless of what agency or person

11

undertakes such actions), has the potential for significant environmental impact." 7 C.F.R. § 372.5(d)(1).

APHIS's and Amici's argument that APHIS was justified in concluding that the permits fall within a categorical exclusion rest entirely on their argument, already rejected by this Court, that the permits may be segmented and considered in isolation from any further production cycles of genetically engineered sugar beets. Therefore, despite the deference afforded to APHIS's interpretation of its own regulations, the Court finds that APHIS failed to articulate a reason to support its finding that the plantings pursuant to the permits, when considered in conjunction with reasonably foreseeable future actions, such as the subsequent planting and production cycles of genetically engineered sugar beets, would not have any potential significant environmental impact. Accordingly, the Court finds that Plaintiffs are likely to succeed on the merits that APHIS unlawfully relied on a categorical exclusion to avoid conducting any environmental review.

### 2. Proposed Remedies.

Plaintiffs initially requested a TRO to enjoin any further permits and any plantings pursuant to the issued permits which had not already occurred. However, at this point, it appears that APHIS has already issued four permits to the seed companies to plant seed stecklings in the fall of 2010 and does not intend to issue any more permits of this nature. Moreover, it appears as though the seed companies have already planted most, if not all, of the stecklings authorized by the permits at issue. In later briefs in support of their TRO, Plaintiffs request an injunction to remove the stecklings that were planted pursuant to these permits.

In order to fully and fairly address the requested remedies, the Court directs Plaintiffs to file a supplemental brief on the remedies by no later than October 4, 2010. In light of the factual context that has now become clear, Plaintiffs shall explicitly state what remedy they are seeking pursuant to their application for a TRO.

Defendants and Proposed Defendant-Intervenors may file their oppositions by no later than October 8, 2010. Proposed Defendant-Intervenors and Amici state that APHIS identifies that the permits at issue were granted on September 3, 2010 and that APHIS updates its website

1 regularly, but do not state exactly when the information that the permits had been granted was
2 posted on the publicly available website. In the further briefing, APHIS shall state under
3 penalty of perjury exactly when and where it made the information public that the permits had
4 been granted. Moreover, APHIS shall describe exactly what information was publicly
5 disclosed.

6 Plaintiffs may file a reply by no later than 4:00 p.m. on October 15, 2010. The Court
7 will hold a hearing on the remedies requested on October 22, 2010 at 9:00 a.m.

**IT IS SO ORDERED.**

Dated: September 28, 2010

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California