LATHAM & WATKINS LLP
 Philip J. Perry (Ca. Bar No. 148696)
 philip.perry@lw.com
 Janice M. Schneider (DC Bar No. 472037) (*pro
 hac vice*)
 janice.schneider@lw.com
 Drew C. Ensign (Ca. Bar No. 243956)
 drew.ensign@lw.com
555 Eleventh Street, N.W., Suite 1000
Washington, D.C.  20004-1304
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201

ARENT FOX LLP
 Stanley H. Abramson (D.C. Bar No. 217281) (*pro
 hac vice*)
 abramson.stanley@arentfox.com
 Rachel G. Lattimore (D.C. Bar No. 450975) (*pro
 hac vice*)
 lattimore.rachel@arentfox.com
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5339
Telephone: (202) 857-6000
Facsimile:  (202) 857-6395

Attorneys for Intervenor-Defendant
Monsanto Company

**[Complete list of Parties on signature page]**

# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| Center for Food Safety, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Thomas J. Vilsack, *et al.*, <br><br> Defendants. | CASE NO. C-10-04038 JSW <br><br> **DEFENDANTS' AND INTERVENOR-DEFENDANTS' JOINT POST-HEARING BRIEF** <br><br> **(Honorable Jeffrey S. White)** |

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS...................................................................................... i

TABLE OF AUTHORITIES .............................................................................. ii

INTRODUCTION ..............................................................................................1

ARGUMENT ......................................................................................................3

I.      PLAINTIFFS FAILED TO DEMONSTRATE IMMINENT
IRREPARABLE HARM NECESSARY FOR A PRELIMINARY
INJUNCTION.........................................................................................3

II.     SPECULATIVE HARMS FROM POTENTIAL FUTURE APHIS
ACTION DO NOT SATISFY PLAINTIFFS' BURDEN TO ESTABLISH
LIKELY IRREPARABLE HARM FROM THESE PERMITS. .......................7

III.    THE BALANCE OF HARMS AND THE PUBLIC INTEREST FAVOR
DEFENDANTS AND INTERVENORS. ..........................................................11

CONCLUSION.................................................................................................15

1

## <u>TABLE OF AUTHORITIES</u>

2

### CASES

3
**Page(s)**

4
*Amoco Production Co. v. Village of Gambell,*
   480 U.S. 531 (1987)...........................................................................................................3, 13

5
*Monsanto Co. v. Geertson Seed Farms,*
   130 S. Ct. 2743 (2010).................................................................................................3, 10, 14

6

7
*Weinberger v. Romero-Barcelo,*
   456 U.S. 305 (1982).............................................................................................................13

8
*Wilderness Society v. U.S. Forest Service,*
   No. 09-35200, 2010 U.S. App. LEXIS 20210 (9th Cir. Sept. 30, 2010)................................12

9

10
*Winter v. NRDC, Inc.,*
   129 S. Ct. 365 (2008)........................................................................................................3, 13

11

### STATUTES AND REGULATIONS

12
7 U.S.C. § 7701(1), (4) .........................................................................................................13

13
7 C.F.R. § 340.4(f)(1) ...........................................................................................................5

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**<ins>INTRODUCTION</ins>**

2    Plaintiffs seek a mandatory injunction to uproot and destroy fields of Roundup Ready

3    sugarbeet (RRSB) stecklings growing on 256 acres of isolated permitted fields in Arizona and

4    Oregon.  Intervenors planted seeds in September 2010 to cultivate into stecklings under permits

5    that expressly prohibit flowering and require removal from the ground by February 28, 2011—

6    before any flowering would occur.  Subsequently, this Court ruled that Plaintiffs had shown a

7    likelihood of success on the merits of their NEPA claim that APHIS's issuance of the permits

8    violated NEPA, but ordered an evidentiary hearing to consider the other factors in the traditional

9    injunction test.  The question now is what remedy, if any, should be imposed with respect to the

10   stecklings pending a final  resolution of the merits of this litigation.

11   As this Court has recognized, to justify injunctive relief, Plaintiffs must establish each of

12   the traditional injunction factors.  *See* 10/22/2010 Tr., 23:13-14 ("We're in the remedies phase,

13   the plaintiff has the burden on that issue, that doesn't change.").  They cannot satisfy that burden

14   by insisting that the permits are illegal, or justify an injunction by alleging a "possibility" of

15   irreparable harm or by asserting "procedural injury."  The Supreme Court has held repeatedly

16   that Plaintiffs claiming a procedural violation of an environmental statute—like any other

17   plaintiff—must prove that, absent an injunction, they will suffer likely irreparable harm to their

18   underlying substantive environmental interests.  Here, the issues before this Court should be

19   narrow and focused: (i) whether the evidence offered by Plaintiffs demonstrates that they are

20   likely to be harmed irreparably in the coming months if the permitted fields are not immediately

21   destroyed; and (ii) whether the balance of the equities weighs in favor of an injunction.

22   Only one page of Plaintiffs' 15-page brief actually addresses the potential for harm from

23   the restricted and temporary growth of stecklings authorized by the permits.  And even there,

24   Plaintiffs do not claim (much less prove) that the permitted activity is likely to cause anyone

25   harm.  The most forceful statement Plaintiffs can conclude is that "*it is far from assured that*

26   *even the steckling production itself is benign.*"  Pls.' Br. at 3 (emphasis added).  Plaintiffs had an

27   opportunity to make their case in an evidentiary hearing, but did not call a single live witness and

28   asserted instead that they need not demonstrate a likely irreparable harm from the challenged

permits.  While Plaintiffs spend the bulk of their brief arguing that growth of mature RRSB plants under a future hypothetical APHIS regulatory action might cause them harm, those agency decisions have not yet been made.  Speculative assertions of future harm cannot satisfy the irreparable harm test.  Order at 8-9, *Sugarbeets I* (Doc. #570) (alleged injury from conduct that is purely speculative and dependent on future action does not warrant injunction).  It is indisputable that Plaintiffs will suffer no harm, irreparable or otherwise, from the cultivation of these stecklings which present *no* possibility of gene flow or mechanical mixing *because the stecklings will not flower* and cannot be intermingled with other crops.

