1
2
3
4
5
6

IN THE UNITED STATES DISTRICT COURT

7

FOR THE NORTHERN DISTRICT OF CALIFORNIA

8
9

CENTER FOR FOOD SAFETY, et al.,

10

Plaintiffs,                                    No. C 10-04038 JSW

11

v.

12

THOMAS J. VILSACK, et al.,                     **ORDER REGARDING THE
                                               REMEDIES ON PLAINTIFFS'**

13

Defendants.                                    **MOTION FOR PRELIMINARY
                                               INJUNCTION**

14
15

_____/

16

Now before the Court is the remedies portion of the motion for a preliminary injunction

17

filed by plaintiffs Center for Food Safety, Organic Seed Alliance, Sierra Club, and High

18

Mowing Organic Seeds (collectively, "Plaintiffs"). Having carefully reviewed the parties'

19

arguments and evidence and considered the relevant legal authority, the Court hereby GRANTS

20

the remedy requested by Plaintiffs.[1]

21

**BACKGROUND**

22

Plaintiffs filed this action challenging the decision by the United States Department of

23

Agriculture ("USDA") and its Animal and Plant Health Inspection Service ("APHIS")

24

(collectively, "Defendants") to issue permits to four seed companies to plant stecklings of

25

genetically engineered sugar beets. Plaintiffs contend that APHIS's decision to issue these

26

permits without conducting any environmental review violates the National Environmental

27
28

_____

[1] The Court GRANTS the parties' request to file the confidential portions of their
post-trial briefs under seal.

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1   Policy Act, 42 U.S.C. §§ 4321-4335 ("NEPA"), the Plant Protection Act ("PPA"), the 2008

2   Farm Bill, and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ("APA").

3       Monsanto Company ("Monsanto") owns intellectual property rights in the technology

4   used to produce Roundup Ready sugarbeets.  Betaseed, Inc. ("Betaseed") is a supplier of sugar

5   beet seed.  Betaseed's parent company, KWS SAAT AG ("KSW"), pursuant to a licensing

6   agreement with Monsanto, inserted the gene for glyphosate tolerance into sugar beets to

7   produce a type of Roundup Readysugar beets known as Event H7-1.

8       KSW and Monsanto submitted a petition to the USDA seeking to deregulate Event

9   H7-1, which the USDA granted on March 4, 2005.  However, on August 13, 2010, in a prior

10  case, *Center for Food Safety v. Vilsack*, Case No. 08-00484 ("*Sugar Beets I*"), this Court

11  vacated Defendants' deregulation decision based on APHIS's failure to prepare an

12  Environmental Impact Statement ("EIS").

13      The Court shall address additional facts as necessary to its analysis in the remainder of

14  this Order.

15                                  **ANALYSIS**

16  **I.      Plaintiffs' Motion for Preliminary Injunction.**

17      In order to obtain a preliminary injunction, Plaintiffs "must establish that [they are]

18  likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of

19  preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in

20  the public interest."  *Winter v. Natural Resources Defense Council*, 129 S. Ct. 365, 374 (2008)

21  (citations omitted).  The *Winter* court also noted that because injunctive relief is "an

22  extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is

23  entitled to such relief."  *Id.* at 375-76 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)

24  (*per curiam*)).  Thus, "[i]n each case, courts 'must balance the competing claims of injury and

25  must consider the effect on each party of the granting or withholding of the requested relief.'"

26  *Id*. at 376 (citing *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987)).  "'In exercising

27  their sound discretion, courts of equity should pay particular regard for the public consequences

28

2

1    in employing the extraordinary remedy of injunction.'"  *Id.* at 376-77 (citing *Weinberger v.*

2    *Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

3          The Court already determined that Plaintiffs have demonstrated a likelihood of success

4    on the merits.  (Docket No. 92.)  Therefore, the Court will address the remaining factors.

