IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR FOOD SAFETY, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>THOMAS J. VILSACK, et al.,<br><br>    Defendants.<br>_____ / | No. C 10-04038 JSW<br><br>**AMENDED ORDER REGARDING THE REMEDIES ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

Now before the Court is the remedies portion of the motion for a preliminary injunction filed by plaintiffs Center for Food Safety, Organic Seed Alliance, Sierra Club, and High Mowing Organic Seeds (collectively, "Plaintiffs"). Having carefully reviewed the parties' arguments and evidence and considered the relevant legal authority, the Court hereby GRANTS the remedy requested by Plaintiffs.[1]

**BACKGROUND**

Plaintiffs filed this action challenging the decision by the United States Department of Agriculture ("USDA") and its Animal and Plant Health Inspection Service ("APHIS") (collectively, "Defendants") to issue permits to four seed companies to plant stecklings of genetically engineered sugar beets. Plaintiffs contend that APHIS's decision to issue these permits without conducting any environmental review violates the National Environmental

---

[1] The Court GRANTS the parties' request to file the confidential portions of their post-trial briefs under seal.

Policy Act, 42 U.S.C. §§ 4321-4335 ("NEPA"), the Plant Protection Act ("PPA"), the 2008 Farm Bill, and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ("APA").

Monsanto Company ("Monsanto") owns intellectual property rights in the technology used to produce Roundup Ready sugarbeets. Betaseed, Inc. ("Betaseed") is a supplier of sugar beet seed. Betaseed's parent company, KWS SAAT AG ("KSW"), pursuant to a licensing agreement with Monsanto, inserted the gene for glyphosate tolerance into sugar beets to produce a type of Roundup Readysugar beets known as Event H7-1.

KSW and Monsanto submitted a petition to the USDA seeking to deregulate Event H7-1, which the USDA granted on March 4, 2005. However, on August 13, 2010, in a prior case, *Center for Food Safety v. Vilsack*, Case No. 08-00484 ("*Sugar Beets I*"), this Court vacated Defendants' deregulation decision based on APHIS's failure to prepare an Environmental Impact Statement ("EIS").

The Court shall address additional facts as necessary to its analysis in the remainder of this Order.

## ANALYSIS

**I.  Plaintiffs' Motion for Preliminary Injunction.**

In order to obtain a preliminary injunction, Plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council*, 129 S. Ct. 365, 374 (2008) (citations omitted). The *Winter* court also noted that because injunctive relief is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 375-76 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*)). Thus, "[i]n each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Id*. at 376 (citing *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987)). "'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences

2

in employing the extraordinary remedy of injunction.'" *Id.* at 376-77 (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

The Court already determined that Plaintiffs have demonstrated a likelihood of success on the merits. (Docket No. 92.) Therefore, the Court will address the remaining factors.

### A. Plaintiffs Have Demonstrated Likelihood of Irreparable Harm.

Despite the Court's repeated admonitions to Defendants and Intervenor-Defendants that the Court will not restrict its consideration of any likely harm to impacts stemming from the plantings allowed pursuant to the permits at issue, Defendants and Intervenor-Defendants continue to argue that Plaintiffs' arguments regarding potential harm from the later cycles of genetically engineered sugar beet plantings and production is speculative because agency decisions have not yet been made to allow such later cycles. In light of the Court's determination that Plaintiffs have demonstrated a likelihood of success on the merits – that Defendants violated NEPA by considering the permits in isolation and segmenting them from the later cycles of genetically engineered sugar beet plantings and production by unlawfully relying on a categorical exclusion to avoid conducting any environmental review, it would be illogical if the Court restricted Plaintiffs' showing of harm to injuries based solely on the unlawfully segmented permits in isolation. *See Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1121-24 (9th Cir. 2005) (based on the interconnected nature of the desert washes and the surrounding area, affirming the district court's finding that the agency improperly constrained its NEPA analysis to the washes, which was one small portion of the land, rather than considering the development's effect on the environmental as a whole); *see also High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 645-46 (9th Cir. 2004) (rejecting intervenors' argument that the impact of their individual activities were not significant: "The effects of individual pack operators may very well be *de minimis*, but the agency has failed to make this evaluation and failed to make findings regarding the cumulative impacts. ... Cumulative impacts that result from individually minor but collectively significant actions are the crux of what the regulations implementing NEPA seek to avoid."); *Colorado River Indian Tribes v. Marsh*, 605 F. Supp. 1425, 1440 (C.D. Cal. 1985) (rejecting defendants' argument to limit the court's

