1  GEORGE A. KIMBRELL (*Pro Hac Vice*)
   PAIGE M. TOMASELLI State Bar No. 237737
   KATERYNA L. RAKOWSKY State Bar No. 246248
2  Center for Food Safety
   2601 Mission St., Suite 803
3  San Francisco, CA 94110
   T: (415) 826-2770 / F: (415) 826-0507
4  Emails: gkimbrell@icta.org
            ptomaselli@icta.org
5          kateryna@icta.org

6  PAUL H. ACHITOFF (*Pro Hac Vice*)
   Earthjustice
7  223 South King Street, Suite 400
   Honolulu, Hawaiʻi 96813
8  T: (808) 599-2436 / F: (808) 521-6841
   Email: achitoff@earthjustice.org

9
   *Counsel for Plaintiffs*
10

11              **UNITED STATES DISTRICT COURT**
           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
12                 **SAN FRANCISCO DIVISION**

13

14  CENTER FOR FOOD SAFETY, *et al.*,     )   Case No.: 3:10-cv-04038-JSW
                                          )
15              Plaintiffs,               )   PLAINTIFFS' CLOSING BRIEF
                                          )
16        vs.                             )   [REDACTED VERSION]
                                          )
17  THOMAS J. VILSACK, *et al.*,          )   Date:
                                          )   Time:
18              Defendants.               )   Judge:  Hon. Jeffrey S. White
                                          )   Place:  Courtroom 11, 19th floor
19                                        )
                                          )
20  _____ )

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.    PLAINTIFFS WILL BE IRREPARABLY HARMED UNLESS A PRELIMINARY
      INJUNCTION ISSUES ................................................................................................2

II.   THE BALANCE OF EQUITIES FAVORS PLAINTIFFS.................................................9

III.  ISSUANCE OF A PRELIMINARY INJUNCTION IS CONSISTENT WITH THE
      PUBLIC INTEREST ...............................................................................................12

III.  CONCLUSION.......................................................................................................16

# TABLE OF AUTHORITIES

**FEDERAL CASES**

Page

Amoco Prod. Co. v. Village of Gambell,
480 U.S. 531 (1987)............................................................................9

Colorado River Indian Tribes v. Marsh,
605 F. Supp. 1425 (C.D. Cal. 1985) ..............................................2, 3

Colorado Wild, Inc. v. U.S. Forest Service,
523 F. Supp. 2d 1213 (D. Colo. 2007)..............................................1

Highland Co-op. v. City of Lansing,
492 F. Supp. 1372 (W.D. Mich. 1980) ..............................................4

National Parks & Conservation Ass'n v. Babbitt,
241 F.3d 722 (9th Cir. 2001) ....................................................2, 3, 9

Oregon Natural Resources Council v. Goodman,
505 F.3d 884 (9th Cir. 2008) ............................................................11

Pit River Tribe v. U.S. Forest Service,
469 F.3d 768 (9th Cir. 2006) ............................................................11

Save Our Sonoran v. Flowers,
408 F.3d 1113 (9th Cir. 2005) ............................................................3

Save Strawberry Canyon v. Dep't of Energy,
613 F. Supp. 2d 1177 (N.D. Cal. 2009) ..............................................1

Seattle Audubon Soc. v. Evans,
771 F. Supp. 1081 (W.D. Wash. 1991)..............................................12

South Fork Band Council Of Western Shoshone v. U.S. Dept. of Interior,
588 F.3d 718 (9th Cir. 2009) ....................................................9, 12, 13

The Lands Council v. McNair,
537 F.3d 981 (9th Cir. 2008) ............................................................11

Ty, Inc. v. Jones Group, Inc.,
    237 F.3d 891 (7th Cir. 2001) .......................................................................9, 10

Winter v. Natural Resources Defense Council,
    129 S. Ct. 365 (2008).......................................................................................1

**UNPUBLISHED CASES**

Center for Food Safety v. Vilsack, No. C 08-00484 JSW,
    2009 WL 3047227 (N.D. Cal. Sept. 21, 2009) .................................................8

Sierra Nevada Forest Protection Campaign v. Tippin,
    2006 WL 2583036 (E.D. Cal. 2006).............................................................12