The evidence establishes that the balance of harms tilts sharply against issuance of the requested injunction.[1]  The destruction of the stecklings at this preliminary stage of the proceedings (effectively final relief) will cause the seed companies to lose their investment in the stecklings and will have enormous long-term consequences on sugarbeet processors, growers and seed companies, resulting in unnecessary losses of millions of dollars.

Assuming that APHIS authorizes further planting of RRSB in the United States, Intervenors also have shown that destruction of the stecklings would create a supply shortage of RRSB seed in 2012, 2013 and 2014, and severely disrupt vital research and development programs essential to sugarbeet growers.  The cost in jobs, business and financial losses would be real and irreversible for processors, growers, seed companies and the communities in which they operate.  Destroying the stecklings now will foreclose the possibility that these harms can be avoided and ensure great harm to farmers and processors dependent on this technology for their economic survival.  Furthermore, the evidence demonstrates that, even if no further use is permitted in the United States, the stecklings can be transplanted in Canada to produce seed there, as they have been in past years; accordingly, their destruction would cause the seed companies millions of dollars of certain harm.  This Court should deny Plaintiffs' motion.

---

[1] Defendants and Intervenors were instructed to file a joint brief.  Defendants note that many of the factual conclusions stated in this brief are based on the testimony of Intervenors' witnesses and relate primarily to points made at the hearing by Intervenors.  At the evidentiary hearing, Defendants offered the testimony of Dr. Neil Hoffman and Dr. Douglas Grant.

## ARGUMENT

**I.    PLAINTIFFS FAILED TO DEMONSTRATE LIKELY IMMINENT IRREPARABLE HARM.**

The evidence is unequivocal.  There is no likely irreparable harm from the permitted sugarbeet stecklings under the permits.[2]  Three days of hearings passed and not one person came to this Court to tell the Court how, when, or where he or she is likely to be harmed, or that any harm would be irreparable.

**The Permitted Activities Cannot Cause Harm.[3]**  The challenged permits cover the growth of stecklings from seed and require removal or destruction of the stecklings from the ground by February 28, 2011  (the stecklings will, in the normal course, be removed beginning in December).   11/3/2010 Tr., 300:1-17, 301:6-21 (permits only allow juvenile stage of plant development).  Gene flow will not occur during the permit period because the stecklings cannot physically flower until April or produce pollen until June.  *Id.*; 11/2/2010 Tr., 123:8-22, 127:24-128:3; Exhs. 317, 318; *see also* 11/2/2010 Tr., 114:25-119:6 (explaining timing, what is being grown, and when the stecklings will be removed and placed in cold storage).  These facts are

---

[2] Plaintiffs' argument that a NEPA violation (*i.e.*, "procedural harm") constitutes irreparable injury, Pl. Br. at 1-2, fails under established law.  A violation of an environmental statute's procedural requirements does not itself constitute irreparable harm warranting equitable relief.  Indeed, the Supreme Court has squarely rejected the notion that an agency's failure to analyze environmental impacts creates even a presumption of irreparable harm.  *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 540, 544-45 (1987).  This was clarified again in both *Monsanto* and *Winter*, which prohibited any such "thumb on the scale" of the injunction test intended to excuse Plaintiffs from their required evidentiary showing of likely irreparable harm.  *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2757 (2010); *Winter v. NRDC, Inc.*, 129 S. Ct. 365, 375-76 (2008).

[3] Plaintiffs' case-in-chief consisted only of deposition excerpts of Mark Anfinrud.  The Anfinrud testimony is irrelevant here because it does not (and can not) identify any possible "irreparable harm" from the permitted fields Plaintiffs ask this Court to destroy.  Plaintiffs imply that the proper harm inquiry is one that goes beyond the actual effects of cultivating stecklings under the permits, but there is no support for this faulty proposition.  Plaintiffs rely on *Colorado River Indian Tribes v. Marsh*, 605 F. Supp. 1425, 1440 (C.D. Cal. 1985), but that case both presumed a showing of irreparable harm based on a procedural NEPA violation and required only a "possibility" of harm—in both respects, it is no longer good law.  Plaintiffs also rely on *Save Our Sonoran v. Flowers*, but in that case, the harm to the waterways covered by permit was so intertwined with harm to the surrounding land that the court could not distinguish the harms to consider them separately.  408 F.3d 1113, 1124 (9th Cir. 2005).  That is not the case here.  *See also* Prop. Int.-Def. Opp. Pl. Mot. TRO at 10-11 (Doc. #74).

DEFENDANTS' AND INTERVENOR-DEFENDANTS' JOINT
                                                                POST-HEARING BRIEF; CASE NO. 10-4038

undisputed.  It is also undisputed that gene flow cannot occur unless (i) a plant flowers, (ii) produces pollen, (iii) pollinates another plant, and (iv) the second plant produces seed. 11/3/2010 Tr., 311:3-10.

**The Permits Impose Strict Restrictions on Cultivation and Handling of Stecklings.[4]** The conditions imposed by the challenged permits prevent any possibility of harm.  *See* Exhs. 601-604, 606-607, 609-610; *see also* 11/3/2010 Tr., 302-09, 338-39.   First, flowering is specifically prohibited by the permits.  *Id.* at 301:10-21, 303:4-6; *see also, e.g.*, Exh. 601 at 8 (condition 11) ("Sugar beets authorized for planting under this permit are not allowed to flower and produce pollen.").  The seed companies have full-time, expert staff monitoring the steckling fields to ensure compliance with the permit conditions which prohibit flowering.  11/2/2010 Tr., 123:10-22, 124:13-21, 127:24-128:3, 140:16-142:5 (Betaseed), 149:16-21, 151:1-23 (Syngenta).

Additionally, the permits impose strict requirements to prevent physical mixing, including a visual identification system, "[p]hysical separation of RRSB material at all points in the seed-to-steckling production process," separate storage, equipment cleaning requirements, and a prohibition against using equipment in the steckling production "that might be used in chard/red beet seed production in the same growing year."  *See, e.g.*, Exh. 601 at 8 (conditions 15-19); *see also* Fagan Depo., Exh. 537 at 114:25-115:13, 174:24-175:11, 186:11-187:24 (discussing effective segregation systems to preserve varietal purity); Clarkson Depo. Exh. 533 at 48:20-49:3, 55:8-16 (same).  Moreover, the permit conditions in 7 C.F.R. § 340.4(f)(1) require proper disposal of genetically-engineered material.  11/3/2010 Tr., 308:24-309:3; *see, e.g.*, Exh. 601 at 10 (standard conditions 1-2).