5          **A.     Plaintiffs Have Demonstrated Likelihood of Irreparable Harm.**

6          Despite the Court's repeated admonitions to Defendants and Intervenor-Defendants that

7    the Court will not restrict its consideration of any likely harm to impacts stemming from the

8    plantings allowed pursuant to the permits at issue, Defendants and Intervenor-Defendants

9    continue to argue that Plaintiffs' arguments regarding potential harm from the later cycles of

10   genetically engineered sugar beet plantings and production is speculative because agency

11   decisions have not yet been made to allow such later cycles.  In light of the Court's

12   determination that Plaintiffs have demonstrated a likelihood of success on the merits – that

13   Defendants violated NEPA by considering the permits in isolation and segmenting them from

14   the later cycles of genetically engineered sugar beet plantings and production by unlawfully

15   relying on a categorical exclusion to avoid conducting any environmental review, it would be

16   illogical if the Court restricted Plaintiffs' showing of harm to injuries based solely on the

17   unlawfully segmented permits in isolation.  *See Save Our Sonoran, Inc. v. Flowers*, 408 F.3d

18   1113, 1121-24 (9th Cir. 2005) (based on the interconnected nature of the desert washes and the

19   surrounding area, affirming the district court's finding that the agency improperly constrained

20   its NEPA analysis to the washes, which was one small portion of the land, rather than

21   considering the development's effect on the environmental as a whole); *see also High Sierra*

22   *Hikers Ass'n v. Blackwell*, 390 F.3d 630, 645-46 (9th Cir. 2004) (rejecting intervenors'

23   argument that the impact of their individual activities were not significant: "The effects of

24   individual pack operators may very well be *de minimis*, but the agency has failed to make this

25   evaluation and failed to make findings regarding the cumulative impacts. ... Cumulative impacts

26   that result from individually minor but collectively significant actions are the crux of what the

27   regulations implementing NEPA seek to avoid."); *Colorado River Indian Tribes v. Marsh*, 605

28   F. Supp. 1425, 1440 (C.D. Cal. 1985) (rejecting defendants' argument to limit the court's

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  consideration of environmental impact to the primary impacts of the permit and to ignore the

2  secondary and cumulative impacts).[2]

3  Moreover, it is significant that the permits themselves provide that their purpose was

4  "[t]o produce stecklings (seed vernalization) for transplant into basic seed (commercial)

5  production trials in 2010-2011."  (Evidentiary Hearing Exhibit ("Ex.") 610 at 6.)  *See Colorado*

6  *River Indian Tribes*, 605 F. Supp. at 1441 ("To then say that [the entire project] is not a

7  reasonably foreseeable event and therefore its impact should not be considered because the

8  Developer has other reasons in seeking to [engage in the conduct pursuant to the permits] ...

9  overlooks the primary motivating force behind the application for the permit.").

10  Additionally, despite their arguments that Plaintiffs' assertions of harm based on later

11  cycles of genetically engineered sugar beet plantings and production are purely speculative,

12  Defendants and Intervenor-Defendants argue that the Court should consider the harm

13  Intervenor-Defendants will incur if the Court orders the stecklings to be removed *and*

14  Defendants later grant further approvals to authorize such later cycles.  However, the law

15  directs the Court to consider the potential environmental impacts from the full project that was

16  unlawfully segmented.  Additionally, Defendants and Intervenor-Defendants have not cited to,

17  and the Court did not find, any authority directing the Court to consider potential economic

18  impacts from development of a crop that is not currently legal.

19  Nevertheless, Plaintiffs have demonstrated a likelihood of harm stemming from the

20  plantings pursuant to the permits at issue.  The evidence presented at the evidentiary hearing

21  made clear that, even with the existence of protocols designed to minimize any environmental

23  [2] Defendants' and Intervenor-Defendants' attempts to distinguish *Sonoran* and
24  *Colorado River Indian Tribes* from the facts here are unpersuasive.  They contend that unlike
in *Sonoran*, the harms from the permits at issue are distinguishable from those caused by the
25  later production and development cycles.  However, this argument ignores this Court's
finding that Defendants improperly segmented their consideration of the permits.  The
26  permits are one part of a larger project and it is the obligation of Defendants, and of the
Court, to consider the entire project as a whole.
27  Defendants and Intervenor-Defendants also argue that the holding of *Colorado River Indian Tribes* should be disregarded because that court presumed irreparable harm.
28  However, in the portion of the order cited to by Plaintiffs and relied on by this Court, the
Central District Court considered the evidence of irreparable environmental injury and did
not rely on the presumption.