3

1 consideration of environmental impact to the primary impacts of the permit and to ignore the
2 secondary and cumulative impacts).[2]

3 Moreover, it is significant that the permits themselves provide that their purpose was
4 "[t]o produce stecklings (seed vernalization) for transplant into basic seed (commercial)
5 production trials in 2010-2011." (Evidentiary Hearing Exhibit ("Ex.") 610 at 6.) *See Colorado*
6 *River Indian Tribes*, 605 F. Supp. at 1441 ("To then say that [the entire project] is not a
7 reasonably foreseeable event and therefore its impact should not be considered because the
8 Developer has other reasons in seeking to [engage in the conduct pursuant to the permits] ...
9 overlooks the primary motivating force behind the application for the permit.").

10 Additionally, despite their arguments that Plaintiffs' assertions of harm based on later
11 cycles of genetically engineered sugar beet plantings and production are purely speculative,
12 Defendants and Intervenor-Defendants argue that the Court should consider the harm
13 Intervenor-Defendants will incur if the Court orders the stecklings to be removed *and*
14 Defendants later grant further approvals to authorize such later cycles. However, the law
15 directs the Court to consider the potential environmental impacts from the full project that was
16 unlawfully segmented. Additionally, Defendants and Intervenor-Defendants have not cited to,
17 and the Court did not find, any authority directing the Court to consider potential economic
18 impacts from development of a crop that is not currently legal.

19 Nevertheless, Plaintiffs have demonstrated a likelihood of harm stemming from the
20 plantings pursuant to the permits at issue. The evidence presented at the evidentiary hearing
21 made clear that, even with the existence of protocols designed to minimize any environmental

---

[2] Defendants' and Intervenor-Defendants' attempts to distinguish *Sonoran* and *Colorado River Indian Tribes* from the facts here are unpersuasive. They contend that unlike in *Sonoran*, the harms from the permits at issue are distinguishable from those caused by the later production and development cycles. However, this argument ignores this Court's finding that Defendants improperly segmented their consideration of the permits. The permits are one part of a larger project and it is the obligation of Defendants, and of the Court, to consider the entire project as a whole.

Defendants and Intervenor-Defendants also argue that the holding of *Colorado River Indian Tribes* should be disregarded because that court presumed irreparable harm. However, in the portion of the order cited to by Plaintiffs and relied on by this Court, the Central District Court considered the evidence of irreparable environmental injury and did not rely on the presumption.

4

1  harm, there is a significant risk that the plantings pursuant to the permits will cause
2  environmental harm.  Despite efforts by Defendants to implement effective protocols and
3  efforts by Intervenor-Defendants to minimize any contamination or cross-pollination, there are
4  examples of where such efforts were ineffective, either because the conditions were later
5  determined to be insufficient or the conditions were not followed.  In other instances, the causes
6  of the contamination were never discovered.  These incidents are too numerous for this Court to
7  declare confidently that these permits provide sufficient containment to protect the
8  environment.

9  Defendants and Intervenor-Defendants argue that Plaintiffs have not demonstrated any
10 harm has occurred when a permit has been issued with the particular conditions included with
11 the permits at issue.  In addition to applying the wrong standard (actual harm versus likelihood
12 of harm), Defendants and Intervenor-Defendants are seeking to penalize Plaintiffs, as well as
13 the environment, because the precise effects from these plantings are not yet known.  However,
14 "this lack of precision is the result of [APHIS's] failure to conduct an environmental evaluation
15 *prior* to" issuing these permits.  *Brady Campaign*, 612 F. Supp. 2d at 25 (citing *Winter*, 129
16 S.Ct. at 376 ("[p]art of the harm NEPA attempts to prevent in requiring an EIS is that, without
17 one, there may be little if any information about prospective environmental harms and potential
18 mitigating measures")).  To the extent Defendants and Intervenor-Defendants contend that they
19 would suffer any harm, it is only of their own doing.  Due to their preemptive conduct, the
20 stecklings have been planted pursuant to the permits at issue and they have created a significant
21 risk of environmental harm.