**PLAINTIFFS' CLOSING BRIEF**

Plaintiffs seek a preliminary injunction enjoining Intervenor Defendants' continued growing of Roundup Ready sugar beet seedlings, or stecklings, that Federal Defendants purported to authorize with field trial permits. The Court has determined that the issuance of the permits without prior analysis under the National Environmental Policy Act ("NEPA") of the environmental impacts of the Roundup Ready sugar beet ("RRSB") crop cycle violated NEPA. Having established their likelihood of success on the merits, Plaintiffs' remaining burden is to show they likely will be irreparably harmed, the balance of harms tilts in their favor, and issuance of an injunction will not be contrary to the public interest. *See Winter v. Natural Resources Defense Council*, 129 S. Ct. 365, 374 (2008).

I.   PLAINTIFFS WILL BE IRREPARABLY HARMED UNLESS A PRELIMINARY
     INJUNCTION ISSUES[1]

Because the Court has determined that the issuance of the steckling permits was illegally segmented from the rest of the RRSB crop cycle, the proper analysis of harm must examine two types of injury. First, Plaintiffs have incurred the procedural injury resulting from Federal Defendants' failure to comply with NEPA. Congress intended NEPA's procedural mandates to prevent environmental harm by ensuring that before making decisions, agencies take into account all relevant information. When an agency fails to perform the required analysis, the procedural harm can support preliminary injunctive relief. *See, e.g.*, *Save Strawberry Canyon v. Dep't of Energy*, 613 F. Supp. 2d 1177, 1187-1189 (N.D. Cal. 2009) ("The procedural injury is also irreparable—even if a NEPA review might later be conducted."). Allowing the first of a series of connected actions to proceed undermines congressional intent, regardless of the impacts of the first segment. *Colorado Wild, Inc. v. U.S. Forest Service*, 523 F. Supp. 2d 1213, 1220-21

---

[1] Plaintiffs reassert, but will not reargue, their position presented in their motion in limine that Defendants are collaterally estopped from relitigating the Court's prior ruling in *Sugar Beets I* that Plaintiffs likely will be irreparably harmed by the RRSB crop cycle.

(D. Colo. 2007) ("Defendants … ignore the primary injury that would result from allowing the proposed activities to proceed, which is the difficulty of stopping 'a bureaucratic steam roller' once it is launched. … [T]his type of harm is irreparable and can support issuance of a preliminary injunction.") (citing *Sierra Club v. Marsh*, 872 F.2d 497, 499-504 (1st Cir.1989) (Breyer, J.) and *Davis v. Mineta*, 302 F.3d 1104, 1115 & n. 7 (10th Cir. 2002)); *see also National Parks & Conservation Ass'n v. Babbitt,* 241 F.3d 722, 737 n.18 (9th Cir. 2001) (citing *Marsh*).

Second, Plaintiffs face concrete irreparable injury to their interests from the RRSB crop cycle. Although Defendants have urged that the preflowering phase of the RRSB stecklings alone would not likely harm plaintiffs, this is not the appropriate inquiry. That said, history does not support Federal Defendants' claims that protocols will contain genetically engineered crops, even in "confined" fields regulated by permits. Nor did the USDA Inspector General. Exh. 39, at 19 ("We found that APHIS' current approach is not sufficient to manage field releases of regulated GE crops"). Such regulated crops have on many occasions escaped into the environment, and into the food supply, and have caused very substantial economic and environmental harm. Exhs. 38, at 14-16; 71, ¶25; 11/3/2010 Tr., 321:23-25; 322:1-23 (pharmaceutical-producing corn escapes field trial into food supply); 326:21-22 (regulated Event 32 corn escapes). These contaminations occurred despite being tightly regulated under permits with extensive restrictions. *Id*., 323:2-24. Even after investigation, APHIS has no idea how some of the most devastating contamination incidents occurred despite all efforts to prevent them with extensive protocols. *Id.* 324:3-24; 333:9-14 (APHIS has no idea how regulated herbicide-resistant long grain rice entered food supply, resulting in a billion dollars in damages claims); Exh. 615, ¶¶10, 13-14 ("[T]he United States rice industry lost $1.2 billion as a result of the LL601 contamination event based on a conservative assessment calculated by the USRPA.")