The conditions further guard against any future risk of cross-pollination and mixing by imposing strict recordkeeping and monitoring requirements, requiring growers to take steps to force germination of RRSB in the same year, and limiting the types of crops growers may plant

---

[4] Plaintiffs repeatedly characterize the fields planted under the permits as "illegal."  However, the fact remains that the fields were planted under permits issued by APHIS, which, to date, have neither been found to be unlawful in any final merits ruling based on the administrative record (which has not yet been produced), nor have they been vacated by any court.  There is no such action as a preliminary vacatur.

in these fields in subsequent years.  Exh. 601 at 8 (conditions 13, 20-21, 23); 11/3/2010 Tr.,

307:3-20.    Each permit contains all of these restrictions.    11/2/2010 Tr., 123:14-124:21

(Betaseed); 145:24-146:20 (Syngenta).  Each of the seed companies also has implemented visual

identification systems to ensure that RRSB material is easily identifiable, as required by the

permit conditions.[5]

Plaintiffs' evidence did not refute the effectiveness of these specific control measures.

Nor could they:  these measures are virtually identical to the stewardship conditions for seed

fields that Plaintiffs previously proposed to this Court for fields that would be permitted to

flower.  *See* Exh. 314, ¶ 3.  And APHIS's experience with RRSB grown under field permits,

such as those at issue here, shows clearly that these fields present no risk of harm to Plaintiffs.

Plaintiffs have presented no evidence of *any* gene flow or mixing under *any* of the prior 100+ GE

sugarbeet regulatory permits or notifications.  11/3/2010 Tr., 335:18-336:12.

**APHIS Inspections Before and After Harvest Will Ensure Permit Compliance.**  The

permit conditions further prevent any possibility of harm by authorizing APHIS personnel to

"conduct inspections of the test site, facilities, and/or records at any time."  *See, e.g.*, Exh. 601 at

6 (condition 5).  APHIS has committed to inspect *all* of the RRSB fields in November 2010,

involving on-the-ground reviews of the permit sites and employee interviews to ensure permit

compliance with each condition.    APHIS already has prepared the detailed compliance

inspection worksheets for that purpose.  11/3/2010 Tr., 348-353; 11/4/2010 Tr., 371-381; Exhs.

216-221.  Additional post-harvest inspections will also be conducted.  11/4/2010 Tr., 380:9-18.

Violations of the permit conditions can lead to significant civil penalties, and, potentially,

criminal sanctions, giving growers further incentive to comply.  *Id.* at 383:17-25.

**The 2009 Steckling Event Is Not Relevant to This Case and Did Not Cause**

**Irreparable Harm.**  Plaintiffs attempt to justify injunctive relief by pointing to the so-called

2009 steckling event, but it is irrelevant.  The 2009 event involved the transplanting of stecklings

after vernalization (the period of low winter temperature to initiate or accelerate the flowering

---

[5] *See, e.g.*, Exh. 606, at 12 (requiring RRSB storage containers to be clearly labeled); Exh. 609, at 38 (requiring RRSB seed storage containers and storage areas to be labeled).

process), occurred when RRSB was deregulated, and even then caused no harm.  Here, by contrast, the permits cover only the growth of stecklings from seed, *prior to complete vernalization*, and specifically prohibit flowering.  If no further authorization is obtained for use in the United States, and if not used in Canada, these stecklings must be destroyed by February 28, 2011.  Under the permit conditions, all seed companies must keep detailed records of how and when they dispose of any stecklings grown under the permit, and document the steps that they take to devitalize any residue.  *See, e.g.*, Exh. 603 at 10-11 (condition 9(b)(vi)); *id.* at 11 (other measures, including conditions 14-17);[6] *see also* Exh. 601, at 7-8; Exh. 609, at 9-10.

**Unable to Establish Any Likelihood of Irreparable Harm, Plaintiffs Invoke Isolated and Irrelevant Incidents Involving Different Crops.**  Plaintiffs' purported evidence related to past incidents of gene flow involving different crops is a generalized attack on all genetic engineering—effectively an argument that it should never be permitted—and has no bearing on whether non-flowering RRSB stecklings grown under strict conditions pose any threat of cross-pollination over the short 15-week period before the permits expire.  The bottom line is that there have been no inadvertent releases under permits with conditions similar to the permits here. 11/3/200 Tr., 336:9-12.

The crops and incidents Plaintiffs cite are very different from RRSB and the specific permits at issue.  11/3/2010 Tr., 330-336, 342-343; 11/4/2010 Tr., 387-388, 390-391, 400-404, 406-407.  LibertyLink rice is a radically different crop and was grown under less stringent protective conditions.  For example, it lacked the significant record-keeping requirements imposed by the permits at issue here.  11/3/2010 Tr., 333:9-334:12; Exh. 232, ¶¶ 10-16 (APHIS response to OIG report).  And, as a result of the ProdiGene event, APHIS changed its permit restrictions considerably, including an increase in the number of inspections of permitted fields. 11/3/2010 Tr., 323:14-17.  The steckling fields here will be subject to inspections, and will not

---

[6] There has been no evidence that the steckling event ever led to any impact on any other crop—no gene flow or mixing with related crops was ever reported.  Navazio Depo., Exh. 531 at 139:12-16; Stearns Depo., Exh. 532 at 86:10-13, 151:17-23, 152:9-13; 11/3/2010 Tr., 279-80; 11/2/2010 Tr., 133-143 (Betaseed SOPs revised following incident); Lehner Decl., Exh. 498 ¶¶ 19-30 (virtually no chance of gene flow based on nature of stecklings at issue).

DEFENDANTS' AND INTERVENOR-DEFENDANTS' JOINT
POST-HEARING BRIEF; CASE NO. 10-4038

1   be allowed to flower.  11/4/2010 Tr., 370:12-372:4, 379:23-380:18.