United States District Court
For the Northern District of California

1    harm, there is a significant risk that the plantings pursuant to the permits will cause

2    environmental harm.  Despite efforts by Defendants to implement effective protocols and

3    efforts by Intervenor-Defendants to minimize any contamination or cross-pollination, there are

4    examples of where such efforts were ineffective, either because the conditions were later

5    determined to be insufficient or the conditions were not followed.  In other instances, the causes

6    of the contamination were never discovered.  These incidents are too numerous for this Court to

7    declare confidently that these permits provide sufficient containment to protect the

8    environment.

9         Defendants and Intervenor-Defendants argue that Plaintiffs have not demonstrated any

10   harm has occurred when a permit has been issued with the particular conditions included with

11   the permits at issue.  In addition to applying the wrong standard (actual harm versus likelihood

12   of harm), Defendants and Intervenor-Defendants are seeking to penalize Plaintiffs, as well as

13   the environment, because the precise effects from these plantings are not yet known.  However,

14   "this lack of precision is the result of [APHIS's] failure to conduct an environmental evaluation

15   *prior* to" issuing these permits.  *Brady Campaign*, 612 F. Supp. 2d at 25 (citing *Winter*, 129

16   S.Ct. at 376 ("[p]art of the harm NEPA attempts to prevent in requiring an EIS is that, without

17   one, there may be little if any information about prospective environmental harms and potential

18   mitigating measures")).  To the extent Defendants and Intervenor-Defendants contend that they

19   would suffer any harm, it is only of their own doing.  Due to their preemptive conduct, the

20   stecklings have been planted pursuant to the permits at issue and they have created a significant

21   risk of environmental harm.

22        Plaintiffs have further demonstrated a likelihood of harm stemming from the entire cycle

23   of genetically engineered sugar beet plantings and production.  If the stecklings are transplanted

24   and replanted to produce seed, and the remainder of the planting and production cycle of

25   genetically engineered sugar beets moves forward, the potential for contamination, including

26   through cross-pollination merely increases.  The evidence demonstrates that there are points of

27   vulnerability where contamination is likely at every production stage.  Even Intervenor-

28   Defendants, despite their best efforts, have not been able to prevent contamination.  Plaintiffs

United States District Court
For the Northern District of California

have members who grow organic *Beta vulgaris* seed in and around the Willamette Valley, buy seed from such growers, and consume organic *beta* crops in that area. These farmers and consumers would likely suffer harm from cross-contamination.

The likely environmental harm established by Plaintiffs is irreparable. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co.*, 480 U.S. at 545 (1987) (finding injunction was not warranted because the asserted environmental injury was "not at all probable").

Additionally, Plaintiffs have demonstrated significant procedural injury stemming from the NEPA violations. "There is no doubt that the failure to undertake an [environmental review] when required to do so constitutes procedural injury to those affected by the environmental impacts of a project." *See Save Strawberry Canyon v. Dept. of Energy*, 613 F. Supp. 2d 1177, 1187 (N.D. Cal. 2009) (finding that, due to the alleged NEPA violations, the plaintiff was "virtually certain to suffer irreparable procedural injury absent an injunction"). "The NEPA duty is more than a technicality; it is an extremely important statutory requirement to serve the public and the agency *before* major federal actions occur." *Foundation on Econ. Trends v. Heckler*, 756 F.2d 143, 157 (D.C. Cir. 1985) (emphasis in original) (finding that "[i]f plaintiffs succeed on the merits, then the lack of an adequate environmental consideration looms as a serious, immediate, and irreparable injury.").