22 Plaintiffs have further demonstrated a likelihood of harm stemming from the entire cycle
23 of genetically engineered sugar beet plantings and production.  If the stecklings are transplanted
24 and replanted to produce seed, and the remainder of the planting and production cycle of
25 genetically engineered sugar beets moves forward, the potential for contamination, including
26 through cross-pollination merely increases.  The evidence demonstrates that there are points of
27 vulnerability where contamination is likely at every production stage.  Even Intervenor-
28 Defendants, despite their best efforts, have not been able to prevent contamination.  Plaintiffs

5

have members who grow organic *Beta vulgaris* seed in and around the Willamette Valley, buy seed from such growers, and consume organic *beta* crops in that area. These farmers and consumers would likely suffer harm from cross-contamination.

The likely environmental harm established by Plaintiffs is irreparable. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co.*, 480 U.S. at 545 (1987) (finding injunction was not warranted because the asserted environmental injury was "not at all probable").

Additionally, Plaintiffs have demonstrated significant procedural injury stemming from the NEPA violations. "There is no doubt that the failure to undertake an [environmental review] when required to do so constitutes procedural injury to those affected by the environmental impacts of a project." *See Save Strawberry Canyon v. Dept. of Energy*, 613 F. Supp. 2d 1177, 1187 (N.D. Cal. 2009) (finding that, due to the alleged NEPA violations, the plaintiff was "virtually certain to suffer irreparable procedural injury absent an injunction"). "The NEPA duty is more than a technicality; it is an extremely important statutory requirement to serve the public and the agency *before* major federal actions occur." *Foundation on Econ. Trends v. Heckler*, 756 F.2d 143, 157 (D.C. Cir. 1985) (emphasis in original) (finding that "[i]f plaintiffs succeed on the merits, then the lack of an adequate environmental consideration looms as a serious, immediate, and irreparable injury.").

Failing to conduct the required environmental review and depriving Plaintiffs and the public "of the opportunity to participate in the NEPA process at a time when such participation is required and is calculated to matter" constitutes irreparable harm. *See Save Strawberry Canyon*, 613 F. Supp. 2d at 1189-90 (noting that even if the plaintiff did not receive a preliminary injunction but ultimately wins on the merits, "much of the environmental harm will already have occurred and alternatives will have been foreclosed."); *see also Colorado Wild, Inc. v. United States Forest Service*, 523 F. Supp. 2d 1213, 1221 (D. Colo. 2007) (finding that, in the absence of an injunction, even if the agency decision was later overturned and the agency

6

was required to "redecide" the issue, there was a risk that "the bureaucratic momentum created by Defendants' activities [would] skew the analysis and decision-making of the [agency] towards its original, non-NEPA complaint ... decision.") (citing *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989) ("Once large bureaucracies are committed to a course of action, it is difficult to change that course – even if new, or more thorough, NEPA statements are prepared and the agency is told to 'redecide.'")); *San Luis Valley Ecosystem Council v. United States Fish and Wildlife Serv.*, 657 F. Supp. 2d 1233, 1241-42 (D. Colo. 2009) (finding that plaintiffs' remedy would be meaningless and plaintiffs' procedural interest would likely be irreparably harmed if preliminary injunction were not issued).

Although, standing alone, a procedural deprivation may not be sufficient to warrant the issuance of an injunction, the likely environmental harm to be suffered here is compounded by the procedural injury. *See Citizens for Better Forestry v. United States Dept. of Agriculture*, 341 F.3d 961, 970-71 (9th Cir. 2003) (explaining that the procedural injury from a NEPA violation "is tied to a substantive harm to the environment – the harm consists of added risk to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with public comment) of the likely effects of their decision on the environment.") (internal quotations marks and citations omitted); *see also Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 24-26 (D.D.C. 2009) ("Although a procedural violation of NEPA is not itself sufficient to establish irreparable injury, it is certainly a relevant consideration"); *see also Save Strawberry Canyon*, 613 F. Supp. 2d at 1189 (find that plaintiff satisfied the "likelihood of injury" requirement by demonstrating irreparable procedural injury). "When a procedural violation of NEPA is combined with a showing of environmental or aesthetic injury, courts have not hesitated to find a likelihood of irreparable injury." *Brady Campaign*, 612 F. Supp. 2d at 24-25 (citing cases).