New such events are revealed on a regular basis, year after year. There have been hundreds of documented releases. Exhs. 87-91. Only a few weeks ago, APHIS first became aware that Monsanto's Roundup Ready creeping bentgrass had escaped seven or eight years ago from regulated fields trials and established itself in the wilds of eastern Oregon. 11/4/2010 Tr.,

392:19-25; 393:2-25; 394:1-8; 395:4-25; 396:7-19; 398:10-18.  APHIS believes the regulated

crop escaped through either seed or cross-pollination.  *Id*. 399:8-24.  Yet APHIS had imposed

many restrictions on the field trials, *id*. 388:2-25; 389:1-25; 390:1-2, which it thought would

contain them.  *Id*. 405:11-16.  In fact, the same thing happened during other creeping bentgrass

field trials hundreds of miles away.  *Id*. 390:3-12.

     The U.S. Fish and Wildlife Service ("FWS") issued a draft Biological Opinion finding

that Roundup Ready creeping bentgrass in the wild was likely to jeopardize the continued

existence of several endangered species and adversely modify their critical habitat; the variety

has never been commercialized.  Exh. 74 at 32.  In fact, the FWS noted: "Recent escape of GM

sugar beets into compost sold to homeowners illustrates the potential for products to move

outside of their intended market.  Sugar beets are likewise wind pollinated and were thought to

be well controlled by the growers using the product.  Despite best management practices, escape

of transgenes occurred.")  *Id.* at 30.  Yet, APHIS is so eager to support Monsanto that, when

asked to inform the public of this latest fiasco, it delayed. 11/4/2010 Tr., 397:13-25; 398:1-18.

     Thus, it is far from assured that even the steckling production itself is benign.  But the

proper harm inquiry extends far beyond the impacts of the permitted plantings to those of the

plantings' intended results: RRSB seed crop flowering, seed production, harvest, transport,

processing, storage, and planting, as well as root crop production, harvest, transport, storage, and

processing, to sugar production.  Exhs. 602 at 4, 17; 604 at 6; 607 at 4, 13; 610 at 6; Exh. 612, ¶8

(stecklings intended for commercial seed production).  *See Save Our Sonoran v. Flowers*, 408

F.3d 1113, 1124 (9th Cir. 2005) ("[B]ecause the uplands are inseparable from the washes, the

district court was correct to conclude that the Corps' permitting authority, and likewise the

court's authority to enjoin development, extended to the entire project. Lone Mountain cannot

begin developing any portion of the land in the absence of an appropriately broad NEPA analysis

by the Corps."); *Colorado River Indian Tribes v. Marsh*, 605 F. Supp. 1425, 1440 (C.D. Cal.

1985) ("Defendants urge this court to consider only the direct impact of the riprap, limiting

inquiry of the effects of the riprap to the river and its banks.  However, defendants' focus is

misdirected."); *Highland Co-op. v. City of Lansing*, 492 F. Supp. 1372, 1382-83 (W.D. Mich. 1980).

According to Defendants' plan, if the stecklings are not removed, they will be packed up and transported from their present locations to numerous sites throughout the Willamette Valley ("WV"), then transplanted there, where they will flower and produce seed. Exh. 2, ¶18. Regardless of what happens at the preflowering stage, Plaintiffs likely will be irreparably harmed by genetic contamination from RRSB production. There are countless points of vulnerability by which genetic contamination can—and has—occurred, from seed spillage to seed mixing to disposal of unwanted plants to mixing of crops with volunteers from the previous season's crop. Exh. 28, ¶6 ("There are problems with segregation of seed at every stage of production."); 69, ¶11 ("Avoiding biological contamination from GE material is extremely challenging because contamination can occur through a variety of mechanisms."); 69, ¶12 (seed mixing "inevitable"); 71, ¶¶23-26 ("[T]he problem is that there are many routes whereby contamination may occur"); 80, ¶¶16-19, 22. APHIS acknowledges this. 11/3/2010 Tr., 320:21-25 (many sources of contamination); 321:1-5 (seed mixing, such as through equipment); 306:6-10 (seed caught in equipment can survive dry conditions); 321:8-25 (commingling; contamination events from human error). After each containment failure, APHIS and industry add more protocols designed to minimize the newly-discovered contamination risk, and so the protocols proliferate. *Id.* 323:4-17. Yet even in the middle of this hotly-contested litigation, one Intervenor could not manage to prevent thousands of its RRSB stecklings from ending up in potting soil sold to dozens of members of the public. Exhs. 78, ¶¶ 4-9; 79, ¶ 21; 81, ¶¶ 9, 12-16; 11/2/2010 Tr., 132:2-12.