2          Likewise, the Roundup Ready bentgrass field release trials were conducted primarily

3   pursuant to notification (rather than permits), and therefore lacked the protection of both permit-

4   specific conditions and APHIS inspections that will occur here.  11/4/2010 Tr., 400:22-401:17.

5   As with ProdiGene, the Roundup Ready bentgrass event resulted, in large part, from the failure

6   of the grower to follow APHIS conditions, 11/4/2010 Tr., 391:4-6, which is highly unlikely to

7   occur here.   Additionally, there are important biological differences between sugarbeet and

8   bentgrass that dramatically affect the possibility of cross-pollination and persistence in the

9   environment—including that these stecklings cannot flower or spread pollen under the permits.

10  *Id.* at 401:23-402:18.  There have been no incidents of inadvertent releases under permits with

11  conditions like these.  11/3/2010 Tr., 336:9-12.

12         Moreover, experience shows that prior incidents have been rare, and that an unintended

13  release under the current permits is not at all "likely."  Plaintiffs point to 19 occasions where

14  some regulated event appeared in a non-regulated field or elsewhere from a total of over 29,000

15  permits and notifications grown on over 200,000 fields.  *Id.* at 335:15-17.  These few incidents

16  hardly prove unauthorized releases are "likely," and says nothing about the likelihood of an

17  unauthorized release under the stringent conditions imposed by these permits.

18  **II.     SPECULATIVE HARMS FROM POTENTIAL FUTURE APHIS ACTION
            DO NOT SATISFY PLAINTIFFS' BURDEN TO ESTABLISH LIKELY
19          IMMINENT IRREPARABLE HARM FROM THESE PERMITS.**

20         **Plaintiffs' Entire Case Relies On Speculative Future Harms.**  Plaintiffs' case for an

21  injunction is rooted in the possibility that they might suffer harm from a later event in the RRSB

22  life cycle if APHIS someday authorizes RRSB use with inadequate protections.  But there is no

23  way to know now whether future permits or deregulation will be issued by APHIS or, if so, what

24  protective conditions APHIS would impose.  And in any event, if APHIS considers future

25  deregulation of (or other regulatory action concerning) RRSB, it is undisputed that Plaintiffs will

26  be able to participate in that public process and seek redress if they believe APHIS has acted

27  unlawfully.   11/3/2010 Tr., 344:18-345:2.   Plaintiffs cannot, however, base a request for

28  injunctive relief on potential harms they may suffer from future lawful government action, and

they cannot ask this Court to presume that APHIS will act unlawfully.  Indeed, Plaintiffs concede

that "it is speculative" whether APHIS will ever deregulate RRSB.  11/3/2010 Tr., 262:15-17.

Yet Plaintiffs urge this Court to disregard Dr. Sexton's evidence on harm to growers if the

stecklings are destroyed because, according to Plaintiffs, the uncertainty of APHIS approval

renders this harm speculative.[7]

Even if Plaintiffs were correct that destruction of the stecklings could be based on harms

arising from hypothetical future events, Plaintiffs still have not identified any risk of irreparable

harm from gene flow or otherwise.  The Anfinrud testimony related entirely to circumstances

present when RRSB was fully deregulated—and thus did not (and could not) address the form of

future action by APHIS regarding RRSB, if any.  ███████████████████████

████████████████████████████████████████████████████████████████████

█████████████  [8]  The undisputed expert testimony is that gene flow depends on many variables:

whether or not sexually compatible plants exist in the area of sugarbeet fields, whether the

sexually compatible plants are flowering at the same time, the distance that sugarbeet pollen

must travel to reach any such plants, the environmental and topographical land features in the

area (*e.g.,* prevailing wind direction and speed and the existence of natural barriers such as hills

and tree lines), and the density of the pollen cloud of the receptor field. 11/3/2010 Tr., 309:23-

317:12; Exh. 478, ¶¶ 12-22.[9]  Here there is no evidence as to where the stecklings may be

---

[7]   But they then rely entirely on the injuries they might suffer from a later deregulation to
establish their irreparable harm.

[8] ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████  ██Fagan Depo., Exh. 537 at
117:7-13; Clarkson Depo., Exh. 533 at 84:12-20. ███████████████████████
███████████████████████████████████  Second, while red beet and
chard occasionally pollinate sugarbeet, the opposite does not occur.  *See also* 11/3/2010 Tr., 278-
82 (Dr. Stander explaining why red beet and chard can occasionally pollinate sugarbeet while the
opposite does not occur, and explaining that, in 30 plus years in the industry working in the
Willamette Valley, Dr. Stander has never seen gene flow from sugarbeet seed fields into red beet
or chard fields.); Exh. 501, ¶ 7.

[9] For example, Dr. Hoffman testified that due to competition effects and the high density of a
Swiss chard pollen cloud, even at a distance of 0.3 miles between a sugarbeet source field and a
chard receptor field, the probability of gene flow to the chard field is 0.000005% (50/1 billion).
11/3/2010 Tr., 309:23-317:12.  Dr. Westgate confirms this, stating "when all the principal factors

---

DEFENDANTS' AND INTERVENOR-DEFENDANTS' JOINT
                            POST-HEARING BRIEF; CASE NO. 10-4038

transplanted or any of the other factors needed to assess gene flow. Plaintiffs' assertions of harm from gene flow are thus mere speculation.

**Plaintiffs' "Evidence" Is Vastly Overstated.[10]** Although RRSB seed has been grown in the Willamette Valley since 2003 under permit and deregulation, there is no evidence of any gene flow to any of Plaintiffs' crops or any red beet or chard crops *ever* during the seven years that RRSB was grown in the Willamette Valley either under permit or when fully deregulated after 2005. Navazio Depo., Exh. 531 at 139:12-16; Stearns Depo., Exh. 532 at 86:10-13, 151:17-23, 162:13-20; 11/3/2010 Tr., 279:7-280:5.[11] Indeed, most table beet (93%) and chard seed (nearly 100%) crops are grown in Washington State or California—not in Oregon. *Id.* at 75:8-11, 77:3-18, 78:2-9, 81:22-24, 82:19–25; 11/3/2010 Tr., 305:1-10; Exh. 242, ¶¶ 9-10.