Failing to conduct the required environmental review and depriving Plaintiffs and the public "of the opportunity to participate in the NEPA process at a time when such participation is required and is calculated to matter" constitutes irreparable harm. *See Save Strawberry Canyon*, 613 F. Supp. 2d at 1189-90 (noting that even if the plaintiff did not receive a preliminary injunction but ultimately wins on the merits, "much of the environmental harm will already have occurred and alternatives will have been foreclosed."); *see also Colorado Wild, Inc. v. United States Forest Service*, 523 F. Supp. 2d 1213, 1221 (D. Colo. 2007) (finding that, in the absence of an injunction, even if the agency decision was later overturned and the agency

United States District Court

For the Northern District of California

1   was required to "redecide" the issue, there was a risk that "the bureaucratic momentum created

2   by Defendants' activities [would] skew the analysis and decision-making of the [agency]

3   towards its original, non-NEPA complaint ... decision.") (citing *Sierra Club v. Marsh*, 872 F.2d

4   497, 500 (1st Cir. 1989) ("Once large bureaucracies are committed to a course of action, it is

5   difficult to change that course – even if new, or more thorough, NEPA statements are prepared

6   and the agency is told to 'redecide.'")); *San Luis Valley Ecosystem Council v. United States*

7   *Fish and Wildlife Serv.*, 657 F. Supp. 2d 1233, 1241-42 (D. Colo. 2009) (finding that plaintiffs'

8   remedy would be meaningless and plaintiffs' procedural interest would likely be irreparably

9   harmed if preliminary injunction were not issued).

10        Although, standing alone, a procedural deprivation may not be sufficient to warrant the

11   issuance of an injunction, the likely environmental harm to be suffered here is compounded by

12   the procedural injury.  *See Citizens for Better Forestry v. United States Dept. of Agriculture*,

13   341 F.3d 961, 970-71 (9th Cir. 2003) (explaining that the procedural injury from a NEPA

14   violation "is tied to a substantive harm to the environment – the harm consists of added risk to

15   the environment that takes place when governmental decisionmakers make up their minds

16   without having before them an analysis (with public comment) of the likely effects of their

17   decision on the environment.") (internal quotations marks and citations omitted); *see also Brady*

18   *Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 24-26 (D.D.C. 2009)

19   ("Although a procedural violation of NEPA is not itself sufficient to establish irreparable injury,

20   it is certainly a relevant consideration"); *see also Save Strawberry Canyon*, 613 F. Supp. 2d at

21   1189 (find that plaintiff satisfied the "likelihood of injury" requirement by demonstrating

22   irreparable procedural injury).  "When a procedural violation of NEPA is combined with a

23   showing of environmental or aesthetic injury, courts have not hesitated to find a likelihood of

24   irreparable injury."  *Brady Campaign*, 612 F. Supp. 2d at 24-25 (citing cases).

25        Accordingly, the Court finds that Plaintiffs have made a strong showing that they and

26   the environment are likely to suffer irreparable harm if this Court does not issue an injunction.

27        **B.**    **Balance of Equities and the Public Interest Tip in Favor of an Injunction.**

28

**United States District Court**
For the Northern District of California

1    In light of Plaintiffs' strong showing of likely irreparable harm and Defendants' and

2    Intervenor-Defendants' weak showing of harm, the balance of equities tips sharply in favor of

3    Plaintiffs. Notably, the harm of which Defendants and Defendant-Intervenors complain – the

4    purported harm based on the lack of genetically engineered sugar beet seed in 2012, 2013 and

5    2014 – has already been caused by this Court's prior order vacating APHIS's deregulation

6    decision. Unless and until APHIS alters the status quo by fully or partially deregulating

7    genetically engineered sugar beets, and does so in a manner that comports with the requisite

8    environmental statutes and regulations, Intervenor-Defendants are legally precluded from

9    growing and processing genetically engineered sugar beets.

10       Moreover, that Defendants and Intervenor-Defendants waited almost a year after the

11   Court held that Defendants acted unlawfully in deregulating genetically engineered sugar beets

12   before they attempted to enact interim measures or sought permits to authorize continued

13   plantings and production of genetically engineered sugar beets has further contributed to the

14   harm of which they now complain. Intervenor-Defendants and Defendants then rushed to seek

15   and grant permits which improperly segmented the planting of seed stecklings from the

16   remainder of the sugar beet planting and production cycles. Thus, the Court finds that the harm

17   of which Defendants and Defendant-Intervenors now complain was caused by the Court's prior

18   orders and their own delay, rather than from Plaintiffs' efforts to require Defendants to comply

19   with NEPA.