Accordingly, the Court finds that Plaintiffs have made a strong showing that they and the environment are likely to suffer irreparable harm if this Court does not issue an injunction.

**B.     Balance of Equities and the Public Interest Tip in Favor of an Injunction.**

In light of Plaintiffs' strong showing of likely irreparable harm and Defendants' and Intervenor-Defendants' weak showing of harm, the balance of equities tips sharply in favor of Plaintiffs. Notably, the harm of which Defendants and Defendant-Intervenors complain – the purported harm based on the lack of genetically engineered sugar beet seed in 2012, 2013 and 2014 – has already been caused by this Court's prior order vacating APHIS's deregulation decision. Unless and until APHIS alters the status quo by fully or partially deregulating genetically engineered sugar beets, and does so in a manner that comports with the requisite environmental statutes and regulations, Intervenor-Defendants are legally precluded from growing and processing genetically engineered sugar beets.

Moreover, that Defendants and Intervenor-Defendants waited almost a year after the Court held that Defendants acted unlawfully in deregulating genetically engineered sugar beets before they attempted to enact interim measures or sought permits to authorize continued plantings and production of genetically engineered sugar beets has further contributed to the harm of which they now complain. Intervenor-Defendants and Defendants then rushed to seek and grant permits which improperly segmented the planting of seed stecklings from the remainder of the sugar beet planting and production cycles. Thus, the Court finds that the harm of which Defendants and Defendant-Intervenors now complain was caused by the Court's prior orders and their own delay, rather than from Plaintiffs' efforts to require Defendants to comply with NEPA.

The Court further finds that neither Defendants nor Intervenor-Defendants "have any cause to claim surprise as a result of any injunction." *See National Park & Conservation Ass'n. v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001). Plaintiffs vigorously litigated the deregulation of genetically engineered sugar beets. On September 21, 2009, in the prior case, *Sugar Beets I*, this Court held that the deregulation decision violated NEPA. Plaintiffs objected to APHIS's request to delay the vacature for nine months to provide APHIS with more time to consider interim measures regarding the genetically engineered sugar beets pending a full environmental review. On August 13, 2010, the Court vacated APHIS's deregulation decision and denied its request for a stay of the vacature.

8

On September 1, 2010, APHIS announced that it had received permit applications and intended to grant these permits to authorize steckling production within the next two weeks. (Ex. 93.) The next day, Plaintiffs issued a press release in which they noted that APHIS's intended use of the permitting process for a commercially grown genetically engineered crop was unprecedented and that they were considering legal action. APHIS issued the permits a couple of days later and on Labor Day, Monday, September 6, 2010, updated its website to reflect that the permits had been issued. Three days later, on September 9, 2010, Plaintiffs filed this lawsuit challenging the issuance of the permits, and they filed a motion for a temporary restraining order on September 10, 2010.[3]

Therefore, when the permits were issued and the plantings began, Defendants and Intervenor-Defendants were well aware of Plaintiffs' objections to genetically engineered sugar beets, of Plaintiffs' prior litigation and of Plaintiffs' likely challenge to the issuance of the new permits. Moreover, Defendants and Monsanto were aware of Plaintiffs' concern regarding potential abuse of the permitting process to avoid the effect of court orders regarding deregulation, as this issue had been raised in a prior case regarding the deregulation of genetically engineered alfalfa. *See Geertson Farms, Inc. v. Johanns*, 2007 WL 1302981, *8 (N.D. Cal. May 3, 2007) (noting that the plaintiffs in that case "[had] not established that APHIS [would] avoid the import of this Court's injunction by abusing the permit process."). Therefore, the Court finds that Defendants' and Intervenor-Defendants' advanced knowledge of Plaintiffs' position and likely litigation regarding the permits renders their assertions regarding the potential economic harm "less than convincing." *See Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 903 (7th Cir. 2001) (finding that the defendant's assertions regarding the economic burdens it would face if an injunction were granted were "less than convincing" in light of the fact that the defendant had knowledge of the plaintiff's trademarks prior to adopting its mark);