The entire Canadian non-GE canola industry has been virtually wiped out due to genetic contamination, despite stewardship measures designed to prevent this. Exhs. 29, ¶11 ("[T]he actual genetic contamination of canola spread faster and affected more crops than anyone

predicted possible."), ¶17; 36, ¶23 ("The loss of the once-thriving organic canola market in Canada is a good example of how an organic crop can be destroyed by contamination."). Notably (and ironically), when GE canola production in the WV was being considered, *Monsanto complained bitterly about the impact of GE contamination on its conventional canola production in the valley, despite isolation distances.* Exh. 122 ("We would have to question if … a 3 mile isolation is sufficient anymore. . . . A higher number of volunteers will likely increase the likelihood of volunteers escaping control methods and becoming established long term as a weed. . . . Any level of contamination caused at the Foundation Seed level will only be multiplied at the certified seed level.").

Plaintiffs have members who grow organic *Beta vulgaris* seed in and around the WV, or who buy seed from such growers, or who grow, buy, or consume organic *beta* crops in that area. These seed crops and the produce grown from them are worth hundreds of millions of dollars. Exhs. 7, ¶¶14-16; 10, ¶¶7-8; 11, ¶¶ 3-7, 11; 24, ¶¶12-13, 16; 80, ¶ 20-21; 82, ¶5. Contamination of organic, or even conventional, seed can cause substantial damage, including irreparable loss of goodwill and reputation. Exhs. 15, ¶13 ("Contamination of any Willamette Valley chard or table beet seed crop by genetically engineered traits presents the likelihood that all Willamette Valley growers of these seed crops, myself included, will have our reputations as reliable sources of untainted seed irreparably damaged."); 76, ¶13. A grower planting GE seed risks losing his organic certification. Exh. 31, ¶15. Any level of contamination can result in consumer rejection. Exhs. 11, ¶19; 36, ¶21; 28, ¶16 ("The Korean marketplace has no tolerance for GE presence, and any Clarkson Grain Company products testing positive for genetic contamination—*at any level*—will not be allowed to pass through customs."); 30, ¶¶8-10; 69, ¶ 10; Counter-Designated Clarkson Depo, 92:22-95:15 (rejection of shipments to Europe due to testing conflicts)..

In practice, genetic contamination is neither simple to detect, nor to prevent, nor to remove, particularly for smaller growers who lack Intervenors' resources. Exhs. 69, ¶13 ("[C]ontamination may exist, but not be detected during any given PCR testing); 16, ¶¶10-14; 71, ¶27 ("The Union of Concerned Scientists concluded that even though it may be theoretically possible to prevent contamination, it would not be economically feasible."); 80, ¶22. Continual testing is costly and burdensome. Exhs. 11, ¶22; 20, ¶7; 24, ¶¶12-13; 25, ¶¶13-14, 17; 33, ¶13; 35, ¶9; 76, ¶11. Some of Plaintiffs' seed is purchased to propagate more seed, and those seed growers then distribute their seed to others. Exhs. 16, ¶19; 24, ¶19; 25, ¶19. Once contamination spreads throughout the distribution chain, it can become impossible to track and the harms are magnified. Exhs. 16, ¶¶18-19 ("If the contaminated seed extends into the commercial seed, the problem is exponentially more difficult."); 18, ¶4; 25, ¶21; 23, ¶3; 24, ¶19; 31, ¶12. Removal of contamination once discovered also is costly and time-consuming. Exhs. 16, ¶9; 25, ¶20; 69, ¶18 ("Once GE material mixes with non-GE material, segregation becomes essentially impossible.").

Although Intervenors pretend that unenforceable protocols preclude genetic contamination in the WV, the seed companies themselves have experienced extensive and persistent contamination of their own sugar beet seed production fields through cross-pollination by RRSB, as well as by table beet and Swiss chard pollen, despite all efforts to prevent it. If it happens to them, it will happen to other growers. Isolation distances are simply inadequate, and the sugar beet industry knows it. Exhs. 79, ¶¶7,8,10; 80, ¶¶11-15; 82, ¶¶7-9 ████████

████████████████████████████████████████████████

████████████████████████████████████████



Exh. 48 (SESVH-1017) (under seal) (emphasis added).