With a mandatory 4-mile isolation distance (such as APHIS proposed in *Sugarbeets I*), there is virtually zero chance of cross pollination from RRSB crops. *See* 11/3/2010 Tr., 313-21 (99.9% of sugarbeet pollen falls within 0.3 miles, and even at that distance detectible pollination in another field would be rare when you consider pollen competition and other factors.). Dr. Carol Mallory-Smith of Oregon State University, a third party expert from the Willamette Valley in Oregon, whom Plaintiffs initially offered as their own expert, *see* Exh. 78, specifically analyzed APHIS's mandatory 4-mile isolation requirement, along with other requirements for handling and processing RRSB seed. She concluded that APHIS's proposed measures would "provide significant safeguards to protect *Beta* species seed producers," and would "protect the organic and conventional *Beta* seed growers from any contamination of their crops" because any

---

affecting pollination are considered, the probability of pollination of table beet or chard fields by sugarbeet pollen in the Willamette Valley is infinitesimally small." Exh. 478, ¶ 22.

[10] Having failed to offer any live witness testimony at the hearing, Plaintiffs instead rely principally on hearsay declarations, newspaper articles and the like. Hearsay cannot be properly relied upon to justify the type of final relief Plaintiffs seek. And there has been no prior opportunity to depose any of Plaintiffs' declarants about the permitted fields at issue in this case. Indeed, Plaintiffs' declarants would be compelled to acknowledge that the permit restrictions at issue now would be effective in confining RRSB, as Plaintiffs themselves did in their August 13, 2010 Proposed Order in *Sugarbeets I*. *See* Exh. 314.

[11] Because Plaintiffs "in this case do not represent a class," they cannot seek an injunction "on the ground that it might cause harm to other parties" beyond the specific harm suffered by the identified members. *Monsanto*, 130 S. Ct. at 2760.

1   risk of cross-pollination "would be extremely low."  Exh. 525, ¶¶ 4, 7, 8.  Plaintiffs' other

2   proffered experts acknowledge that isolation distances are effective for RRSB and other *Beta*

3   crops.  *See* Fagan Depo., Exh. 537 at 106:10-19, 107:13-17 (agreeing that the organic industry

4   consensus standard is 5 miles); Navazio Depo., Exh. 531 at 119:5-24 & Exh. 378 at 14

5   (recommending 1.8 to 4.8 mile isolation distances); Navazio Depo., Exh. 531 at 117:7-13 & Exh.

6   375, ¶¶ 13-14 (5-6 mile isolation distances); Clarkson Depo., Exh. 533 42:25-43:10, 43:10-

7   44:10, 83:10-84:11.   And Plaintiff High Mowing Seeds recommends only a quarter-mile

8   isolation for seed savers.  Stearns Depo., Exh. 532 at 125:20-126:06; Exhs. 461, 462.[12]

9          Plaintiffs also concede that putting the RRSB gene on the female sugarbeet plant rather

10   than on the male pollinator further "drastically reduces" any chance of gene flow.  *See* 11/3/2010

11   Tr., 311:21-312:8 (male sterile plants produce almost zero pollen, only conventional pollen

12   comes off those fields). ███████████████████████████████████████

13   █████████████████████████████████████████████████████████████

14   █████████████████████████████████████████████████████████████

15   █████████████████████████████████████████████████████████████

16   █████████████████████████████████████████████████████████████

17   ██████████████████████████████████ 11/3/2010 Tr., 311:21-312:8 (male sterile

18   plants produce almost zero pollen); Ex. 412, ¶ 30 ("Syngenta's and others' use of RR MS parent

19   lines continues to reduce the presence of RR pollen in the Willamette Valley.").

20          Finally, although any risk of gene flow could be all but eliminated under a future APHIS

21   authorization for wide scale RRSB commercial planting, Plaintiffs' proffered "expert" has

22   acknowledged that neither the Organic Foods Production Act nor the organic industry consensus

23   standards actually require zero cross-pollination from RRSB.  Fagan Depo., Exh. 537 at 116:23-

24   117:3, 117:7-13, 119:4-22 (tolerance for GE sugarbeet genes in other beta crops).

25

26

27   [12] Plaintiffs' claim that "contamination" occurred at fields 18 miles away from other RRSB fields
     is mistaken.  The chart Plaintiffs rely on for this allegation includes only RRSB seed fields
28   grown by West Coast Beet Seed, and therefore cannot possibly account for other fields nearby
     the site of the event.  11/2/2010 Tr., 75:2-78:1, 83:8-14.

## III.   THE BALANCE OF HARMS AND THE PUBLIC INTEREST FAVOR DEFENDANTS AND INTERVENORS.

Intervenors' unrefuted evidence shows that the immediate destruction of these seed fields will harm the seed companies and threaten serious future harm to sugarbeet growers and the communities that depend on them in the millions of dollars.[13]   The balance of harms analysis necessarily requires the Court to consider the effects of any potential order that would permanently foreclose potential future APHIS action and the benefits that would flow from it.   If the stecklings are destroyed, the seed companies will unquestionably be harmed because they will lose their opportunity to transplant the stecklings in the United States if authorized by APHIS.   As this Court has recognized, Plaintiffs bear the burden of showing that the balance of harms tips in their favor with the permitted conditions in place.   They have not done so.