20       The Court further finds that neither Defendants nor Intervenor-Defendants "have any

21   cause to claim surprise as a result of any injunction." *See National Park & Conservation Ass'n.*

22   *v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001). Plaintiffs vigorously litigated the deregulation of

23   genetically engineered sugar beets. On September 21, 2009, in the prior case, *Sugar Beets I*,

24   this Court held that the deregulation decision violated NEPA. Plaintiffs objected to APHIS's

25   request to delay the vacature for nine months to provide APHIS with more time to consider

26   interim measures regarding the genetically engineered sugar beets pending a full environmental

27   review. On August 13, 2010, the Court vacated APHIS's deregulation decision and denied its

28   request for a stay of the vacature.

1    On September 1, 2010, APHIS announced that it had received permit applications and

2    intended to grant these permits to authorize steckling production within the next two weeks.

3    (Ex. 93.)  The next day, Plaintiffs issued a press release in which they noted that APHIS's

4    intended use of the permitting process for a commercially grown genetically engineered crop

5    was unprecedented and that they were considering legal action.  APHIS issued the permits a

6    couple of days later and on Labor Day, Monday, September 6, 2010, updated its website to

7    reflect that the permits had been issued.  Three days later, on September 9, 2010, Plaintiffs filed

8    this lawsuit challenging the issuance of the permits, and they filed a motion for a temporary

9    restraining order on September 10, 2010.[3]

10   Therefore, when the permits were issued and the plantings began, Defendants and

11   Intervenor-Defendants were well aware of Plaintiffs' objections to genetically engineered sugar

12   beets, of Plaintiffs' prior litigation and of Plaintiffs' likely challenge to the issuance of the new

13   permits.  Moreover, Defendants and Monsanto were aware of Plaintiffs' concern regarding

14   potential abuse of the permitting process to avoid the effect of court orders regarding

15   deregulation, as this issue had been raised in a prior case regarding the deregulation of

16   genetically engineered alfalfa.  *See Geertson Farms, Inc. v. Johanns*, 2007 WL 1302981, *8

17   (N.D. Cal. May 3, 2007) (noting that the plaintiffs in that case "[had] not established that

18   APHIS [would] avoid the import of this Court's injunction by abusing the permit process.").

19   Therefore, the Court finds that Defendants' and Intervenor-Defendants' advanced knowledge of

20   Plaintiffs' position and likely litigation regarding the permits renders their assertions regarding

21   the potential economic harm "less than convincing."  *See Ty, Inc. v. Jones Group, Inc.*, 237 F.3d

22   891, 903 (7th Cir. 2001) (finding that the defendant's assertions regarding the economic

23   burdens it would face if an injunction were granted were "less than convincing" in light of the

24   fact that the defendant had knowledge of the plaintiff's trademarks prior to adopting its mark);

25

26   [3] Of the 526 acres authorized for plantings pursuant to the permits at issue, 153.2
     acres were planted before or on September 9, 2010 and an additional 4.1 acres were planted
27   on September 10, 2010.  (Declaration of Natalia A. Weinsetel (Docket No. 133), ¶¶ 6-7.)  A
     total of 256.14 acres were planted pursuant to these permits.  Thus, when Plaintiffs filed their
28   lawsuit, only 29 percent of the authorized acreage and 59.8 percent of the actual acreage had
     been planted.

1   *see also Baykeeper v. United States Army Corp of Engineers*, 2006 WL 2711547, *17 (E.D.

2   Cal. Sept. 20, 2006) ( in balancing the harms taking into consideration the fact that the

3   government agency knowingly accepted the risk of incurring financial harm).

4          Moreover, Defendants' and Intervenor-Defendants' claims of likely harms are

5   undermined by the language of the permits themselves, which provide that the crop will be

6   destroyed if further approvals were not granted.  (Ex. 602 at 4.)  Intervenor-Defendants also

7   represented to the Court that "[i]n the event that APHIS decides not to authorize the

8   transplantation and flowing [of the stecklings], the stecklings will be destroyed by the terms of

9   the permits ...."  (Intervenor-Defendants' Opp. to TRO (Docket No. 74) at 12.)