---

[3] Of the 526 acres authorized for plantings pursuant to the permits at issue, 153.2 acres were planted before or on September 9, 2010 and an additional 4.1 acres were planted on September 10, 2010. (Declaration of Natalia A. Weinsetel (Docket No. 133), ¶¶ 6-7.) A total of 256.14 acres were planted pursuant to these permits. Thus, when Plaintiffs filed their lawsuit, only 29 percent of the authorized acreage and 59.8 percent of the actual acreage had been planted.

9

*see also Baykeeper v. United States Army Corp of Engineers*, 2006 WL 2711547, *17 (E.D. Cal. Sept. 20, 2006) ( in balancing the harms taking into consideration the fact that the government agency knowingly accepted the risk of incurring financial harm).

Moreover, Defendants' and Intervenor-Defendants' claims of likely harms are undermined by the language of the permits themselves, which provide that the crop will be destroyed if further approvals were not granted. (Ex. 602 at 4.) Intervenor-Defendants also represented to the Court that "[i]n the event that APHIS decides not to authorize the transplantation and flowing [of the stecklings], the stecklings will be destroyed by the terms of the permits ...." (Intervenor-Defendants' Opp. to TRO (Docket No. 74) at 12.)

Additionally, the Court finds Defendants' and Intervenor-Defendants' assertions of economic harm not to be credible. The evidence of economic harm at the evidentiary hearing was presented primarily through Dr. Richard J. Sexton, Intervenor-Defendants' expert witness. However, the analysis and conclusions Dr. Sexton presented at the evidentiary hearing were actually prepared before May 6, 2010, in anticipation of the remedies hearing in *Sugar Beets I*. Therefore, his study was not specifically on the effects of limiting the use of the stecklings planted pursuant to the permits at issue here, but rather, was a study of potential economic effects due to a complete vacature and injunction regarding the entire planting and production cycle of genetically engineered sugar beets. In his prepared analysis, Dr. Sexton did not account for the stecklings that were legally planted before August 13, 2010 and would not be subject to the preliminary injunction at issue here.[4] Nor did Dr. Sexton evaluate what impact existing inventories of conventional or genetically engineered sugar beet seed held by the seed producers would have on his analysis and conclusions. Therefore, the Court finds Dr. Sexton's conclusions regarding the extent of economic harm to be greatly exaggerated.[5]

---

[4] At the evidentiary hearing, Dr. Sexton did estimate that use of the stecklings planted prior to August 13, 2010 may reduce his estimated damages by fifty percent.

[5] Moreover, Intervenor-Defendants improperly submitted evidence at the evidentiary hearing regarding harm they would allegedly suffer in their research efforts if the stecklings planted pursuant to the permits were destroyed. Intervenor-Defendants argue that such evidence should be considered by the Court as relevant to the balance of equities and public interest inquiries. However, the Court finds that Intervenor-Defendants' introduction of this

10

Finally, to the extent the Court considers the assertions of likely economic harm made by Defendants and Intervenor-Defendants, the Court finds that these anticipated losses do not outweigh the potential irreparable damage to the environment established by Plaintiffs. *See National Parks & Conservation Ass'n*, 241 F.3d at 738 (finding that the defendants' loss of anticipated revenues did not outweigh the potential irreparable harm to the environment); *see also Lands Council v. McNair,* 537 F.3d 981, 1005 (9th Cir. 2008) ("Consistent with *Amoco Production Company*, we have held that the public interest in preserving nature and avoiding irreparable environmental injury outweighs economic concerns in cases where plaintiffs were likely to succeed on the merits of their underlying claim."); *Save Our Sonoran*, 408 F.3d at 1125 (affirming injunction where district court found that balance of hardships tipped in favor of injunction in light of likelihood of environmental harm and despite the fact that defendant would suffer financial harm); *Idaho Sporting Congress, Inc. v. Alexander*, 222 F. 3d 562, 569 (9th Cir. 2000) (finding injunction proper where environmental harm was sufficiently likely, despite fact that it "could present financial hardship" to government agency, the intervenors and the surrounding communities).