Defendants emphasize that some seed producers no longer grow commercial seed in the WV using male pollinators carrying the Roundup Ready ("RR") trait in the pollen; they instead put the gene on the female, or "male sterile," plant.  Male sterility is not entirely reliable, and some plants do flower.  Counter-Designated Navazio Depo. 32:6-32:16 (male sterility will fail at 10% in some cases and in all cases be present to some degree).  Regardless, male sterility is not

---

[2] The seed companies themselves cannot even agree on whether the applicable isolation distance is three miles or four.  *Compare* Exh. 396, ¶ 7, *with* Exh. 412, ¶ 32.

[3] 

required of WV seed producers, some of which continue to use RR-carrying male pollinators, which can genetically contaminate other sugar beets, table beets, and chard.  11/3/2010 Tr., 320:7-20; 11/2/2010 Tr., 162:9-13; 11/3/2010 Tr., 282:18-21.  There also exist many fields in the WV that produce basic (or breeder) seed, which is subsequently used to produce commercial seed.  Even the companies that use male-sterile plants to carry the RR trait in commercial seed production must use male pollinators carrying the RR gene in their basic seed production.  Exh. 27, ¶10.  None of these production fields are marked on pinning maps or elsewhere, so a table beet or chard grower might easily be unaware of a nearby RRSB basic seed production field. 11/2/2010 Tr., 129:18-25; 130:22-25; 131:1-4; *see also* Exh. 25, ¶10.

Plaintiffs also have members who make substantial efforts to avoid consuming genetically engineered produce, and sugar derived from genetically engineered sugar beets. These members are harmed when contamination eliminates their ability to choose what they eat. *Center for Food Safety v. Vilsack*, No. C 08-00484 JSW, 2009 WL 3047227, *9 (N.D. Cal. Sept. 21, 2009) (contamination can lead to loss of farmer and consumer choice).  Exh. 5, ¶3; Exh. 8, ¶¶5-6;  Exh. 9, ¶¶6-8; Exh. 10, ¶¶4-12.

II.     THE BALANCE OF EQUITIES FAVORS PLAINTIFFS

As they did in *Sugar Beets I*, Intervenors try to swamp the balance of equities with projections of large "losses" and "damages" they claim they will incur if not allowed to continue growing their illegally planted stecklings.  Intervenors thus seek to convert enforcement of environmental laws on behalf of the public interest into an arithmetic equation of relative economic impacts.  This is not how equities are balanced in these cases.  Congress intended NEPA to protect the environment, on behalf of all members of the public.  "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often

permanent or at least of long duration, *i.e.,* irreparable." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987).  Intervenors' claimed economic impacts are not irreparable.  *National Parks & Conservation Ass'n*, 241 F.3d at 738 ("[T]he loss of anticipated revenues, however, does not outweigh the potential irreparable damage to the environment"); *South Fork Band Council Of Western Shoshone v. U.S. Dept. of Interior*, 588 F.3d 718, 728 (9th Cir. 2009).

Moreover, Intervenors' claimed impacts are neither "losses" nor "damages"; they are projections of how much more money they might make if only the law were other than it is, and RRSB were legal.  Intervenors have no contracts to deliver RRSB, because such contracts would be illegal, nor do they any other legally enforceable expectation or right to profit from RRSB.  Moreover, they knew RRSB was illegal to plant before they planted it, and cynically assumed they had nothing to lose by playing fast and loose.  *See National Parks & Conservation Ass'n*, 241 F.3d at 738 (neither cruise industry intervenors nor their passengers had "cause to claim surprise as a result of any injunction."); *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 903 (7th Cir. 2001) (rejecting evidence of the "burden [defendant] voluntarily assumed by proceeding in the face of a known risk.")  Intervenors seem to believe that the larger their bet on illegal activity, the more they should be exempt from the environmental laws.  There are many other opportunities to profit from illegal activity, such as by planting other illegal crops and betting on a future change in the law.  There is nothing equitable about this.