While Plaintiffs now claim that organic *Beta* seed grown "in and around the [Willamette Valley]" is worth "hundreds of millions of dollars," Pls.' Br. at 5, this is unsupported.   First, USDA data demonstrates that virtually all table beet and chard seed is grown *outside of the state of Oregon*.   Exh. 242 ¶¶ 19-20.   Plaintiffs themselves previously disavowed the declaration of John Fagan purporting to establish that "Willamette Valley seed producers currently have more than 50% of the world market for chard and table beet seed and 80% of the domestic market," Pls.' Br. Opp. Mot. Exclude at 4-5, *Sugarbeets I* (Doc. #531), and this Court struck that evidence.   Second, none of the declarations cited by Plaintiffs establish any error in the USDA data.   Indeed, Frank Morton is the only member seed grower Plaintiffs identify in the Willamette Valley who could even hypothetically be affected, and he at least 28 miles from any field.   11/4/2010 Tr., 416:12-418:4.   Despite seven years of prior RRSB cultivation in the Willamette Valley (including multiple years of unrestricted conditions), there is no evidence that gene flow

---

[13] The Court has previously declined to consider this evidence in the preliminary merits in this matter because it allowed Intervenors to participate only in this remedies phase.  This evidence is separately relevant now to the balance of equities and public interest prongs of the injunction test.  Moreover, the Ninth Circuit has recently ordered *en banc* review of the merits/remedies distinction for third party intervention in NEPA litigation.  *See Wilderness Soc'y v. U.S. Forest Serv.*, No. 09-35200, 2010 U.S. App. LEXIS 20210 (9th Cir. Sept. 30, 2010).  Oral argument is scheduled for December 13.  *See* http://www.ca9.uscourts.gov/enbanc/.

to chard or table beet seed crop has ever occurred, much less any vegetable crop.  Moreover, whatever the value Plaintiffs allege of chard and table beet vegetable crops in the Willamette Valley, Plaintiffs have shown no likelihood that the value of these crops is at any risk absent the injunction they seek.[14]

Intervenors' unrebutted evidence shows that Intervenors, farmers, and the broader economy will suffer hundreds of millions of dollars in harms and lose years of agronomic research if Plaintiffs' injunction is adopted.  The balance of harms thus tips sharply in favor of denying Plaintiffs' mandatory injunction, which would disserve the public interest as well.  *See Amoco Prod. Co.*, 480 U.S. at 545 (reversing preliminary injunction where injury was "not at all" probable and defendants had invested $70 million in action sought to be enjoined).

The stecklings are needed to produce seed for 2012, 2013 and 2014. ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[14] There is no evidence that RRSB will have any significant effect on weed resistance either.  Plaintiffs do not even argue that the limited activities allowed by the permits at issue will have any such effects.  Nor have Plaintiffs proved any imminent likelihood of developing glyphosate resistant weeds in sugarbeets more generally.  Dr. Andrew Kniss, professor of weed ecology and author of over 15 peer reviewed publications on weed management in sugarbeets, declared that because sugarbeet growing practices are "fundamentally different than other cropping systems", it is "highly unlikely" that weed resistance to glyphosate will develop.  Exh. 447 ¶¶ 9-13; *see also* Exhs. 505 ¶¶ 42-51; 519 ¶¶ 49-53.  The unopposed evidence in this hearing is that all sugarbeet growers have a multi-year rotation where they never plant sugarbeets on the same acreage in successive years, and use different modes of action which inhibits the potential for weed resistance.  Exhs. 511 ¶¶ 12, 515 ¶¶ 11-12; 499 ¶ 12; 513 ¶¶ 9, 17.  Moreover, the sugarbeet growers' practice is to "tank mix" other herbicides with glyphosate if a weed difficult to eradicate with glyphosate was ever encountered.  Plaintiffs' own weed expert Dr. Radosevich agrees, Radosevich Depo., Exh. 536 at 76:6-76:16, 78:11-78:20, 155:11-155:18, 192:10-192:15, and their mischaracterizations of the Snyder testimony do not change these facts.  *See* 11/3/2010 Tr., 268: 2325; 269:6-7 (uses 3-year rotation and "different modes of action"); Exh. 516 ¶ 12 (same).  The potential for mixing and human error is also minimized under protocols used for sugarbeets.  *See, e.g.*, Exhs. 601, at 12-13, 16-17 (describing orange tagging system for RRSB seed); 603, at 17 ("Regulated seed will be clearly identified and labeled to distinguish it from other stored seed or materials").  Similarly, Plaintiffs have presented *no* evidence that the use of glyphosate on RRSB seedlings planted under the field trial permits has caused, or is likely to cause, increased crop disease on those acres.  Plaintiffs also have *no* evidence that imagined crop disease could harm them specifically.  The record evidence is that glyphosate neither binds with manganese in plant tissue nor sequesters micronutrients, and thus, there is no scientific mechanism for glyphosate to predispose RRSB to disease.  Exh. 476, ¶¶ 8-17; Exh. 477, ¶¶ 3-18; Exh. 466, ¶¶ 5-8.

DEFENDANTS' AND INTERVENOR-DEFENDANTS' JOINT
POST-HEARING BRIEF; CASE NO. 10-4038



the testimony of John Snyder, who testified that the potential loss of RRSB through the destruction of the permitted stecklings would eliminate a tremendously useful tool for farmers.  *See* 11/3/2010 Tr., 252:5-255:25, 256:10-19, 257:2-16, 257:23-258:14, 258: 20-260:3.  Without RRSB, sugarbeet farmers typically must use a potent cocktail of five or six more toxic herbicides which decrease sugarbeet yields. *Id*. at 255:19-261:19, 264:23-265:9; *see also* Exhs. 433-37 (photographs of chemicals used on conventional sugarbeet crops); 502, ¶¶ 15-16; 503.  Farmers also would be forced to reacquire

---

[15]  Although Dr. Sexton assumed that APHIS will take some future action that would allow at least some RRSB seed to be planted for root crops, this assumption is appropriate to consider in addressing potential injury to Intervenors.  APHIS is obligated under the Plant Protection Act to act on a petition for deregulation, including implementation of an alternative action, within a reasonable time, and to base its decision "on sound science."  7 U.S.C. § 7701(1), (4).  If the Court destroys the permitted stecklings, it will effectively eliminate APHIS's discretion to take administrative action respecting those plants, thereby destroying these farmers' livelihoods while presenting no risk at all to Plaintiffs.  The law does not require this result.  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("[A] federal judge . . . is not mechanically obligated to grant an injunction for every violation of law.") (cited in *Winter*, 129 S.Ct. at 381).

additional, expensive equipment, which they replaced in the years after deregulation and before Plaintiffs brought suit in *Sugarbeets I*. 11/3/2010 Tr., 267:17-268:16. And Plaintiffs' injunction threatens the growers' significant investment in the Wyoming Sugar Company plant in the wake of a previous bankruptcy that occurred while growing conventional sugarbeets. *Id.* at 250:12-255:18. If the Court grants Plaintiffs' proposed injunction, it would eliminate the possibility that APHIS could take appropriate action to allow the transplantation of the stecklings, and have significant consequences on sugarbeet growers. *Monsanto*, 130 S. Ct. at 2760-61.