10          Additionally, the Court finds Defendants' and Intervenor-Defendants' assertions of

11   economic harm not to be credible.  The evidence of economic harm at the evidentiary hearing

12   was presented primarily through Dr. Richard J. Sexton, Intervenor-Defendants' expert witness.

13   However, the analysis and conclusions Dr. Sexton presented at the evidentiary hearing were

14   actually prepared before May 6, 2010, in anticipation of the remedies hearing in *Sugar Beets I*.

15   Therefore, his study was not specifically on the effects of limiting the use of the stecklings

16   planted pursuant to the permits at issue here, but rather, was a study of potential economic

17   effects due to a complete vacature and injunction regarding the entire planting and production

18   cycle of genetically engineered sugar beets.  In his prepared analysis, Dr. Sexton did not

19   account for the stecklings that were legally planted before August 13, 2010 and would not be

20   subject to the preliminary injunction at issue here.[4]  Nor did Dr. Sexton evaluate what impact

21   existing inventories of conventional or genetically engineered sugar beet seed held by the seed

22   producers would have on his analysis and conclusions.  Therefore, the Court finds Dr. Sexton's

23   conclusions regarding the extent of economic harm to be greatly exaggerated.[5]

24

25          [4] At the evidentiary hearing, Dr. Sexton did estimate that use of the stecklings planted
26   prior to August 13, 2010 may reduce his estimated damages by fifty percent.

27          [5] Moreover, Intervenor-Defendants improperly submitted evidence at the evidentiary
    hearing regarding harm they would allegedly suffer in their research efforts if the stecklings
28   planted pursuant to the permits were destroyed.  Intervenor-Defendants argue that such
    evidence should be considered by the Court as relevant to the balance of equities and public
    interest inquiries.  However, the Court finds that Intervenor-Defendants' introduction of this

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

Finally, to the extent the Court considers the assertions of likely economic harm made by Defendants and Intervenor-Defendants, the Court finds that these anticipated losses do not outweigh the potential irreparable damage to the environment established by Plaintiffs.  *See National Parks & Conservation Ass'n*, 241 F.3d at 738 (finding that the defendants' loss of anticipated revenues did not outweigh the potential irreparable harm to the environment); *see also Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) ("Consistent with *Amoco Production Company*, we have held that the public interest in preserving nature and avoiding irreparable environmental injury outweighs economic concerns in cases where plaintiffs were likely to succeed on the merits of their underlying claim."); *Save Our Sonoran*, 408 F.3d at 1125 (affirming injunction where district court found that balance of hardships tipped in favor of injunction in light of likelihood of environmental harm and despite the fact that defendant would suffer financial harm); *Idaho Sporting Congress, Inc. v. Alexander*, 222 F. 3d 562, 569 (9th Cir. 2000) (finding injunction proper where environmental harm was sufficiently likely, despite fact that it "could present financial hardship" to government agency, the intervenors and the surrounding communities).

Regarding the public interest at stake, the Ninth Circuit has recognized "the well-established public interest in preserving nature and avoiding irreparable environmental injury." *Alliance for Wild Rockies v. Cottrell*, 622 F.3d 1045, 1056 (9th Cir. 2010) (internal quotations marks and citation omitted); *see also Earth Island Inst. v. United States Forest Serv.*, 442 F.3d 1147, 1177 (9th Cir. 2006) ("The preservation of our environment, as required by NEPA and the NFMA, is clearly in the public interest."), *abrogated on other grounds by Winter*, 129 S.Ct. 365.  Moreover, "Congress's determination in enacting NEPA was that the public interest requires careful consideration of environmental impacts before major federal projects may go forward."  *South Fork Bank Council of Western Shoshone of Nevada v. United States Dept. of Interior*, 588 F.3d 718, 728 (9th Cir. 2009) (finding that issuance of an injunction pending consideration of environmental impacts under NEPA comported with the public interest); *see*

_____

evidence is an improper attempt to avoid the impact of the Court's prior finding and ruling regarding the limited purpose of the permits.