Regarding the public interest at stake, the Ninth Circuit has recognized "the well-established public interest in preserving nature and avoiding irreparable environmental injury." *Alliance for Wild Rockies v. Cottrell*, 622 F.3d 1045, 1056 (9th Cir. 2010) (internal quotations marks and citation omitted); *see also Earth Island Inst. v. United States Forest Serv.*, 442 F.3d 1147, 1177 (9th Cir. 2006) ("The preservation of our environment, as required by NEPA and the NFMA, is clearly in the public interest."), *abrogated on other grounds by Winter*, 129 S.Ct. 365. Moreover, "Congress's determination in enacting NEPA was that the public interest requires careful consideration of environmental impacts before major federal projects may go forward." *South Fork Bank Council of Western Shoshone of Nevada v. United States Dept. of Interior*, 588 F.3d 718, 728 (9th Cir. 2009) (finding that issuance of an injunction pending consideration of environmental impacts under NEPA comported with the public interest); *see*

---

evidence is an improper attempt to avoid the impact of the Court's prior finding and ruling regarding the limited purpose of the permits.

11

*also Colorado Wild*, 523 F. Supp. 2d at 1223 ("The public has an undeniable interest in the [agency's] compliance with NEPA's environmental review requirements and in the informed decision-making that NEPA is designed to promote.")

Therefore, the Court finds that the balance of hardships between the parties and the public interest tips sharply in favor of Plaintiffs and in favor of issuing an injunction.

**C.     The Requested Injunction Is Warranted.**

Plaintiffs seek an injunction requiring Intervenor-Defendants and SES VanderHave USA that planted stecklings pursuant to the permits at issue be ordered to remove the stecklings from the ground. Defendants and Intervenor-Defendants complain that such an order would be an improper mandatory injunction.

Issuing an injunction that alters status quo *pendente lite*, although disfavored, may be issued where "the facts and law clearly favor the moving party." *Stanley v. University of So. Calif.*, 13 F.3d 1313, 1320 (9th Cir. 1994); *see also Dahl v. HEM Pharmaceuticals Corp.*, 7 F.3d 1399, 1403, 1405 (9th Cir. 1993) (noting issuance of injunction requiring affirmative action is subject to heightened scrutiny, but still affirming issuance of preliminary mandatory injunction). Moreover, "[w]here a defendant with notice of an injunction proceeding completes an act sought to be enjoined by the plaintiff, the court has the authority to issue a mandatory injunction restoring the status quo." *Sierra Club v. United States Dept. of Transp.*, 664 F. Supp. 1324, 1341 (N.D. Cal. 1987); *see also Porter v. Lee*, 328 U.S. 246, 251 (1946) ("It has long been established that where a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may by mandatory injunction restore the status quo."). Here, despite the rapid pace at which the permits were issued and the plantings pursuant to these permits were completed, Plaintiffs filed this instant lawsuit and requested a temporary restraining order before a substantial portion of the plantings had been completed.

Moreover, Defendants' and Intervenor-Defendants' claims regarding the extraordinary nature of requested injunction are belied by the requirements of the permits themselves, which require the stecklings be destroyed if further transplantation is not approved by APHIS or other regulatory authority. (Ex. 602 at 4.) And, as noted above, Intervenor-Defendants represented

to the Court that "[i]n the event that APHIS decides not to authorize the transplantation and flowing [of the stecklings], the stecklings will be destroyed by the terms of the permits ...." (Intervenor-Defendants' Opp. to TRO (Docket No. 74) at 12.)