Intervenors' calculations themselves are both skewed and of limited relevance.  This case concerns a total of 256.14 acres of stecklings.  Switzerland-based Intervenor Syngenta, which planted only 32.3 acres under its permit, Exh. 415, ¶3, vies with Intervenor Monsanto to be the world's largest agrochemical company and is among the world's several hundred largest corporations, with over $11 billion in annual revenues.  The impact of an injunction on its

bottom line would be miniscule.  11/2/2010 Tr., 169:7-13.  Betaseed's parent, Germany-based KWS SAAT AG, Exh. 2, ¶4, had over $1 billion in sales last year.  These are diversified companies doing business in dozens of countries.  They have been selling seed for over a century, *id*., 11/2/2010 Tr., 161:11-23, and doubtless will be selling seed for whichever crops these farmers grow in 2012.  *See, e.g.*, 11/2/2010, 167:5-25; 168:18-23 (sale of conventional seed will offset any economic effects).  Enforcing the law will hardly be catastrophic for any of them.[4]

    Given the flea-bite size of the impacts on these multinational corporations, Intervenors had Dr. Sexton paint a grim portrait of the sugar beet industry if RRSB remains illegal.  This was based on the most unreliable data imaginable: rank hearsay about seed company inventories from the Intervenors themselves, and from growers about their crops, as in Susan Manning's stricken testimony in *Sugar Beets I*.  11/3/2010 Tr. (under seal), 223:23-25; 224:1-9 ███████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ *Id*. 243:4- 18.  ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████ *Id*. 239:1-11.  This fee is "substantial" and "makes the seed considerably more expensive."  Exh. 19, ¶30.  *See also* Exh. 49 (SYN2659) (under seal) ████████████ ████████████████████████████████████████████████████████████████

Mr. Snyder testified that he chose to grow conventional sugar beets every year for 26 years,

---

[4] *Sugar Beets I* intervenor seed company SESVanderHave, which planted stecklings under these permits, felt intervention in this case was not worth the trouble, and thus offers no opposition to having its stecklings removed.  This may be because that company controls more RRSB seed than the other Intervenors, and will be able to supply growers in 2012 regardless.

[5] *See* note 4, *supra*.

1    notwithstanding any purported profitability issues.  Snyder, 11/3/2010 Tr., 267:8-10.  There is no

2    reason to believe he would not continue to grow it if RRSB becomes legal but is not available.

3            Regardless, Dr. Sexton's warmed-over analysis looked at the effects of RRSB re-

4    regulation, prepared in anticipation of the remedies hearing in *Sugar Beets I*. 11/3/2010 Tr.

5    (under seal), 225:7-10, 17-18; 214:14-19.  His study had nothing to do with the steckling

6    plantings, having been prepared months before.  *Id*. 229:13-22.  RRSB re-regulation is now a

7    fact, and that this particular illegal crop might (or, depending on commodity prices, might not) be

8    more profitable than some legal ones is irrelevant to any issue in this suit.  There are other, even

9    more profitable, illegal crops Dr. Sexton failed to model.  This is an argument to be made to

10   APHIS.  If his analysis is correct, and if RRSB remains unlawful, all of the economic effects Dr.

11   Sexton projected will occur regardless of what becomes of the stecklings.  *Id*. 242:10-15.  Should

12   APHIS eventually decide to legalize RRSB, this will not alter the illegality before the Court, or

13   the analysis of its proper remedy.  *See Pit River Tribe v. U.S. Forest Service*, 469 F.3d 768, 785-

14   786 (9th Cir. 2006) ("[W]e have repeatedly held that dilatory or ex post facto environmental

15   review cannot cure an initial failure to undertake environmental review…. [A]n agency could

16   merely ignore the requirements of NEPA, build its structures before a case gets to court, and then

17   hide behind the mootness doctrine. Such a result is not acceptable.") (internal quotation marks,

18   citation, and emphasis omitted).

19

20

21   III.   ISSUANCE OF A PRELIMINARY INJUNCTION IS CONSISTENT WITH THE
             PUBLIC INTEREST

22

23            Protecting the environment by enforcing NEPA's mandate is in the public interest.  *See,*

24   *e.g., The Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (*en banc*) ("[P]reserving

25   environmental resources is certainly in the public's interest."); *Oregon Natural Resources*

26   *Council v. Goodman*, 505 F.3d 884, 898 (9th Cir. 2008) ("[T]he risk of permanent ecological

27

28

harm outweighs the temporary economic harm that [industry intervenors] may suffer pending

further study. …"); *Sierra Nevada Forest Protection Campaign v. Tippin*, 2006 WL 2583036,

*21 (E.D. Cal. 2006) ("The environment is a vital constituent public interest that must be

recognized and protected by federal law even in the face of adverse economic consequences.").