Kurt Wickstrom, President of Betaseed, also testified that Plaintiffs' proposed injunction would bring Betaseed's research program to a halt, put 39 full-time researcher jobs at risk and threaten Betaseed's $7 million annual research program. 11/2/2010 Tr., 136:22-137:4, 142:2-5. It also would completely eliminate Betaseed's ability to plant the stecklings and sell the derived products in Canada, where RRSB can be grown regardless of whatever action APHIS takes.[16]

Bryan Meier of Syngenta similarly testified that Plaintiffs' proposed injunction would harm a nine-year project to develop a new disease resistant sugarbeet variety, and would set back Syngenta's overall agronomic research efforts "a minimum of two years." 11/2/2010 Tr., 154:17-155:3, 157:17-21. These research projects are important to the overall health of the industry. *Id.* at 160:8-22. The stecklings Plaintiffs want to destroy represent $10 million in projected seed sales in 2012 and $5 million in projected seed sales in 2013 and 2014 for Syngenta. *Id.* at 159:3-8. Destruction of Syngenta's stecklings would threaten the employment of 3 full-time and 40 temporary workers, with damage to the local economy of southern Oregon of around $750,000 to $950,000 per year from the loss of a research station alone, and loss of key employee expertise. *Id.* at 159:9-23. Plaintiffs assert that these harms would be "miniscule" and "flea-bite size" for Syngenta, but Meier testified that the impact on Syngenta's sugarbeet division is the relevant metric. *Id.* at 171: 21-23 ("Each business unit has to be profitable").

While Plaintiffs suggest (without any evidence) that conventional seed sales would offset these harms, Meier testified that any conventional seed sales would be uncertain, and would not

---

[16] 11/2/2010 Tr., 140:2-7, 141:4-8, 142:10-17; Exhs. 620-21; *see also* Tr. 284:14-18 (no permit required for shipment to Canada).

DEFENDANTS' AND INTERVENOR-DEFENDANTS' JOINT
POST-HEARING BRIEF; CASE NO. 10-4038

1 | compensate for the harmful impacts of losing the seed represented by the stecklings.  11/2/10 Tr.,

2 | 167:16-19, 168:2-5, 168:23; Exh. 416, ¶ 4[17]

3 | **CONCLUSION**

4 | Plaintiffs have failed to satisfy the requirements for preliminary injunctive relief.

5 | Plaintiffs seek the ultimate relief: the destruction of the stecklings in the guise of a preliminary

6 | injunction.  This Court should deny Plaintiffs' request.  It would cause significant and irreparable

7 | harm to Intervenors, processors and growers.   If the Court finds that injunctive relief is

8 | warranted, any such relief should be narrowly tailored.

9 | Should this Court nonetheless grant injunctive relief that would require stecklings to be

10 | destroyed, the Court should stay that order to permit, if necessary, an expedited appeal.  The

11 | evidence discussed herein shows that an order to uproot and destroy stecklings will cause

12 | immediate and irreparable harm.  The evidence also shows that plaintiffs will suffer no harm

13 | whatsoever from a stay.  Should this Court deny a stay, this Court should include in its order a

14 | provision delaying its effectiveness for 30 days to provide the Ninth Circuit a sufficient

15 | opportunity to consider whether to institute a stay under its appellate authority.  *See* Ninth Circuit

16 | Rule 27-3 (providing procedures to process an emergency stay motion within 21 days).[18]

---

[17] Plaintiffs also imply that SESVanderhave did not intervene because it can supply the whole sugarbeet market in 2012.  Pls.' Br. at 10 n. 4.  ████████████████████████████ Additionally, Plaintiffs' unsupported hyperbole about Monsanto has no bearing on the question of whether injunctive relief should be issued here.  Contrary to Plaintiffs' assertions, Monsanto has posed no obstacle to independent research involving RRSB.  Exh. 519, ¶ 61.  ██████████████████████████████████████████ Exh. 423.

[18] An appeal, if any, by APHIS must be authorized by the Solicitor General of the United States, see 28 C.F.R. 0.20(b), a stay of injunctive relief while a decision on appeal is assessed allows this process to occur in an orderly manner.

1    Dated:  November 12, 2010                    Respectfully submitted,
                                                  _____/s/ Drew C. Ensign_____
2    PHILIP J. PERRY (CA Bar No. 148696)          DREW C. ENSIGN (CA Bar No. 243956)
     JANICE M. SCHNEIDER (DC Bar No.              LATHAM & WATKINS LLP
3    472037) (pro hac vice)                       555 11th Street, N.W., Suite 1000
     LATHAM & WATKINS LLP                         Washington, D.C. 20004
4    555 11th Street, N.W., Suite 1000            Telephone: (202) 637-2200
     Washington, D.C. 20004                       Facsimile: (202) 637-2201
5    Telephone: (202) 637-2200                    Email: drew.ensign@lw.com
     Facsimile: (202) 637-2201
6    Email: phil.perry@lw.com
     Email: janice.schneider@lw.com
7
     STANLEY H. ABRAMSON (DC Bar No. 217281)
8    (pro hac vice)
     RACHEL G. LATTIMORE (DC Bar No. 450975)
9    (pro hac vice)
     ARENT FOX LLP
10   1050 Connecticut Avenue, N.W.
     Washington, D.C. 20036-5339
11   Telephone: (202) 857-6000
     Facsimile: (202) 857-6395
12   Email: abramson.stanley@arentfox.com
     Email: lattimore.rachel@arentfox.com
13
                  Attorneys for Intervenor-Defendant Monsanto Company
14                                                _____/s/ Nancy Bryson_____
     DAVID J. LAZERWITZ (Cal. Bar No.             NANCY BRYSON (DC Bar No. 913673) (pro
15   221349)                                      hac vice)
     FARELLA BRAUN + MARTEL LLP                   ALISON SUTHERS (DC Bar No. 995789)
16   235 Montgomery Street, 17th Floor            (pro hac vice)
     San Francisco, CA 94104                      HOLLAND & HART LLP
17   Telephone: (415) 954-4400                    975 F Street, N.W., Suite 900
     Facsimile: (415) 954-4480                    Washington, D.C. 20004
18   Email: dlazerwitz@fbm.com                    Telephone: (202) 654-6921
                                                  Facsimile: (202) 747-6567
19                                                Email: nbryson@hollandhart.com