1  *also Colorado Wild*, 523 F. Supp. 2d at 1223 ("The public has an undeniable interest in the

2  [agency's] compliance with NEPA's environmental review requirements and in the informed

3  decision-making that NEPA is designed to promote.")

4      Therefore, the Court finds that the balance of hardships between the parties and the

5  public interest tips sharply in favor of Plaintiffs and in favor of issuing an injunction.

6      **C.      The Requested Injunction Is Warranted.**

7      Plaintiffs seek an injunction requiring Intervenor-Defendants and SES VanderHave

8  USA that planted stecklings pursuant to the permits at issue be ordered to remove the stecklings

9  from the ground.  Defendants and Intervenor-Defendants complain that such an order would be

10  an improper mandatory injunction.

11      Issuing an injunction that alters status quo *pendente lite*, although disfavored, may be

12  issued where "the facts and law clearly favor the moving party."  *Stanley v. University of So.

13  Calif.*, 13 F.3d 1313, 1320 (9th Cir. 1994); *see also Dahl v. HEM Pharmaceuticals Corp.*, 7

14  F.3d 1399, 1403, 1405 (9th Cir. 1993) (noting issuance of injunction requiring affirmative

15  action is subject to heightened scrutiny, but still affirming issuance of preliminary mandatory

16  injunction).  Moreover, "[w]here a defendant with notice of an injunction proceeding completes

17  an act sought to be enjoined by the plaintiff, the court has the authority to issue a mandatory

18  injunction restoring the status quo."  *Sierra Club v. United States Dept. of Transp.*, 664 F. Supp.

19  1324, 1341 (N.D. Cal. 1987); *see also Porter v. Lee*, 328 U.S. 246, 251 (1946) ("It has long

20  been established that where a defendant with notice in an injunction proceeding completes the

21  acts sought to be enjoined the court may by mandatory injunction restore the status quo.").

22  Here, despite the rapid pace at which the permits were issued and the plantings pursuant to

23  these permits were completed, Plaintiffs filed this instant lawsuit and requested a temporary

24  restraining order before a substantial portion of the plantings had been completed.

25      Moreover, Defendants' and Intervenor-Defendants' claims regarding the extraordinary

26  nature of requested injunction are belied by the requirements of the permits themselves, which

27  require the stecklings be destroyed if further transplantation is not approved by APHIS or other

28  regulatory authority.  (Ex. 602 at 4.)  And, as noted above, Intervenor-Defendants represented

1   to the Court that "[i]n the event that APHIS decides not to authorize the transplantation and

2   flowing [of the stecklings], the stecklings will be destroyed by the terms of the permits ...."

3   (Intervenor-Defendants' Opp. to TRO (Docket No. 74) at 12.)

4          Additionally, the Court notes that, to the extent the requested injunction is a mandatory

5   injunction, Defendants and Intervenor-Defendants created this problem.  They delayed in

6   seeking or implementing interim relief despite knowing in *September of 2009* that the Court

7   found APHIS unlawfully deregulated sugar beets and thus, at a minimum, a vacature of the

8   decision was highly likely.  Moreover, once the vacature was issued, instead of moving

9   formally for a stay of the vacature and making the requisite showing, or asking the Ninth Circuit

10  to stay the vacature pending the appeal, Defendants rushed to grant permits, and Intervenor-

11  Defendants rushed to plant stecklings pursuant to these permits.  These permits have gone far

12  beyond the scope of what has been done before – granting permits for commercially grown

13  genetically engineered crops.  Despite the fact that the permits themselves state that their

14  purpose was "[t]o produce stecklings (seed vernalization) for transplant into basic seed

15  (commercial) production trials in 2010-2011," Defendants took the position before this Court

16  that they did not unlawfully segment this portion of the genetically sugar beet production cycle.

17  Based on the record currently before the Court, the legality of Defendants' conduct does not

18  even appear to be a close question.  It appears clear that Defendants and Intervernor-Defendants

19  were merely seeking to avoid the impact of the Court's prior order *in Sugar Beets I.*  Therefore,

20  the Court finds that Plaintiffs have established that the "facts and law clearly favor" granting the

21  requested injunction in this case.  *See Dahl*, 7 F.3d at 1403.