Additionally, the Court notes that, to the extent the requested injunction is a mandatory injunction, Defendants and Intervenor-Defendants created this problem. They delayed in seeking or implementing interim relief despite knowing in *September of 2009* that the Court found APHIS unlawfully deregulated sugar beets and thus, at a minimum, a vacature of the decision was highly likely. Moreover, once the vacature was issued, instead of moving formally for a stay of the vacature and making the requisite showing, or asking the Ninth Circuit to stay the vacature pending the appeal, Defendants rushed to grant permits, and Intervenor-Defendants rushed to plant stecklings pursuant to these permits. These permits have gone far beyond the scope of what has been done before – granting permits for commercially grown genetically engineered crops. Despite the fact that the permits themselves state that their purpose was "[t]o produce stecklings (seed vernalization) for transplant into basic seed (commercial) production trials in 2010-2011," Defendants took the position before this Court that they did not unlawfully segment this portion of the genetically sugar beet production cycle. Based on the record currently before the Court, the legality of Defendants' conduct does not even appear to be a close question. It appears clear that Defendants and Intervernor-Defendants were merely seeking to avoid the impact of the Court's prior order *in Sugar Beets I*. Therefore, the Court finds that Plaintiffs have established that the "facts and law clearly favor" granting the requested injunction in this case. *See Dahl*, 7 F.3d at 1403.

**D.    No Bond Will Be Required.**

Although Federal Rule of Civil Procedure 65(c) generally requires that a successful application for a preliminary injunction post a bond or other security, "[t]he court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review." *California ex rel. Van De Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985), *amended on other grounds*, 775 F.2d 998 (9th Cir. 1985); *see also Save Our Sonoran*, 408 F.3d at 1126 (noting the

13

Ninth Circuit's "long-standing precedent that requiring nominal bonds is perfectly proper in public interest litigation," but affirming imposition of $50,000 bond where the plaintiffs had an opportunity and failed to demonstrate that the imposition of such bond would constitute an undue hardship).

Upon review of the declarations submitted by Plaintiffs, the Court finds that an imposition of a bond here would effectively deny Plaintiffs access to judicial review. By virtue of an agreement among all of the Plaintiffs, Center for Food Safety is the organization that would be responsible for any bond required. (Declaration of Andrew Kimbrell ("Kimbrell Decl."), ¶ 13.) Center for Food Safety is a small non-profit with a full-time staff of only twelve and a part time staff of six. Its budget is already committed to paying the expenses of existing staff expenses and programs. Center for Food Safety would not be able to post a substantial bond without eliminating other programs and reducing its staff. (Kimbrell Decl., ¶¶ 15-18.) The founder and executive director of Center for Food Safety attests that requiring the organization to pay a bond would fatality harm its ability to bring lawsuits on behalf of the public interest. (*Id*., ¶ 20.) Accordingly, the Court does not require Plaintiffs to post a bond.

**II.     No Stay Will Be Issued.**

In their conclusion of their post-hearing brief, Defendants and Intervenor-Defendants summarily request a stay pending appeal if the Court issues the injunction. In *Golden Gate Restaurant Ass'n v. City and County of San Francisco*, the Ninth Circuit set forth the factors regulating issuance of a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." 512 F.3d 1112, 1115 (9th Cir. 2008) (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). The Court finds that Defendants and Intervenor-Defendants fail to make a strong showing they are likely to succeed on the merits, that they will be irreparably injured absent a stay, or that the public interest would be served by a stay. Accordingly, the Court declines to stay this Order issuing a preliminary injunction pending appeal. Nevertheless, it is likely that Defendants and Intervenor-Defendants

14

will seek a stay pending appeal from the Ninth Circuit.  Therefore, this preliminary injunction shall not take effect until Tuesday, December 7, 2010 at 10:00 a.m.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS Plaintiffs' motion for a preliminary injunction and HEREBY ORDERS that the stecklings planted pursuant to the permits issued by Defendants shall be removed from the ground.  After meeting and conferring with Defendants and Intervenor-Defendants, Plaintiffs shall submit a proposed injunction in accordance with this Order by no later than 4:00 p.m. on December 2, 2010.  The proposed injunction shall specify who will be responsible for carrying out the Court's order and ensuring that the stecklings are removed from the ground.  The Court FURTHER ORDERS that this preliminary injunction shall not take effect until Tuesday, December 7, 2010 at 10:00 a.m.

**IT IS SO ORDERED.**

Dated: December 1, 2010

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

15