Moreover, "[t]he problem here has not been any shortcoming in the laws, but simply a

refusal of administrative agencies to comply with them. … This invokes a public interest of the

highest order: the interest in having government officials act in accordance with law." *Seattle*

*Audubon Soc. v. Evans,* 771 F. Supp. 1081, 1096 (W.D. Wash. 1991), *aff'd* 952 F.2d 297 (9th

Cir. 1991). *See also South Fork Band Council Of Western Shoshone*, 588 F.3d at 728.

This case also presents many specific reasons why enjoining any production of RRSB

until completion of a thorough NEPA analysis is in the public interest.  First, the contamination

and loss of choice issues described above extend beyond Plaintiffs to the hundreds of thousands

of members of the public who go out of their way to purchase, sell, and consume organic or non-

GE seed, non-GE produce, and sugar derived from non-GE sources.  Exhs. 20, ¶¶6-9; 21, ¶10;

24, ¶16; 26, ¶¶2-3, 12-15; 28, ¶¶10-12; 67, ¶¶7-8; 68, ¶¶2-5; 76, ¶12; 77, ¶¶7-11.

Second, the Roundup Ready crop system has created a serious and growing problem of

weed resistance to glyphosate, leading to reduced yields from proliferating resistant weeds,

increased costs to remove them, and increased use of herbicides, including reliance on older,

higher-risk herbicides leading in turn to "heightened risk of birth defects and other reproductive

problems [and] more severe impacts on aquatic ecosystems."  Exh. 72, ¶17 et seq. Exhs. 6, ¶12;

19, ¶¶10-52; 34, ¶¶11 ("[T]here is no doubt in the weed science community that [glyphosate

resistant ("GR")] cropping systems … are responsible for the great majority of GR weeds, as

measured by their geographic range.") and 12 (weeds developing in one RR crop can spread to

1  other crops); 44 at 3 (*Syngenta*: "With 20 different states now battling nine different glyphosate-

2  resistant weeds, most experts agree that facing glyphosate resistance in your field is not a matter

3  of if, but when."); 66 at 10 (Adoption of RR crops has "vastly increased the use of glyphosate

4  herbicide," and "[e]xcessive reliance on glyphosate has spawned a growing epidemic of

5  glyphosate-resistant weeds."); 72, ¶ 19 (resistance causes significant extra expense for growers);

6  Exhs. 19, ¶5, and 70, ¶¶8 (increased use of herbicide) and 10 ("Herbicide-resistant weeds have

7  increased dramatically in recent years, due particularly to the expansion of Roundup-ready

8  crops…."). Glyphosate formulations include very toxic ingredients. Exh. 70, ¶6.

9  

10  Defendants have argued that "this time it will be different," but of course, that begs the

11  question of why Monsanto and farmers were unable to prevent epidemic weed resistance in any

12  previous RR crops. Defendants claim RRSB growers rotate their crops, such that RRSB would

13  not be grown more than once every several years, but sugar beet growers, like RR corn, soybean,

14  canola and cotton growers before them, will not observe stewardship measures to the extent

15  Defendants might like them to. Exh. 135 ("'Many American Crystal growers presently do not

16  place much emphasis on managing weed resistance,' according to Cattanach. 'Some will choose

17  other modes of action for herbicides in other crops; but this will not be a widespread practice,' he

18  suggests.") Sugar beet grower Snyder acknowledged he usually grows only two crops, sugar

19  beets and malt barley, with either crop grown two out of three years. 11/3/2010 Tr., 268:20-25;

20  269:1. RR corn and RR soybeans are commonly grown in rotation with RRSB, using the same

21  single herbicide, year after year. Exhs. 19, ¶¶42-45; 134. While Intervenors' experts advocate

22  tank mixes of additional herbicides to delay resistance, Exh. 72, ¶16, Mr. Snyder used only

23  Roundup on his RRSB. *Id.* 255:3-7. As he acknowledged, using the same herbicide year after

24  year leads to resistance. *Id.* 269:8-9. Weed resistance will develop in RRSB, just as it has in all

other RR crops.  Exhs. 71, ¶¶9-15; 19, ¶¶38-52; 72, ¶16 (two weeds common in sugar beet fields are already glyphosate tolerant).