20                Attorneys for Intervenor-Defendant Syngenta Seeds, Inc.

21                                                _____/s/ Harry Zirlin_____
     DANIEL MURPHY (Ca. Bar No. 141006)           DANIEL M. ABUHOFF (NY Bar No.
22   W. ALLAN EDMISTON (Ca. Bar No.               1227057) (pro hac vice)
     228246)                                      HARRY ZIRLIN (NY Bar No. 2315737) (pro
23   LOEB & LOEB LLP                              hac vice)
     10100 Santa Monica Blvd., 22nd Floor         DEBEVOISE & PLIMPTON LLP
24   Los Angeles, California  90067               919 Third Avenue
     Telephone:  (310) 282-2000                   New York, NY  10022
25   Facsimile:  (310) 282-2200                   Telephone:  (212) 909-6000
     Email:  dmurphy@loeb.com                     Facsimile:  (212) 909-6836
26   Email:  aedmiston@loeb.com                   Email:  dmabuhof@debevoise.com
                                                  Email:  hzirlin@debevoise.com
27                Attorneys for Intervenor-Defendant Betaseed, Inc.

28

                                          16          DEFENDANTS' AND INTERVENOR-DEFENDANTS' JOINT
                                                      POST-HEARING BRIEF; CASE NO. 10-4038

1

2   JOANNE LICHTMAN (Ca. Bar No. 137300)
    HOWREY LLP
3   550 South Hope Street, Suite 1100
    Los Angeles, California 90071-2627
4   Telephone: (213) 892-1800
    Facsimile: (213) 892-2300
5   Email: lichtmanj@howrey.com

6

7

8

_____/s/ Gilbert S. Keteltas_____
GILBERT S. KETELTAS (DC Bar No. 421236)
(*pro hac* granted)
CHRISTOPHER H. MARRARO (DC Bar No. 395152) (*pro hac vice* granted)
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2402
Telephone: (202) 783-0800
Facsimile: (202) 383-6610
Email: keteltasg@howrey.com
Email: marraroc@howrey.com

Attorneys for Intervenor-Defendant American Crystal Sugar Company

9   TONY WEST
    Assistant Attorney General
10  JOHN R. GRIFFITHS
    Assistant Director, Federal Programs Branch
11  JOHN R. COLEMAN (Va. Bar # 70908)
    Trial Attorney, U.S. Department of Justice
12  Civil Division, Federal Programs Branch
    20 Massachusetts Ave., N.W., Room 6118
13  Washington, D.C. 20530
    Telephone: (202) 514-4505
14  Facsimile: (202) 616-8460
    E-mail: John.Coleman3@usdoj.gov
15

16

17

IGNACIA S. MORENO
Assistant Attorney General

*/s/ Luther L. Hajek*
LUTHER L. HAJEK
BEVERLY F. LI
Trial Attorneys
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Tel.: (202) 305-0492 (Hajek) / (202) 353-9213 (Li)
Facsimile: (202) 305-0506
E-mail: Luke.Hajek@usdoj.gov
Beverly.Li@usdoj.gov

18                     Attorneys for Federal Defendants

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' AND INTERVENOR-DEFENDANTS' JOINT
                        POST-HEARING BRIEF; CASE NO. 10-4038

1

## CERTIFICATE OF SERVICE

2

     I HEREBY CERTIFY that on November 12, 2010 I electronically filed the foregoing
DEFENDANTS' AND INTERVENOR-DEFENDANTS' JOINT POST-HEARING BRIEF with

3

the Clerk of the Court for the United States District Court for the Northern District of California
by using the CM/ECF system.

4

5

     I HEREBY CERTIFY that a redacted copy of the foregoing was served on November 12,
2010 on the following individuals via the court's electronic filing system, with unredacted
versions served via electronic mail.

6

7

George A. Kimbrell
Center for Food Safety
2601 Mission Street, Suite 803

8

San Francisco, California 94110
Telephone: (415) 826-2770

9

Fax: (415) 826-0507
Email: gkimbrell@icta.org

10

11

Paul H. Achitoff
Earthjustice
223 South King Street, Suite 400

12

Honolulu, Hawai'i 96813
Telephone: (808) 599-2436

13

Fax: (808) 521-6841
Email: pachitoff@earthjustice.org

14

*Counsel for Plaintiffs*

15

16

Dated: November 12, 2010

Respectfully submitted,
/s/ Drew C. Ensign

17

PHILIP J. PERRY (CA Bar No. 148696)
JANICE M. SCHNEIDER (DC Bar No.
472037) (*pro hac vice*)

DREW C. ENSIGN (CA Bar No. 243956)
LATHAM & WATKINS LLP

18

LATHAM & WATKINS LLP
555 11th Street, N.W., Suite 1000

555 11th Street, N.W., Suite 1000
Washington, D.C. 20004

19

Washington, D.C. 20004
Telephone: (202) 637-2200

Telephone: (202) 637-2200
Facsimile: (202) 637-2201

20

Facsimile: (202) 637-2201
Email: phil.perry@lw.com

Email: drew.ensign@lw.com

21

Email: janice.schneider@lw.com

22

STANLEY H. ABRAMSON (D.C. Bar No.
217281) (*pro hac vice*)

23

RACHEL G. LATTIMORE (D.C. Bar No.
450975) (*pro hac vice*)

24

ARENT FOX LLP
1050 Connecticut Avenue, N.W.

25

Washington, D.C. 20036-5339
Telephone: (202) 857-6000

26

Facsimile: (202) 857-6395
Email: abramson.stanley@arentfox.com

27

Email: lattimore.rachel@arentfox.com

*Attorneys for Intervenor-Defendant*

28

*Monsanto Company*

CERTIFICATE OF SERVICE