22          **D.      No Bond Will Be Required.**

23          Although Federal Rule of Civil Procedure 65(c) generally requires that a successful

24  application for a preliminary injunction post a bond or other security, "[t]he court has discretion

25  to dispense with the security requirement, or to request mere nominal security, where requiring

26  security would effectively deny access to judicial review."  *California ex rel. Van De Kamp v.*

27  *Tahoe Regional Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985), *amended on other*

28  *grounds*, 775 F.2d 998 (9th Cir. 1985); *see also Save Our Sonoran*, 408 F.3d at 1126 (noting the

**United States District Court**
For the Northern District of California

13

United States District Court

For the Northern District of California

1    Ninth Circuit's "long-standing precedent that requiring nominal bonds is perfectly proper in

2    public interest litigation," but affirming imposition of $50,000 bond where the plaintiffs had an

3    opportunity and failed to demonstrate that the imposition of such bond would constitute an

4    undue hardship).

5           Upon review of the declarations submitted by Plaintiffs, the Court finds that an

6    imposition of a bond here would effectively deny Plaintiffs access to judicial review.  By virtue

7    of an agreement among all of the Plaintiffs, Center for Food Safety is the organization that

8    would be responsible for any bond required.  (Declaration of Andrew Kimbrell ("Kimbrell

9    Decl."), ¶ 13.)  Center for Food Safety is a small non-profit with a full-time staff of only twelve

10   and a part time staff of six.  Its budget is already committed to paying the expenses of existing

11   staff expenses and programs.  Center for Food Safety would not be able to post a substantial

12   bond without eliminating other programs and reducing its staff.  (Kimbrell Decl., ¶¶ 15-18.)

13   The founder and executive director of Center for Food Safety attests that requiring the

14   organization to pay a bond would fatality harm its ability to bring lawsuits on behalf of the

15   public interest.  (*Id*., ¶ 20.)  Accordingly, the Court does not require Plaintiffs to post a bond.

16   **II.     No Stay Will Be Issued.**

17          In their conclusion of their post-hearing brief, Defendants and Intervenor-Defendants

18   summarily request a stay pending appeal if the Court issues the injunction.  In *Golden Gate*

19   *Restaurant Ass'n v. City and County of San Francisco*, the Ninth Circuit set forth the factors

20   regulating issuance of a stay pending appeal:  "(1) whether the stay applicant has made a strong

21   showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably

22   injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties

23   interested in the proceeding; and (4) where the public interest lies."  512 F.3d 1112, 1115 (9th

24   Cir. 2008) (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).  The Court finds that

25   Defendants and Intervenor-Defendants fail to make a strong showing they are likely to succeed

26   on the merits, that they will be irreparably injured absent a stay, or that the public interest would

27   be served by a stay.  Accordingly, the Court declines to stay this Order issuing a preliminary

28   injunction pending appeal.  Nevertheless, it is likely that Defendants and Intervenor-Defendants

United States District Court

For the Northern District of California

1 will seek a stay pending appeal from the Ninth Circuit. Therefore, this preliminary injunction

2 shall not take effect until Monday, December 6, 2010 at 10:00 a.m.

3 **CONCLUSION**

4 For the foregoing reasons, the Court GRANTS Plaintiffs' motion for a preliminary

5 injunction and HEREBY ORDERS that the stecklings planted pursuant to the permits issued by

6 Defendants shall be removed from the ground. After meeting and conferring with Defendants

7 and Intervenor-Defendants, Plaintiffs shall submit a proposed injunction in accordance with this

8 Order by no later than 4:00 p.m. on December 2, 2010. The proposed injunction shall specify

9 who will be responsible for carrying out the Court's order and ensuring that the stecklings are

10 removed from the ground. The Court FURTHER ORDERS that this preliminary injunction

11 shall not take effect until Tuesday, December 7, 2010 at 10:00 a.m.

12 **IT IS SO ORDERED.**

13

14 Dated: November 30, 2010

15 JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28