Third, use of glyphosate on Roundup Ready crops make them more prone to developing serious crop diseases.  These problems affect not only the RR crop itself, but also other crops grown on the same field in subsequent years. Exh. 22, ¶3 (the glyphosate resistance gene in RR crops reduces the crop's absorption and utillization of micronutrients, increasing the severity and prevalence of plant diseases); ¶94 ("[T]here is now ample evidence that glyphosate can increase the incidence of disease, reduce yield and nutrient quality, reduce nutrient efficiency, and cause major changes in the soil microbiota affecting plant health and nutrient relationships"); ¶97 ("Increased application of glyphosate will not only impact the sugar beets, but it can also have deleterious consequences for other crops in rotation with sugar beets, taking potatoes as the first example.")

Fourth, monopolistic practices are contrary to the public interest in free competition. This is all the more so when the food supply is at stake, and the nation's commodity crops are under the control of an aggressively litigious patent holder. Exh. 121, at 25.  Almost immediately after RRSB came on the market, Intervenors began claiming (although they have never been able to prove it) that making conventional seed available was virtually impossible, and that the price of sugar surely would rise unless Monsanto and the other Intervenors have their way.  They continue to use threats of rising commodity prices as leverage to circumvent the law.  Concerns about Intervenor Monsanto's practices in marketing its Roundup Ready crops have been serious enough to prompt ongoing investigations by the Department of Justice and at least seven states.

The patent holders also exploit their position to limit research into the health and environmental effects of their crops, and limit publication of adverse studies.  Exhs. 17, ¶16

("Monsanto's consent is required for a researcher to publish his or her research in a peer-reviewed publication…."); 22, ¶¶15, 18, 29 (examples of Monsanto's restrictions on research into RR crops); 40 (public statement by 26 scientists protesting: "Technology/stewardship agreements required for the purchase of genetically modified seed explicitly prohibit research [and] inhibit public scientists from pursuing their mandated role on behalf of the public good unless the research is approved by industry," so that "no truly independent research can be legally conducted …."), 41 (report of statement); 42 (discussion of research restrictions).

Monsanto also is notorious for exploiting its patent to aggressively harass and prosecute small farmers whom it suspects of growing its crops, even when the farmer may not want the crop but has been contaminated.  Exh. 121 at 25 (Monsanto has a "department of 75 employees" and "an annual budget of $10 million for the sole purpose of investigating and prosecuting farmers for patent infringement.")

IV.   CONCLUSION

Intervenors' interests are simple.  Monsanto wants to sell patented seed, and maintain its grip on yet another of the nation's commodity crops.  The grower-processors want to grow the crop they consider most profitable.  These pecuniary interests will not be harmed in any cognizable way by issuance of an injunction, since RRSB is illegal, as all Intervenors well knew before they planted it. Any economic effects will be due to the crop's illegality, but in any case will be temporary.  Plaintiffs seek only to prevent likely irreparable harm to themselves, the public, and the public interest, and enforce Congress' unmistakable intent in enacting NEPA, which absent an injunction will become a charade.  Plaintiffs have met their burden for the relief they seek.

1  Respectfully submitted this 9th day of November, 2010.

2

3           GEORGE A. KIMBRELL (*Pro Hac Vice*)
            PAIGE M. TOMASELLI, State Bar No. 237737
4           KATERYNA L. RAKOWSKY, State Bar. No. 246248
            Center for Food Safety
5           2601 Mission St., Suite 803
            San Francisco, CA 94110
6           T: (415) 826-2770 / F: (415) 826-0507
            Emails: gkimbrell@icta.org
7                    ptomaselli@icta.org
                     kateryna@icta.org
8
                 /s/
9           _____
            PAUL H. ACHITOFF (*Pro Hac Vice*)
10          Earthjustice
            223 South King Street, Suite 400
11          Honolulu, Hawai'i 96813
            T: (808) 599-2436 / F: (808) 521-6841
12          Email: achitoff@earthjustice.org

13          *Counsel for Plaintiffs*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28